1  Mildred K. O'Linn, Esq. (State Bar No. 159055)
   MANNING & MARDER
2  KASS, ELLROD, RAMIREZ LLP
   15th Floor at 801 Tower
3  801 South Figueroa Street
   Los Angeles, CA 90017
4  Telephone: (213) 624-6900
   Facsimile: (213) 624-6999
5  mko@mmker.com

6  Attorneys for Defendant,
   TASER INTERNATIONAL, INC.
7
   Michael Brave, Esq.
8  Wisconsin State Bar No. 1012226
   National Litigation Counsel
9  TASER International, Inc.
   17800 North 85th Street, 3rd Floor
10 Scottsdale, AZ 85255-6311
   Telephone: (651) 248-2809
11 Facsimile: (480) 275-3291
   brave@laaw.com
12
   (Pro Hac Vice) Attorney for Defendant,
13 TASER INTERNATIONAL, INC.

14          UNITED STATES DISTRICT COURT

15          NORTHERN DISTRICT OF CALIFORNIA

16

17 ELVIRA TERAN, an individual;           ) Case No.: C 06-06947 JW
   STEPHANIE LIZAOLA, As Guardian Ad      )
18 Litem For: ANGELA ALYSSA TERAN, a      ) **DECLARATION OF MARK**
   minor child, JENNIFER LISETTE TERAN,   ) **W. KROLL, PhD, FACC,**
19 a minor child; and BRIANA ISABEL       ) **FHRS, IN SUPPORT OF:**
   TERAN, a minor child, JAIME TERAN      ) **1) DEFENDANT TASER**
20 CORONEL, DECEDENT, by and through      ) **INTERNATIONAL, INC.'S**
   his successor in interest, STEPHANIE   ) **MOTION FOR SUMMARY**
21 LIZAOLA                                ) **JUDGMENT AND/OR**
                                          ) **ADJUDICATION OF**
22          Plaintiffs,                   ) **ISSUES; AND 2)**
                                          ) **DEFENDANT TASER'S**
23 vs.                                    ) **MOTION TO EXCLUDE**
                                          ) **EXPERT OPINIONS AND**
24 COUNTY OF MONTEREY; MONTEREY           ) **TESTIMONY OF DR.**
   COUNTY SHERIFF'S DEPARTMENT;           ) **BYRON LEE, OR, IN THE**
25 TASER INTERNATIONAL, INC., An          ) **ALTERNATIVE, FOR**
   Arizona Corporation, AND DOES 1        ) *DAUBERT* **HEARING**
26 THROUGH 50, INCLUSIVE,                 )
                                          ) **Date:  2-9-09**
27          Defendants.                   ) **Time:  9:00 a.m.**
                                          ) **Ctrm.: 8**
28

                                        1

I, MARK W. KROLL, PhD, FACC, FHRS, declare as follows:

1.    I have personal knowledge of the facts and statements set forth in this declaration and, if called upon to testify, I could and would competently testify thereto.

2.    I have been designated as one of Defendant TASER International, Inc's ("TASER's") experts. I have invested most of my adult life researching and developing electrical devices to diagnose and treat disease. My primary scientific specialty is the effect of shocks on the human body. This investment has resulted in every ICD (Implantable Cardioverter Defibrillator) made anywhere in the world licensing some of my patented improvements. I research, lecture, and publish on electric shocks and their effects on the human body. I have lectured in over 30 countries as well as at the major universities and medical centers of the United States on this topic. With over 280 issued United States patents and numerous pending and international patents, I currently hold the most patents on electrical medical devices of anyone in the world. Over 1 million people have devices in their chests — made by licensees of my patents — monitoring every heartbeat and ready to give lifesaving therapy. I also currently hold the most cardiac device patents. I am an author on about 200 abstracts, papers, book chapters, and invited presentations. I am the co-author of 4 books: 1) Implantable-Cardioverter Defibrillator Therapy; 2) Cardiac Bioelectric Therapy; 3) TASER® Conducted Electrical Weapons: Physiology, Pathology and Law; and 4) Electrical Injuries: Medical and Bioengineering Aspects.

3.    Attached as Exhibit E is a true and correct copy of the report that I prepared in this case, dated May, 9, 2008. At the time I prepared this report, my memory of the information set out by me in the Report was still fresh and I had a clear recollection of that information. All of the information included in the Report is true and correct. I hereby incorporate all of the information set out in the Report into this declaration as though it were set out in full in this declaration. In my Report, I concluded that the Advanced TASER M26 Electronic Control Device had nothing to do with the death of the decedent, and that the most likely cause of death was due to excited delirium leading

to acidosis which led to the decedent's lethal cardiac rhythm of asystole (flat line).

4. Plaintiffs have designated Dr. Byron Lee ("Lee") as an expert in this case. In addition to the materials listed in my previous Report, I have reviewed plaintiffs' Expert Designation, the deposition transcript and deposition exhibits of Byron Lee, dated November 3, 2008, and Dr. Lee's Declaration, dated May 27, 2008.

5. Dr. Lee opined in his expert report that the TASER ECD caused a cardiac arrest in Mr. Coronel. It is important to remember two significant differences between this case and other recent cases where an ECD was alleged to contribute to a death: 1) The ECD was only used in the "drive-stun" mode in this case. Thus there was no probe penetration with its attendant deeper delivery of electrical current. No animal or human study has ever suggested a complication or deleterious effect from a drive-stun application. In fact, studies of the drive-stun mode have found no negative effects in either animals or humans.[1-5] This is a critical issue that Dr. Lee admits that he had not "really thought about" at the time he wrote his report; and 2) The ECD was only applied to the back of the right shoulder of Mr. Coronel. The few studies suggesting ECD complications were all done in swine and had probes inserted either across the chest or directly over the heart.[6-12]

6. Dr. Lee gave two potential means by which the ECD could have killed Mr. Coronel. These are: 1) Direct: By pacing his heart into a dangerous rhythm, and 2) Indirect: By causing excited delirium. However, in his deposition, Dr. Lee recanted theory #1 and could not support theory #2 as the excited delirium existed before the ECD application. In addition, he stated that he could not eliminate the cocaine and methamphetamine as the causes of the death. The following definitions apply in this case:

1) Sinus rhythm - actually, the good rhythm. Normal "sinus" rhythm means the heart is beating normally;

2) Fibrillation - chaotic electrical activity in which no pumping occurs. If found in the ventricle this is called ventricular fibrillation (VF) and the patient will die

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

unless promptly defibrillated with a strong shock;

3)    Tachycardia- literally "fast-heart." Often called "tachyarrhythmia." The term "tachycardia" includes VF along with other rhythms that are not relevant to Mr. Coronel. For example, survivors of previous heart attacks can have a tachycardia called a "monomorphic tachycardia.";

4)    Asystole- "flatline" rhythm with zero or almost zero electrical activity. Not inducible with electrical stimulation. Very common with excited delirium and drug overdose deaths;

5)    Primary asystole - asystole which causes the initial collapse of the patient. Patients with primary asystole can often be converted with drugs and CPR as was the case with Mr. Coronel; Terminal asystole - f a patient has been in VF, for example, for 15-45 minutes, the heart is irretrievably dead and there is no electrical signal at all. (An analogy is to the body temperature which slowly falls to room temperature after death.) Patients in terminal asystole cannot be converted into another rhythm.

6)    Cardiac capture - causing an extra heartbeat by electrical stimulation. Also called "pacing" as this is exactly what pacemakers are designed to do.

**Dr. Lee Recants His Primary Theory of How the TASER ECD Could Have Caused the Death of Mr. Coronel.**

7.    Dr. Lee recanted his primary theory of how the TASER ECD could have caused the death of Mr. Coronel. Dr Lee first opined in his expert report (2:5b): "Within reasonable medical certainty, cardiac arrest in Mr. Coronel was likely induced directly or indirectly by the Taser."  He went on to state (2:6): "The Taser could have directly caused cardiac arrest by pacing Mr. Coronel's heart into a dangerous ventricular tachyarrhythmia that degenerated into asystole, thereby causing Mr. Coronel's death. The medical literature shows that in the animal model, the Taser can cause ventricular fibrillation, a life-threatening arrhythmia, with rapid pacing of the heart." (Note that Dr. Lee is correctly referring to VF as the only relevant type of tachyarrhythmia.) However, in his deposition, Dr. Lee admitted that a drive-stun to the right shoulder could not have

an effect on the heart.

Q Will any degree of significant electricity in drive-stun mode, used in that manner, flow deeply into the body?

A No.

(Lee depo 39:7:-10. )

8. Dr. Lee cited a paper by Nanthakumar[12] suggesting that a swine heart might be negatively affected by an ECD:

Q Does the Nanthakumar paper support your opinion that a drive-stun to the back by a TASER device can put someone into or induce an arrhythmia?

A I think what the paper says is that the TASER, the energy in a TASER, can cause capture of the heart and ventricular fibrillation. *I haven't really thought about this issue that you mentioned here; this drive-stun versus barbs. I think that that is a reasonable thing to think about in this case.* So I would agree that that paper may not be perfectly applicable to this situation.

(Lee depo: 40:3-13, emphasis added).

9. The rhythm from electrocution is called ventricular fibrillation (VF) and that is the only rhythm expected by electrical current stimulation. The rhythm that Mr. Coronel had was asystole which is typical with drug overdoses. Lee testified in his deposition:

Q Is there any indication in the Coronel case that Mr. Coronel was ever in VF?

A There is no documentation that he was in VF.

Q So to a reasonable degree of certainty there is no documentation in this record that he was ever in ventricular fibrillation; correct?

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

23 A Correct.

(Lee depo:40:17-23.)

10.     Thus, Dr. Lee admits that Mr. Coronel did not have the rhythm seen in electrocution and suggested in his expert report, "The medical literature shows that in the animal model, the Taser can cause ventricular fibrillation, a life-threatening arrhythmia, with rapid pacing of the heart." (Lee Decl., ¶6.)

11.     Dr. Lee goes on to admit that neither a drive-stun nor a back application could cause cardiac pacing or VF.

Q Can you identify for me any paper anywhere that finds that a *drive-stun* (added italics) anywhere on the body can cause cardiac pacing or VF?

A No.

Q Would the chances of, or even the possibility that a TASER device in drive-stun is more likely or less likely to cause pacing or VF or any cardiac dysrhythmia when applied to the back in drive-stun as opposed to the chest?

A Repeat the question, please.

Q Can you identify for me any paper anywhere -- and we're comparing here is a drive-stun to the chest versus a drive-stun to the back -- that can show that the drive-stun to the back can cause pacing or cardiac arrest?

16 No.

(Lee depo:43: 1-16.)

12.     Lee then goes on to admit that this is only a "possibility."

Q So, therefore, if the Nanthakumar paper does not show that a TASER M26 in drive-stun to the back can cause pacing, VF, or a negative arrhythmia, then that, if it does not show it can do that then we can remove that from your list of support for your opinions in Section 4(e); correct?

6

A Well, I think that that's debatable. *I think you're right in pointing out a good point; that those papers were barbs and not drive-stun.* (Added italics.) On the other hand, it shows that the energy sent into the body via the TASER by the barbs can induce ventricular pacing and ventricular fibrillation. Now, I acknowledge that a drive-stun to the back is less likely to cause ventricular fibrillation or ventricular pacing because of where the electricity passes through the body. And an application in the back is further from the heart than possibly, you know, where the studies have shown ventricular pacing. But I think that that doesn't disprove that that's a possibility.

**Q First, however, it is only a possibility. You do not hold that opinion to a reasonable degree of medical or scientific certainty; correct?**
**A Yes**.

(Lee depo.:43:17- 44:15; emphasis added).

13.    Dr. Lee also admits that he did not know that the swine studies he cited used the higher net charge X26 and not the M26 used on Mr. Coronel.

Q You also, just to be clear, you said barbs as in we are talking about the Nanthakumar and other papers, those were in probe mode, not drive-stun; correct?

A I believe so.

Q And they were primarily X26 not M26; correct?

A That, I don't know.

(Lee depo.:44:16-22.)

14.    In fact, Dr. Lee was not even aware of the device that was used on Mr. Coronel.

Q J: "To a reasonable degree of medical and scientific certainty, can an ADVANCED TASER M26 induce or cause arrhythmia in a human?" And I did add in, "in a human."

A *I'm not familiar with the ADVANCED TASER M26.*

(Lee depo.:74:11-15.)

15.    Dr. Lee admits that it is "unlikely" that a drive-stun to the right shoulder could have any effect on the heart.

Q Are you telling me to a reasonable degree of medical scientific certainty that any of the electricity, any of the charge at all from a drive-stun to the back is going to go through 12 inches of body and have any delivery of charge to the heart?

A Yeah. I acknowledge that the amount of energy that would pass the heart is very much depreciated by 12 inches.

Q So to a reasonable degree of medical and scientific certainty, the TASER device drive-stun discharge to Mr. Coronel's back would not cause pacing, VF or a cardiac dysrhythmia; correct?

A I think it's unlikely.

Q And that's to a reasonable degree of medical scientific certainty?

A That's correct.

(Lee depo.:45:20-46:10.)

16.    Dr. Lee goes on to admit that none of the papers he cited supported the primary theory of his expert report.

Q The Lakkireddy paper also does not support the earlier opinion you gave me which is in 4(e); correct?

A Yes.

Q And that's to a reasonable degree of medical and scientific certainty?

A Yes.

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

(Lee depo.:47:9-15.)

17.     Later, Dr. Lee admits the same problem with the another paper he cited.

Q To a reasonable degree of medical and scientific certainty, the entire line

of Wu, et al. papers does not support your original opinion in 4(e); correct?

A Correct.

(Lee depo.: 48:15-19.)

18.     Dr. Lee finally admits that none of the papers he first cited support his
primary theory.

Q And I personally don't believe that any of these support the conclusion.

All I'm trying to do is verify that on the record in as unambiguous a way as

I possibly can.

A So, let me tell you what I think. I think you're right, that drive-stun was

not used in these papers. In my recollection of these papers it was by using

the barbs and the barbs across the chest. These papers showed that in the

first two that the ventricular myocardial could be captured, and the last two

that ventricular fibrillation could be reduced. The first two papers indicate

that ventricular myocardium could be captured, and the last two papers

indicated that the ventricular fibrillation could be induced. I acknowledge

that. *Because these papers looked at the barbs, it isn't perfectly*

*supportable; it doesn't perfectly support that drive-stun application --*

*which is a different way of applying the TASER -- induce an arrhythmia.*

(Lee depo:49:18- 50:11; emphasis added).

19.     Dr. Lee finally admitted that the TASER device applied in drive-stun mode

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

to Mr. Coronel did not have a negative effect on his heart, either through pacing, ventricular fibrillation or any other way, as shown by the following deposition excerpts:

Q So as you sit here today, do you believe to a reasonable degree of medical and scientific certainty that an ECD drive-stun application to the back, such as in the Coronel case, can induce an arrhythmia?

A I believe that a drive-stun application, I believe that a drive-stun application to the back, on the right shoulder, is less likely to induce a cardiac arrhythmia than a TASER application from the barbs across the chest.

Q To a reasonable degree of medical and scientific certainty, does a TASER induce cardiac pacing? That's a yes or no question.

A I don't know.

Q As you sit here today, can you say to a reasonable degree of medical and scientific certainty that a TASER device drive-stun to the shoulder of Mr. Coronel induced cardiac pacing in Mr. Coronel?

A Can you repeat the question?

Q As you sit here today, can you state to a reasonable degree of medical and scientific certainty that the drive-stun applications of the TASER device to Mr. Coronel's back induced cardiac pacing in Mr. Coronel?

A *So, if the drive-stun pacing or drive-stun application was to his right shoulder, I would acknowledge that it would be unlikely for it to capture mild cardiac myocardium and unlikely to induce ventricular fibrillation.* (Lee depo.:50:18 - 51:20.)

Q Did the TASER cause cardiac pacing in Mr. Coronel to a reasonable degree of certainty?

A *As I said, the TASER to the back and in the drive-stun mode is unlikely to capture ventricular myocardium and cause ventricular fibrillation.*

Q And to a reasonable degree of medical and scientific certainty, it did not do so with Mr. Coronel in this case; it did not capture his heart, pace his heart or reach the myocardium. Correct?

A *It's unlikely.*

(Lee depo.: 53:15-24; emphasis added.)

Q To a reasonable degree of medical and scientific certainty, did the TASER device applied in drive-stun mode to Mr. Coronel have a negative effect on his heart, either through pacing, ventricular fibrillation or any other way?

A Okay. No.

(Lee depo.:55:9-14.)

Q Back to Exhibit 1, 4(f): "An ECD application to the shoulders or back could induce an arrhythmia." I think we have already clarified this, but I have to make certain. As you sit here today, to a reasonable degree of medical or scientific certainty or probability, a TASER ECD application to the shoulders cannot induce an arrhythmia; correct?

A I don't know.

Q But as you sit here today, to a reasonable degree of medical and scientific certainty, you are not saying that it can; correct?

A I'm saying it's unlikely. And I, and I, and I think back to when we had this conversation before we had our break. And again, like I said, I don't feel comfortable with how you phrase things. And I'm trying my best to answer your questions. And I think that what I can say is that an ECD application to the shoulder or back is unlikely to cause a cardiac arrhythmia because it is far away from the heart muscle. And, you know, I don't know how to put it in your form.

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

Q And to a reasonable degree of medical and scientific certainty, the TASER electronic control device applied to Mr. Coronel's right shoulder did not induce an arrhythmia, correct, in Mr. Coronel?

A It is unlikely.

(Lee depo:70:17-71:18.)

Q First one. In this case, to a reasonable degree of medical and scientific certainty or probability, did the TASER M26 cause Mr. Coronel to experience cardiac pacing, VF or any other negative cardiac effect? I'm indirectly responding to your No. 1 defect. Did it occur to reasonable degree of certainty and probability in this case?

A So, it seems unlikely that in this case ventricular pacing of the heart was the mechanism of his death.

(Lee depo.:122:14-24.)

20.    Thus, by his own deposition testimony, Dr. Lee completely recanted the primary theory from his expert report of how the TASER ECD could have caused the death of Mr. Coronel.

**Dr. Lee Fails to Support His Secondary Theory That the TASER ECD "Caused" the Excited Delirium in Mr. Coronel.**

21.    The consensus of the defense experts is that Mr. Coronel died from excited delirium. Attached as Exhibits F, G, H, I, J, and K are true and correct copies of the expert reports of Dorin Panescu, Ph.D., Deborah C. Mash, M.D., Michael Graham, M.D., Michael A. Evans, Ph.D., Donald Dawes, M.D., and Dr. John G. Peters. This general consensus is part of the basis of my opinion that the Advanced TASER M26 Electronic Control Device had nothing to do with the death of the decedent, and that the most likely cause of death was due to excited delirium leading to acidosis which led to the decedent's lethal cardiac rhythm of asystole (flat line). In his deposition, Dr. Lee

admitted that excited delirium is the cause of death. However, Dr. Lee attempts to link the excited delirium to the ECD usage — a speculative theory that has never been suggested in any scientific papers or even previous plaintiff's expert reports in other excited delirium cases. Since the primary cause of excited delirium is the abuse of illegal stimulants, the acceptance of this creative theory requires one, logically, to believe that the use of a TASER ECD promotes the use of illegal stimulants.

Dr. Lee admitted he is not an expert on excited delirium.

Q Are you an expert in excited delirium?

A No.

Q Are you an expert in Excited Delirium Syndrome?

A No. I don't know who is an expert on Exited Delirium Syndrome. It's a syndrome that is not well defined and very little is known about it.

Q Can you name any books that specifically include significant information on excited delirium or Exited Delirium Syndrome?

A No.

[Note: Excited delirium is discussed in textbooks from the 1800's up to the 2006 book, "Excited Delirium Syndrome" by DiMaio and DiMaio.]

Q Can you name any peer reviewed articles that discuss excited delirium or Exited Delirium Syndrome?

A I cannot name any specific articles offhand, but I can tell you that I've read several articles about excited delirium.

Q Who are the authors?

A I don't recall.

(Lee depo.: 75:9 -76:2.)

22.     Later, Dr. Lee directly contradicts his implication that there are no experts in excited delirium.

Q Which conference was it?

1   A I think it was a Sudden Death -- In Custody Sudden Death conference in

2   Las Vegas that I attended.

3   Q Did you consider at least most of the speakers there to be experts in excited

4   delirium and/or Excited Delirium Syndrome?

5   A Yes.

6   Q At that conference, did those people you considered to be experts discuss

7   the behavioral queues of excited delirium and/or Exited Delirium

8   Syndrome?

9   A I believe so.

10  (Lee depo.:84:9- 85:5.)

11

12  23.    Dr. Lee admits that his theory of the ECD causing the excited delirium is

13  only a "possibility."

14  Q Your quote states that, "The TASER ECD could have indirectly caused

15  cardiac arrest by triggering excited delirium." Right?

16  A Uh-hum.

17  Q To a reasonable degree of medical and scientific certainly as you sit here

18  today, did the TASER ECD, as used on Mr. Coronel, to a reasonable

19  degree of medical and scientific certainty or probability trigger excited

20  delirium in Mr. Coronel?

21  A I believe it could have.

22  Q So, therefore, it's a possibility?

23  A That's right.

24  (Lee depo:76:10-21.)

25

26  24.    Realizing that this is his only remaining causation theory, Dr Lee then

27  attempts to retract his statement:

28  Q You're not saying to a reasonable degree of medical scientific certainly

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

1    or probably it did; correct?

2    A I think it did. I think it probably contributed to excited delirium. If that

3    was the mode of death.

4    Q Here's the question.

5    A Okay.

6    Q To a reasonable degree of medical scientific certainty, did the TASER

7    device application trigger excited delirium in Mr. Coronel?

8    A So, I don't know if I can answer that question as specifically as you ask

9    it. Excited deliriums, as we talked about, is a very ill-defined syndrome that

10   causes death in situations like this. *And it's hard to say that, with a medical*

11   *certainty, that the TASER was the cause.* (Italics added.) But on the other

12   hand, in my opinion, it seemed likely that it was a contributor to the

13   potential for excited delirium. And I think that the mode of death, the

14   description of how he died suggested that excited deliriums could have

15   been the mechanism.

16   Q Again you said, "could have." To a reasonable degree of medical and

17   scientific certainty or probably, did the TASER device application to Mr.

18   Coronel trigger his excited delirium?

19   A I think that it was likely to increase the risk of excited delirium in him.

20   (Lee depo.: 76:22-77:25.)

21

22   25.     Concordant with the defense experts, Dr. Lee admits that Mr. Coronel had

23   excited delirium and that it was the most likely cause of death.

24   Q Therefore, you are not saying to a reasonable degree of medical and

25   scientific certainty or probability that he had excited delirium on the night

26   of the event; correct?

27   A No, that's not correct. *When I look at this case I think that the most likely*

28   *mode of death was excited deliriums.*

Q So, therefore, to a reasonable degree of medical and scientific certainty you're saying he did have excited delirium?

A Yes.

Q You're also saying to a reasonable degree of medical and scientific certainty or probability that he died because of the excited delirium?

A Yes.

(Lee depo:78:24-79:13, emphasis added.)

26.    Dr. Lee cannot find any sign of excited delirium that was not present *before* the ECD was applied which completely defeats his causation theory. Dr. Lee lists the common signs of excited delirium.

Q I'll rephrase the question. First, what do you mean by excited delirium?

A My understanding and my definition of excited deliriums is a syndrome where people in custody die of sudden death. And there are certain features of excited deliriums that are common. One is that the person had been taking drugs like cocaine or methamphetamine, stimulant drugs like that that predisposes people to it. Victims or people who have excited deliriums, there is a common thread that a lot of them have been restrained and held down. And another common thread is that they are exhibiting superhuman strength in fighting the police. And a common thread is that they are feeling threatened and anxious. And then moments after these folks are subdued they suddenly stop resisting arrest and they have sudden death.

Q Anything else?

A No.

Q How many of these did Mr. Coronel exhibit before the TASER device was used on him? A He exhibited, I think, each of those characteristics.

Q Some he exhibited all of them before the TASER was used; correct?

16

1    A That's correct.

2    (Lee depo.:86:19-89:3.)

3    Thus, Dr. Lee admits that the excited delirium existed before the TASER ECD

4    was applied.

5    27.    Finally, Dr. Lee admits that the ECD used in this case did not cause

6    acidosis leading to excited delirium.

7    Q And you're not saying to a reasonable degree of medical and scientific

8    certainty or probability that the TASER device caused acidosis which led

9    to excited delirium?

10   A That's correct. I agree.

11   (Lee depo.:100:21-25.)

12   28.    Dr. Lee admits that there is no evidence that ECD usage increases the risk

13   of death with excited delirium.

14   Q How do you know there is no reduced risk of mortality in the use of an

15   electronic control device on somebody experiencing excited delirium?

16   A Well, I guess if you --

17   Q To a reasonable degree of medical scientific certainty. Not possibility,

18   not conjecture, not maybe. To a reasonable degree of medical and scientific

19   certainty.

20   A I only have conjecture.

21   (Lee depo.:184:8-16.)

22

23   **Dr. Lee Admits That Cocaine and Methamphetamine Were More Likely the**

24   **Cause of Death than the TASER ECD.**

25   29.    Dr. Lee admitted he did not know the degree the TASER ECD played in

26   the total exertion leading to the excited delirium death of Mr. Coronel.

27   Q But you can't tell me to what factors or degree or contribution, to a

28   reasonable degree of medical and scientific certainty or probability, the

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

1  TASER played in the total exertion leading to the excited delirium death

2  of Mr. Coronel; correct?

3  A No, I can't tell you the degree.

4  Q Could it have been as little as 1 percent?

5  A I don't think anybody can know. So I think it's possible.

6  Q Could it have been as low as 1/1000th of 1 percent?

7  A I don't know. That would be speculation. I don't know. I don't know how

8  to quantify this.

9  (Lee depo.:108:16- 109:3.)

10

11  Q Thus, you cannot say to a reasonable degree of medical or scientific

12  certainty or probability if even the alleged contribution of the TASER

13  device to Mr. Coronel's death was a low as 1 billionth of 1 percent? You

14  can't say; can you?

15  MR. LIBERTY: No foundation. Calls for speculation.

16  BY MR. BRAVE: Q You can't say?

17  A I can't say. I can't say.

18  (Lee depo:110:8-17.)

19

20  Q And you also do not know to a reasonable degree of medical and

21  scientific certainty or probability what degree or contribution to the stress

22  the TASER device application played on Mr. Coronel either; do you?

23  A I agree.

24  (Lee depo.:126:20-25.)

25

26  30.     Dr. Lee admitted that the methamphetamine or cocaine could have been the

27  cause of death.

28  Q In this case, can you state to a reasonable degree of medical or scientific

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

certainty or probability that Mr. Coronel did not die because of the
methamphetamine?

A No.

Q Same question with the cocaine?

A No.

(Lee depo.:172:3-9.)

31.    Dr. Lee cannot state that the TASER ECD is what killed Mr. Coronel.

Q Are you saying to a reasonable degree of medical and scientific and
professional certainty and probability that if the TASER had not been used
on Mr. Coronel that he would have lived?

MR. LIBERTY: Same objection.

THE WITNESS: No.

(Lee depo.:177:2-7.)

32.    Dr. Lee admits that he does not know if the methampetamine levels in Mr.
Coronel were higher than the median lethal level. (They were, in fact, 250% of the
median lethal level. Logan BK, Fligner CL, Haddix T. Cause and manner of death in
fatalities involving methamphetamine. J Forensic Sci 1998;43:28-34.)

Q Based upon the amount of methamphetamine that was measured in Mr.
Coronel after this incident, how many times was that from the median
lethal dose of the current literature?

A I don't know.

Q Isn't that something you might find important?

A "Might find important?" Um –

(Lee depo.:188:18-25.)

33.    Dr. Lee repeats that the methamphetamine or cocaine could have been the

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd

1  cause of death.

2      Q    So as you sit here today, to a reasonable degree of medical and

3  scientific certainty, can you state that the Mr. Coronel did not die from the

4  methamphetamine?

5      A  No.

6      Q  To a reasonable degree of medical and scientific certainty and

7  probability as you sit here today, can you say that Mr. Coronel did not die

8  from the cocaine in his system?

9      A  No. (Lee depo.:191:22-192:6.)

10     34.    Finally, Dr. Lee does not really know if the TASER ECD killed Mr.

11 Coronel.

12     Q  As you sit here today, to a reasonable degree of medical scientific

13 certainty or professionalism or probability, can you say that Mr. Coronel

14 would have survived and lived had the TASER device not been used on

15 him on the day of this incident?

16     A  I don't know.

17     Q  So that's a no?

18     A  That's I don't know.

19     Q  You can't say that?

20     A  I have to answer yes or no?

21     Q  Yes.

22     MR. LIBERTY: You can answer yes or no or I don't know. That's entirely

23 acceptable.

24     THE WITNESS: I said I don't know.

25     BY MR. BRAVE: Q  Shorten this to the barest possible 3 essentials. You

26 cannot say Coronel would have lived had the TASER device not been

27 used; right?

28     MR. LIBERTY: Asked and answered.

THE WITNESS: I don't know.

BY MR. BRAVE: Q I'm curious as to how -- you stated definitive nos on methamphetamine and coke. Now we are talking about TASER devices, you're saying "I don't know."

A I should have said I don't know for all those. I'm not used to having these long questions and I'm not used to being forced to answer yes or no. I thought that it was a requirement for me to answer yes or no. But in retrospect, knowing that I can answer I don't know, then I think several of the questions you asked me just now, and previously, I would say I don't know. I don't know what exactly -- (Lee depo.:192:12-193:20.)

35.    The references I used in support of this Declaration are as follows:

**1.** Lakkireddy D, Kroll M, Swerdlow C, Tchou P. Cardiovascular Effects of Conductive Electrical Weapons (TASER®): Is Drive Stun worse than the Barbed Application? . *Europace Cardiostim Abstract Issue* 2008.

**2.** Ho J, Dawes D, Reardon R, Moscati R, Gardner R, Miner J. Cardiac and Diaphragm ECHO Evaluation During TASER Device Drive Stun. *Australian Emergency Medicine Conference* 2008.

**3.** Valentino DJ, Walter RJ, Dennis AJ, Nagy K, Loor MM, Winners J, Bokhari F, Wiley D, Merchant A, Joseph K, Roberts R. Acute effects of MK63 stun device discharges in miniature swine. *Mil Med* 2008;173:167-73.

**4.** Valentino DJ, Walter RJ, Nagy K, Dennis AJ, Winners J, Bokhari F, Wiley D, Joseph KT, Roberts R. Repeated thoracic discharges from a stun device. *J Trauma* 2007;62:1134-42.

**5.** Valentino DJ, Walter RJ, Dennis AJ, Nagy K, Loor MM, Winners J, Bokhari F, Wiley D, Merchant A, Joseph K, Roberts R. Neuromuscular effects of stun device discharges. *J Surg Res* 2007;143:78-87.

**6.** Dennis AJ, Valentino DJ, Walter RJ, Nagy KK, Winners J, Bokhari F, Wiley DE, Joseph KT, Roberts RR. Acute effects of TASER X26 discharges in a swine model.

*J Trauma* 2007;63:581-90.

**7.** Jauchem JR, Cook MC, Beason CW. Blood factors of Sus scrofa following a series of three TASER(®) electronic control device exposures. *Forensic Sci Int* 2007.

**8.** Jauchem JR, Sherry CJ, Fines DA, Cook MC. Acidosis, lactate, electrolytes, muscle enzymes, and other factors in the blood of Sus scrofa following repeated TASER exposures. *Forensic Sci Int* 2006;161:20-30.

**9.** Walter RJ, Dennis AJ, Valentino DJ, Margeta B, Nagy KK, Bokhari F, Wiley DE, Joseph KT, Roberts RR. TASER X26 discharges in swine produce potentially fatal ventricular arrhythmias. *Acad Emerg Med* 2008;15:66-73.

**10.** Wu J, Sun H, O'Rourke A, Huebner S, Rahko P, Will J, Webster J. Taser Dart-to-Heart Distance That Causes Ventricular Fibrillation in Pigs. *IEEE TRANSACTIONS ON BIOMEDICAL ENGINEERING,* 2007;54:503-508.

**11.** Wu J, Sun H, O'Rourke A, Huebner S, Rahko P, Will J, Webster J. Taser blunt dart-to-heart distance causing ventricular fibrillation in pigs. *IEEE Transactions on Biomedical Engineering* 2009:in press.

**12.** Nanthakumar K, Billingsley IM, Masse S, Dorian P, Cameron D, Chauhan VS, Downar E, Sevaptsidis E. Cardiac electrophysiological consequences of neuromuscular incapacitating device discharges. *J Am Coll Cardiol* 2006;48:798-804.

I declare under penalty of perjury of the laws of the State of California, United States, that the foregoing is true and correct.

Executed this 31 day of December, 2008, at Orono, Minnesota.

MARK W. KROLL, PhD, FACC, FHRS

G:\docsdata\MKO\Teran\Pleadings\MSJ\Kroll Decl.002.wpd