# EXHIBIT F

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | | |
|---|---|---|
| ELVIRA TERAN;<br>STEPHANIE LIZAOLA,<br>AS GUARDIAN AD LITEM FOR:<br>ANGELA ALYSSA TERAN, A MINOR CHILD<br>JENNIFER LISETTE TERAN, A MINOR CHILD)<br>AND BRIANA ISABEL TERAN, A MINOR<br>CHILD, ET AL.,<br><br>    Plaintiffs,<br><br>    vs.<br><br>COUNTY OF MONTEREY;<br>COUNTY OF MONTEREY SHERIFF'S<br>DEPARTMENT;<br>MICHAEL KANALAKIS; BRANDON SMITH;<br>WARREN SANO; MIKE DARLINGTON:<br>BENJAMIN PAYTON; BRIAN HOSKINS<br>EMILY HOWLETT;<br>TASER INTERNATIONAL, INC. An<br>Arizona Corporation<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. C 06-06947 JW<br><br>Hon. James Ware |

## Expert Report: Dorin Panescu, Ph.D.

Pursuant to Fed. R. Civ. P. 26(a)(2), I, Dorin Panescu, Ph.D. hereby submit my report that contains a complete statement of all opinions to be expressed and the bases and reasons therefore; the data and other information I considered in forming the opinions; the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

*(signature)*

---
Dorin Panescu, Ph.D.

May 14, 2008

---
Date

243

# 1. Introduction and Summary of Findings

## 1.1 Intent of the report and Dr. Dorin Panescu's credentials

The intent of my report is to provide opinions regarding to the probable distribution of electrical currents produced by TASER®[1] electronic control devices (ECDs or devices) in the human body and whether TASER electrical currents could have had a causal role in the death of Mr. Jaime Teran Coronel.

Throughout my 20-year career, I have conducted research, developed, invented and published about medical electrical devices, particularly cardiac devices. Appendix A includes a copy of my Curriculum Vitae, summarizing my education, experience, patents and publications.

## 1.2 Summary of Findings

After reviewing the evidence presented in Section 2, I found that:

1.2.1 The Advanced TASER M26 device generates significantly less charge and energy than other medical devices, such as external defibrillators and ablation radio-frequency (RF) generators, which are approved and deemed safe for medical use.

1.2.2 The charge carried by the first, also the highest, current peak of the M26 TASER device is, by a wide margin, significantly below charge-based thresholds known to be capable of inducing ventricular fibrillation.

1.2.3 When applied to the right shoulder or to any back areas of the body, only non-dangerous fractions, if any, of the voltage, current and charge generated by the M26 TASER reach the heart.

1.2.4 To restrain him and to prevent his rolling off the roof, officers were forced to expose Mr. Coronel to several TASER ECD applications. Per officers' testimony, although TASER ECD applications were ultimately effective in subduing Mr. Coronel he continued his physical fight with officers after the end of each TASER ECD cycle. Evidence shows that he continued his physical struggle for more than several minutes after the last TASER ECD trigger pull. Even after he was handcuffed, Mr. Coronel continued being physically aggressive.

1.2.5 It has been determined by medical investigators that prior to his confrontation with police officers, Mr. Coronel had self-intoxicated with toxic dosages of methamphetamine and d-amphetamine and cocaine metabolites (benzoylecognine and ecognine). Methamphetamine can cause arrhythmia and ventricular fibrillation similar to symptoms experienced during a heart attack Cocaine overdose is a highly probable cause of cardiac tachycardias, including pulseless electrical activity, asystole, ventricular fibrillation, and respiratory failure.

1.2.6 After being exposed to discharges from the second TASER device, Mr. Coronel had the strength to kicki his legs toward Deputy Smith. Consequently, as officers were concerned that Mr. Coronel could hurt himself or the officers, leg irons were applied. Based on the sequence of events and on officers' depositions, the process of bringing the leg irons to the

---

[1] AIR TASER, M26, and X26 are trademarks of TASER International, Inc. TASER® and ADVANCED TASER® are registered trademarks of TASER International, Inc.

scene took at least several minutes. After the leg irons were applied, Mr. Coronel was lowered to the ground from the rooftop. Once on the ground, only at that time Mr. Coronel was confirmed to be unresponsive. Based on the sequence of events above, the time difference between the last TASER discharge and the confirmation of Mr. Coronel's lack of responsiveness was at least five minutes, if not significantly longer.

1.2.7 Thomas Jenkins, M.D., Deputy Coroner Monterrey County opined that Mr. Coronel died because of anoxic encephalopathy due to cardiorespiratory arrest due to acute methamphetamine and cocaine intoxication. His report indicates TASER applications as contributing conditions. However, as it will be explained by this report, his statement related to TASER application cannot be substantiated scientifically. Furthermore, I was not able to find any citation of evidence in Dr. Jenkins' report that he used, discovered or referred to that would explain scientifically or medically why TASER applications would have contributed to Mr. Coronel's cardiorespiratory arrest. Dr. Jenkins found that Mr. Coronel's heart weighed 390 g and was mildly dilated. Mr. Coronel's lung bronchi were covered by thin purulent exudates, whereas the long tissue had severe anthracosis and vascular congestion. Dilated heart and fluid loaded or congested lung may be a sign of congestive heart failure and of pulmonary edema. Patients affected of heart failure are more prone to experience cardiac arrhythmias.

1.2.8 Mr. Coronel's toxicology report measured abnormally high blood concentration of methamphetamine, d-amphetamine and cocaine metabolites (benzoylecognine and ecognine). Methamphetamine was measured at 1.02 mg/l, amphetamine at 0.28 mg/l and cocaine and benzoylecognine at 4.72 mg/l. The toxicology lab listed the following ranges as potentially toxic: 0.2 –0.6 mg/l for methamphetamine, 0.2 – 3mg/l for amphetamine and 1 – 10 mg/l benzoylecognine. Methamphetamine concentrations of over 1 mg/l have been reported to have lethal potential. Mr. Coronel's methamphetamine level was above the toxicology lab's toxic range and above potentially lethal thresholds. Mr. Coronel's amphetamine concentration was within the lab's toxic range. Mr. Coronel's cocaine metabolite concentration was well within the lab's toxic range and higher than dosages reported to be potentially lethal.

1.2.9 Cocaine increases blood pressure and the heart rate, constricting the coronary arteries. As a result, heart attack may ensue. The toxic effects of cocaine overdose has on the heart muscle may prevent normal propagation of cardiac signals. As such, inhomogeneous refractory period patterns may develop, which, in turn, represent a good substrate for triggering and maintaining either slow or fast ventricular arrhythmias. Pulseless electrical activity and asystole are common results of cocaine abuse. Also a result of cocaine abuse, ventricular tachycardias may degenerate into ventricular fibrillation (VF).

1.2.10 The concept of delayed ventricular fibrillation following electrical excitation is not backed by any scientific evidence. To the contrary, long-term follow-up studies report the lack of delayed VF or dangerous arrhythmias.

1.2.11 The overall VF risk profile of TASER devices is significantly lower than VF probabilities accepted by EN 60601-1, a widely used international standard that stipulates general safety requirements to be met by electrical medical devices, including those in direct contact with the heart.

1.2.12 Among other claims, plaintiffs' claimed that:
- TASER devices directly caused injury and death to Mr. Coronel.
- The design of TASER devices was negligent, resulting in Mr. Coronel's injury and death.

- TASER International, Inc. (TASER) in its marketing materials, did not call attention to the risk of using TASER devices.

## 2. Evidence of Materials Considered

In preparing this report, I have considered the following references and evidence:

1. First Amended Complaint for Damages for Wrongful Death and Survival Action, Jury Trial Demanded, filed October 22, 2007
2. Deposition of Deputy Brandon Smith, February 26, 2008
3. Deposition of Deputy Benjamin Payton, February 21, 2008
4. Deposition of Deputy Bryan Hoskins, February 25, 2008
5. Deposition of Sergeant Denis Greathead, October 2, 2007
6. Deposition of Deputy Michael Darlington, October 1, 2007
7. Teran v. County of Monterey, et al. - Investigative Documents Binder, Volume One:
8. Coroner's Report
9. Internal Affairs Investigation - Case IA #06-08
10. Teran v. County of Monterey, et al. – Investigative Documents Binder, Volume Two:
11. Salinas Valley Memorial Hospital Medical Records of Jaime Coronel
12. Teran v. County of Monterey, et al. – Investigative Documents Binder, Volume Three:
13. Salinas Valley Memorial Hospital – Statement of Account
14. Westmed Ambulance Inc. – Statement of Account
15. Death Certificate
16. Police Records
17. News Articles, and
18. Teran v. County of Monterrey, et al. – Investigative Documents Binder, Volume Four:
19. Salinas Valley Memorial Hospital Medical Records of Jaime Coronel
20. Subpoenas and other legal documents
21. TASER International, *Advanced TASER: M26 Specifications*. 2005.
22. TASER International, *Advanced TASER: M-Series Operating Manual*. 2005.
23. TASER International, *Advanced TASER: M26 Brochure*. 2005.
24. W. McDaniel, R. A. Stratbucker, M. Nerheim, and J. E. Brewer, "Cardiac safety of neuromuscular incapacitating defensive devices," *PACE*, vol. 28, pp. S1-S4, 2004.
25. W. McDaniel, R. A. Stratbucker, and R. W. Smith, "Surface application of Taser stun guns does not cause ventricular fibrillation in canines," *Proc. IEEE-EMBS Ann. Intl. Conf.*, 2000.
26. Stratbucker RA, Kroll MW, McDaniel W, Panescu D, "Cardiac current density distribution by electrical pulses from TASER devices", Conf Proc IEEE Eng Med Biol Soc. 2006;1:6305-7.
27. Panescu D, Kroll MW, Efimov IR, Sweeney JD, "Finite element modeling of electric field effects of TASER devices on nerve and muscle.", Conf Proc IEEE Eng Med Biol Soc. 2006;1: 1277-9.
28. D. Panescu, J. G. Webster, W. J. Tompkins and R. A. Stratbucker, "Optimization of cardiac defibrillation by three-dimensional finite element modeling of the human thorax," *IEEE Trans. Biomed. Eng.*, vol. 42, no. 2, pp. 185–192, 1995.

246

29   G. Koning, "Strength-duration curves for direct ventricular defibrillation with rectangular current pulses," *Proc. Cardiac Defib. Conf.*, pp. 75-80, Purdue University, West Lafayette, IN, 1975.

30   Zoll Medical Corporation, PD 1200 Cardiac Defibrillator, http://www.zoll.com

31   Boston Scientific Corporation, EPT 1000 XP Cardiac Ablation RF Generator, www.bostonscientific.com

32   Boston Scientific Corporation, RF 3000 Hepatic Ablation RF Generator, www.bostonscientific.com

33   D. Panescu, J. G. Webster, W. J. Tompkins and R. A. Stratbucker, "Optimization of transcutaneous cardiac pacing by three-dimensional finite element modeling of the human thorax," *Med. Biol. Eng. Comput.*, vol. 33, no. 6, pp. 769-775, 1995.

34   D. Panescu, J. G. Webster and R. A. Stratbucker, "Modeling current density distribution during transcutaneous cardiac pacing," *IEEE Trans. Biomed. Eng.*, vol. 41, no. 6, pp. 549–555, 1994.

35   O. C. Deale and B. B. Lerman, "Intrathoracic current flow during transthoracic defibrillation in dogs," *Circ. Res.*, vol. 67, no. 6, pp. 1405-1419, 1990.

36   International Electrotechnical Commission (IEC), Effects of Current on Human Beingsand Livestock, *CEI/IEC 479-1: General Aspects*, 3rd Edition, IEC, Geneva, Switzerland, 1994.

37   International Electrotechnical Commission (IEC), Effects of Current on Human Beingsand Livestock, *CEI/IEC 479-2: Effects of currents passing through the human body*, 2nd Edition, IEC, Geneva, Switzerland, 1987.

38   Baselt, R C. Disposition of Toxic Drugs and Chemicals in Man, Second Edition. Davis, Calif.: Biomedical Publications, 1982.

39   National Drug Intelligence Center, *California Central District Drug Threat Assessment*, May 2001

40   Lynn Barkley Burnett and Jonathan Adler, "Toxicity, Cocaine", http://www.emedicine.com/EMERG/topic102.htm April 18, 2006.

41   Carlos J Roldan and Rania Habal, "Toxicity, Cocaine", http://www.emedicine.com/med/topic400.htm Sept 22, 2006.

42   Theresa Di Maio and Vincent J. M. Di Maio, *Excited Delirium Syndrome: Cause of Death and Prevention*, CRC Press, 2005 (ISBN 0849316111).

43   Park KS, Korn CS, Henderson SO. Agitated delirium and sudden death: two case. reports. Prehosp Emerg Care 2001;5(2):214–216.

44   Isenschmid DS: Cocaine — Effects on human performance and behavior; Forensic Sci Rev 14:61; 2002.

45   Hypertrophic cardiomyopathy, Medical Encyclopedia: http://www.nlm.nih.gov/medlineplus/ency/article/000192.htm

46   Vibhuti N Singh and Jeffrey A Miller, "Congestive Heart Failure", http://www.emedicine.com/radio/topic189.htm April 20, 2006.

47   L.A. Geddes and L.E. Baker: 'Principles of Applied Biomedical Instrumentation', 3rd ed., John Wiley & Sons, New York, pp. 460, 1989.

48   H. Sun, J.-Y. Wu, R. Abdallah, and J. G. Webster, "Electromuscular incapacitating device safety," *Proc. IFMBE*, vol. 11(1)., 3rd EMBE Conference, Prague, 2005.

49   D. J. Lakkireddy, W. Kowalewski, D. W. Wallick, A. Verma, D. O. Martin, K. Ryschon, J. Butany, A. Natale and P. J. Tchou, "Cardiovascular safety profile of electrical guns (TASER): Impact of point of delivery on ventricular fibrillation thresholds," *Heart Rhythm*, vol. 3(5)., pp. S249, 2006.

50    N. Blackwell and J. Hayllar, "A three year prospective audit of 212 presentations to the emergency department after electrical injury with a management protocol," *Postgrad. Med. J.*, vol. 78, pp. 283-285, 2002.

51    TASER International, "Facts." Available at: http://www.taser.com/facts/index.htm

52    BSI British Standards. BS EN 60601-1:2006 Medical electrical equipment. General requirements for basic safety and essential performance. 2006.

53    http://en.wikipedia.org/wiki/Methamphetamine

54    Methamphetamine, National Drug Intelligence Center, California Central District Drug Threat Assessment: http://www.usdoj.gov/ndic/pubs0/668/meth.htm

55    B. K. Logan, "Stimulants and driving impairment," Forensic Laboratory Services Bureau, Washington State Patrol, 2004, www.icadts.org/T2004/pdfs/197.pdf

56    The effects of high-dose methamphetamine in the aging rat: differential reinforcement of low-rate 72-s schedule behavior and neurochemistry. Available at: http://www.ncbi.nlm.nih.gov/pubmed/10945833

57    Cardiotoxicity associated with methamphetamine use and signs of cardiovascular pathology among methamphetamine users. Available at: http://ndarc.med.unsw.edu.au/ndarcweb.nsf/resources/tres_1/$file/tr.es238.pdf

58    http://en.wikipedia.org/wiki/Amphetamine

59    An Escalating Dose "Binge" Model of Amphetamine Psychosis: Behavioral and Neurochemical Characteristics. Available at: http://www.jneurosci.org/cgi/content/full/17/7/2551#SEC3

248

# 3. Findings and Opinions

## 3.1 Background

According to [1 – 9], on Tuesday, January 23, 2006 Mr. Coronel appeared paranoid, freaked out, and higher than usual when his wife, Ms. Lizaola, saw him near their home in Castroville, California shortly before midnight. About 30 minutes later, now January 24, 2006, Mr. Coronel, who had a history of illicit drug use and abuse and a long criminal history, was observed in the backyard of a nearby residence. The owner of the residence called the police, reporting a "prowler". Monterey County Sheriff's deputies responded to the caller's residence, and by the time they arrived Mr. Coronel had left the backyard and climbed onto the roof of a residence located across the street [8]. Deputies climbed on the roof where they saw Mr. Coronel rolling around and saying that he was having difficulty breathing. After developing a plan to capture him because they feared that he would roll off the roof, deputies attempted to grab Mr. Coronel's arms and legs when he rolled onto his stomach. Violently resisting the deputies' efforts to capture, control, and restrain him, Mr. Coronel was very strong, preventing the deputies from getting his arms so they could apply handcuffs. One deputy deployed his ADVANCED TASER® M26 ECD in drive stun mode against Mr. Coronel's back area, upper right shoulder region, with the first of two reported contacts having no apparent effect [7, 8]. Mr. Coronel's arms were obtained by the deputies after the second ECD contact was applied to the back upper right quadrant [7, 8]. As Mr. Coronel was still kicking officers with his legs, a decision was made to further secure him with leg irons [9]. Likely more than five minutes later, he was handcuffed and had leg irons applied [7 – 9]. Firefighters and paramedic personnel were staged nearby the residence, and immediately responded after Mr. Coronel was restrained. Mr. Coronel was placed into a basket and lowered to the ground. Once on the ground Mr. Coronel was unresponsive, had a presenting cardiac rhythm or asystole, was provided with emergency medical care, and was taken to the hospital [7 – 17]. Emergency medical personnel applied CPR while with Mr. Coronel on the way to the hospital. Hospital toxicology results showed d-methamphetamine and d-amphetamine were detected in the blood at levels of 1.02 mg/l and 0.28 mg/l respectively. There was also a toxic-level concentration of cocaine metabolite benzoylecognine at 4.72 mg/l, but no free cocaine. The toxicology lab listed the following ranges as potentially toxic: 0.2 –0.6 mg/l for methamphetamine, 0.2 – 3mg/l for amphetamine and 1 – 10 mg/l benzoylecognine. Mr. Coronel died in the hospital on Monday, January 30, 2006 [8]. Cocaine dosage levels, or that of its metabolites, typically of 1 mg/l, but as low as 0.1 mg/l, are reported to be lethal. The toxic level of cocaine are known to be 0.25 – 5 mg/l [8, 11, 37-43]. Thomas Jenkins, M.D., Deputy Coroner Monterrey County opined that Mr. Coronel died because of anoxic encephalopathy due to cardiorespiratory arrest due to acute methamphetamine and cocaine intoxication. His report indicates TASER applications as contributing conditions [8]. However, as it will be explained by this report, his statement related to TASER application cannot be substantiated scientifically. Furthermore, I was not able to find any citation of evidence in Dr. Jenkins' report that he used, discovered or referred to that would explain scientifically or medically why TASER applications would have contributed to Mr. Coronel's cardiorespiratory arrest [8, 11, 12-20]. Dr. Jenkins found that Mr. Coronel's heart weighed 390 g and was mildly dilated [8]. Mr. Coronel's lung bronchi were covered by thin purulent exudates, whereas the long tissue had severe anthracosis and vascular congestion [8]. Dilated heart and fluid loaded or congested lung may be a sign of

congestive heart failure and of pulmonary edema [45, 46]. Patients affected of heart failure are more prone to experience cardiac arrhythmias [45, 46].

## 3.2 Probable effects on the human body of electrical currents generated by TASER devices

### 3.2.1 Electrical output characteristic of Advanced TASER M26 device

As described in [21-27], the output of M26 TASER devices is characterized by peak arcing voltages of about 50 kilovolts (kV), an internal energy of about 1.76 joulues per pulse (J/pulse), at a rate of $20 \pm 25\%$ pulses per second (pulses/s) and an internal electrical power level of about 26 watts (W). After the initial arc, at the load end (i.e. in the subject's body), these values decrease considerably: the peak voltage becomes approximately 5kV, with a delivered energy per pulse of about 0.5 J/pulse at a rate of 15-19 pulses/s. Only about 10 W of electrical power are delivered externally. The duration of the first peak is about 10 microseconds ($\mu$s), with a total active waveform duration of 40 $\mu$s. This peak delivers a charge of approximately 85 microcoulombs ($\mu$C). Given its dampend sinusoidal waveform, subsequent current peaks are biphasic, negative followed by positive peaks. By comparison, some external defibrillator devices, medically approved to resuscitate patients, put out peak voltages in the 2-5 kV range, peak currents well in excess of 20 amperes (A), with durations of typically 5 milliseconds (ms). The total output energy usually exceeds 200 J [28-30]. Similarly, some of the United States Food and Drug Administration (FDA)-approved cardiac or liver ablation RF generators have maximum output power ratings of 100 W, or more, and maximum output current ratings 1-2 $A_{rms}$ [31, 32]. These generators can deliver power and current to the heart, or liver, for durations that exceed 60 s. These output ratings are significantly larger than the output of M26 TASER devices. Yet, such devices are approved for medical use and are widely considered to be safe in terms of not producing undesirable long-term damage to cardiac or to liver structures.

### 3.2.2 Current distribution inside the human thorax and probable effects on the heart

Previous research I conducted on ventricular (de)fibrillation and defibrillator and pacing devices [28, 33-34], showed that even under optimal electrode placement configurations, a low fraction of the current that entered the human thorax reached the heart. For example, we found that more than 66% of the input voltage dropped across portions of the thorax within 4 centimeters (cm) under cardiac electrodes that were optimally placed [28, 34]. For same optimal electrode cardiac placement, less than 10% of the input voltage dropped across the left ventricle [34]. The high resistances of the skin, the fat layer and the thoracic cage reduced the voltage gradient across the heart. Consequently, the current density at the heart level was significantly reduced with respect to values measured at electrode levels.

Koning presented that in order to successfully defibrillate a heart (defibrillation, the reverse of fibrillation, is a process whereby electrical currents resynchronize the cardiac cells) charge levels of at least 42 microcoulombs per gram ($\mu$C/g) were required. The ratio is with respect to the mass of the heart [29]. For a heart of 390 g, such as Mr. Coronel's, 42*390 $\mu$C = 16,380 $\mu$C would be required for successful defibrillation. The charge carried by the first pulse of the current delivered into load by an M26 TASER can be estimated at about 85 $\mu$C [21-27]. While defibrillation currents are usually larger than currents required for triggering fibrillation,

still the ratio between required defibrillation charge and M26 charge, 16380/85, is greater than 192 times.

McDaniel *et al.* found that the blood pressure of animals stimulated with TASER devices was within normal range, an indication that no critical cardiac tachycardias took place [24, 25]. Furthermore, they found that more than 2000 µC of charge were required to fibrillate animals with a mass of 117 kilograms (kg). This charge level represented a significant margin of safety with respect to the charge of the first pulse of the M26 TASER.

Deale and Lerman studied the ratio of transcardiac to transthoracic threshold currents in dogs [35]. They reported that the thoracic cage shunted 82% of the input current and that the lungs shunted 14%. Only the remaining 4% of the input current passed through the heart.

The references cited above indicate that only a small fraction of the input current generated by external devices reaches the heart. Other layers of tissue, such as thoracic cage, fat, intercostal muscles, divert most of the current away from the heart. It is commonly accepted that the amount of charge deposited in cardiac myocytes is the main contributor to the onset of ventricular fibrillation. Work cited above shows that the current, voltage and charge generated by the M26 TASER is below fibrillation thresholds by a wide margin of safety. It is also important to emphasize that there are no significant changes noted in blood pressure levels during TASER ECD applications [24, 25].

### 3.2.3 Review of M26 TASER electrical output with respect to requirements of standard Internatioanl Electrotechnical Commission (IEC) 479-1 and –2

The IEC 479 standard deals with effects of current on human beings and livestock [36, 37]. As stated in IEC 479-1, section 3, page 39, and section 4, page 49, describe the effects of sinusoidal alternating currents with frequencies between 15 hertz (Hz) and 100 Hz and of direct currents passing through the human body, respectively [36]. The effects of non-sinusoidal currents of higher frequencies are covered by IEC 479-2. Section 4.4 describes the thresholds of ventricular fibrillation for impulses of short duration [37]. It states that "for 50% probability of fibrillation, Fq is of the order of 0.005 As." Fq is defined as the charge of the impulse. By the definition of current, charge and time units of measurement, the quantity 0.005 As is equal to 5000 µC. As presented in 3.2.1, the first peak of the M26 TASER current (and by far the largest) carries a charge of about 85 µC. This is at least 50 times less than the threshold indicated by IEC 479-2 for a 50% probability of ventricular fibrillation induction.

## 3.3 Probable effects of drug overdose on cardiac rhythm and congestive heart failure outcomes

Mr. Coronel was reportedly significantly overdosed with toxic concentrations of cocaine metabolites, such as benzoylecognine [8, 11]. Cocaine is known to facilitate respiratory paralysis and cardiac arrhythmias [38-44]. Cocaine abuse can provoke lethal cardiac events, including myocardial infarction and ventricular fibrillation [38-44]. Cocaine has two primary pharmacological properties that can adversely affect the heart and vasculature. Cocaine acts both as a local anesthetic (sodium and potassium channel blockade) and as a powerful cardiac stimulant that accentuates the actions of the sympathetic nervous system (inhibition of central and peripheral neuronal catecholamine uptake). The local anesthetic properties could impair impulse conduction, as well as elicit inhomogeneities in repolarization (refractory period), which

creates an ideal substrate for reentrant arrhythmias [38-44]. Thus, the adrenergic and local anesthetic properties of cocaine could act synergistically to elicit toxic actions on the heart [38-44]. Scientific reports show that individuals overdosed with cocaine are at high probability of developing excited delirium. The combination of this condition and the cocaine overdose requires that such individuals be restrained physically, so that they do not become a further danger to themselves and to others [42, 43]. In several cases analyzed in the scientific literature, the circumstances and the outcomes were very similar to those of Mr. Coronel [42, 43]. Individuals had to be manually restrained and confined to a supine position on a gurney to be taken to a hospital by ambulance [42, 43]. They entered the ambulance alert, but within a few minutes became unresponsive, typically developing asystole/PEA [42, 43]. Resuscitation procedures would be delivered but individuals would not recover to spontaneous cardiac rhythm and then die, less than one hour later, at the hospital [42, 43]. In at least one such case, the time intervals were similar to those seen in Mr. Coronel's case. The individual developed asystole and PEA within 15 min from the time when, while alert and conscious, he was placed on the ambulance gurney [43]. CPR was instituted, but the individual expired 22 min later at the hospital [43]. There were no TASER ECDs, oleoresin capsicum (OC) (pepper spray), or no other type of non-lethal force used to subdue the individuals analyzed in all reported cases cited above [42, 43]. However, all these cases, without exception, had documented overdose of cocaine [42, 43]. Cocaine dosage levels as low as 1 milligram per litre (mg/l) are reported to be lethal [38-44]. Levels of over 0.25 mg/l are reported to be toxic [38-44]. Mr. Coronel's toxicology report measured abnormally high blood concentration of cocaine metabolites, such as benzoylecgonine at 4.72 mg/l.

Mr. Coronel was also reportedly overdosed with 1.02 mg/l of methamphetamine [8, 11]. Methamphetamine makes users aggressive and violent [54, 55]. Twitching, jitteriness, and repetitive behavior (known as "tweaking") are common effects of methamphetamine. Methamphetamine excites specific brain systems and has a high potential for abuse and dependence. Its use releases high amounts of dopamine, a neurotransmitter, which stimulates the brain and enhances mood and body movement. Methamphetamine can cause arrhythmia and ventricular fibrillation similar to symptoms experienced during a heart attack [56, 57]. In high and toxic concentration, such as that found in Mr. Holcomb [8], delusions, hallucinations, severe chest pain, even death, are likely outcomes [55]. Concentrations greater than 1 mg/l are highly likely to trigger physiological reactions that can irreversibly degenerate into fatal cardiac conditions [55 – 57].

Mr. Coronel's toxicology report indicated the presence of toxic levels of amphetamine in his blood [8]. Symptoms of an amphetamine overdose include restlessness, tremor, rapid breathing, confusion, hallucinations, panic, aggressiveness, nausea, vomiting, diarrhea, an *irregular heart beat*, and seizures [58, 59]. Other amphetamine overdose complications are:

- an allergic reaction (difficulty breathing; closing of the throat; swelling of the lips, tongue, or face; or hives);
- *an irregular heartbeat or very high blood pressure* (severe headache, blurred vision); or
- hallucinations, abnormal behavior, or confusion.

The case evidence cited above indicates that Mr. Coronel experienced most, if not all, of the above symptoms [1-20]. Therefore, it is highly likely that his cardiac arrest was related to the illegal drug overdose.

Mr. Coronel's autopsy report indicated that his heart was mildly dilated, that the lung bronchi were covered by thin purulent exudates and that the long tissue had severe anthracosis

252

and vascular congestion [8]. Dilated heart and fluid loaded or congested lung may be a sign of congestive heart failure and of pulmonary edema [45, 46]. Patients affected of heart failure are more prone to experience cardiac arrhythmias [45, 46]. For example, hypertrophic cardiomyopathy is a major cause of death in young athletes who seem completely healthy but die during heavy exercise [45]. Pulmonary edema is a known and accepted consequence of congestive heart failure. Other medically known and accepted symptoms and consequences of heart failure are: dizziness, fatigue and weakness, and rapid or irregular heartbeats. Congestive heart failure is known to severely limit an individual's ability to sustain a high degree of physical activity (e.g. fight police officers) and to promote lethal cardiac arrhythmias [45, 46]. A diseased heart is much more likely to succumb during high level of physical stress, such as during a struggle with enforcement personnel.

## 3.4 Probable effects of TASER currents on Mr. Coronel's heart

It is known that after the onset of ventricular fibrillation (VF) the blood pressure drops precipitously within a few seconds. As a result, the subject would lose consciousness within several seconds, certainly less than a minute, and also lose physical strength, control of gait and balance. Given the fact that Mr. Coronel reportedly had the physical strength to resist arrest even after he was exposed to the TASER devices, it would be highly improbable that his heart experienced VF caused by currents delivered by the TASER device. Although the TASER device might have been applied to the shoulder and back areas, based on information presented in section 3.2.2 above, only an insignificant amount of current, if any, reached Mr. Coronel's heart, making it highly unlikely that TASER currents triggered cardiac arrhythmias or VF. To further validate these statements, I developed finite element models (FEM) of a male body. Finite element modeling is a known mathematical technique that provides numerical approximations to solutions of differential equations, such as those governing electrical current distributions through the thorax [26-28, 33-34]. The following tissue regions were modeled:

- Muscle (neck, shoulder, limbs)
- Bone (spine, ribcage)
- Heart
- Lungs
- Skin/Fat
- Abdomen



Figure 1. Mesh of the finite element model.

The model consisted of 8460 hexahedral elements. Tissue resistivities were assigned using values published in previous work [28, 33-34]. Figure 1 shows the FE mesh with its corresponding regions. Voltage type boundary conditions of 5000 V (approximate peak voltage of the M26 TASER) were assigned at nodes corresponding to approximate left flank and central back areas. Figure 2(a) shows the voltage distribution in the FEM. Figure 2(b) shows the current density distribution in a thoracic cross-section at heart level. The simulated TASER electrode location was on the back. To find actual current density values, the color legend values have to be multiplied by 5. It is important to note that the electric field drops rapidly with the distance from the TASER probes. Figure 2(a) also shows the actual boundary condition locations, which simulated the locations of the TASER probes. Although an approximation, I consider these simulated locations a worst-case scenario, that, although different, applies to Mr. Coronel's actual situation.



(a)



(b)

Figure 2. (a) Voltage distribution with TASER electrodes located at dorsal locations. For actual voltage values; (b) Corresponding current density distribution. This view also shows the location of the boundary condition nodes. Current density values are in A/cm². Multiply by 5 for actual M26 values.

For reference, in Fig. 2(b) the FEM volume simulating the heart is drawn with a white outline. To determine actual current density values expressed in A/cm², multiply by 5 the color legend numbers. The maximum current density at elements representing the heart was 0.32 mA/cm². This value was compared against the threshold estimated to cause VF. I estimated the VF current density threshold that would have to be reached in order for M26 TASER currents to induce VF by using published cardiac myocyte rheobase and chronaxie values (i.e. 7 mA/cm² and 1.2 ms, respectively) [47, 48]. The equation for this threshold is based on the strength-duration curve [47]:

$$J = J_{rheobase} * (1 + chronaxie/duration)$$

Given that the duration of the main current/charge peak of the M26 TASER is 10 μs, or 0.01 ms, the VF current density threshold for M26 is estimated at about 7 mA/cm² *(1+1.2 ms/0.01 ms) = 847 mA/cm² [47, 48].

Consequently, current densities seen in the heart volume for dorsal TASER probe locations (i.e. 0.32 mA/cm²) are significantly lower, by a very wide margin of more than 2600 times, than the required current density for VF induction of 847 mA/cm². Additional, it is important to note that the first actual TASER application was over the shoulder area. The shoulder blade is bone tissue that has a very high electrical resistivity. The FEM did not account for the high resistivity of the

shoulder blade. As such, I estimate that the actual current density values in Mr. Coronel's heart were even lower than the above values due to the electrical protection offered by the shoulder blade. On the bases above, I opine with a high degree of scientific probability that currents delivered by Advanced TASER M26 devices did not cause any cardiac rhythm disturbance to Mr. Coronel.

Additionally, the electrical anisotropy of the skeletal muscle diverts the current flow along preferred longitudinal directions, significantly reducing the current magnitude that penetrates transversally into deeper body organs, such as the heart. By modifying material properties of layers in the model described in my reference [26], I quantified the effects the fat and skeletal muscle layers have on current density distribution. Table II summarizes the electric shell effect of fat and skeletal muscle. Symbol $J$ is used in reference to current density.

**Table I.** Electric shell effect of fat and skeletal muscle.

| Condition | Transversal $J$ [mA/cm$^2$] | Ratio longitudinal $J$ to transversal $J$ | Comments |
|---|---|---|---|
| Thin body with 5 mm fat and anisotropic muscle layers | 15.63 | 8 | 88% of current is diverted away from deeper tissue layers by fat and by the skeletal muscle preferred longitudinal electrical conduction |
| Same but with muscle anisotropy removed | 20.81 | 5 | Removing muscle anisotropy increases current into deeper tissue layers by 30% |
| Same but with high-resistivity fat and muscle anisotropy removed | 45.49 | 2.9 | Removing fat increases current into deeper tissue layers by 200% |

Data in Table I demonstrates that the fat layer, because of its high resistivity, and the skeletal muscle layer, because of its anisotropy, divert a significant level of current in longitudinal directions, rather than allowing it to flow transversally towards deeper layers of tissue, such as the heart.

These results are consistent with recent animal research reports that show TASER devices could not induce VF in swine [49]. Lakkireddy et al. studied five TASER electrode locations. At none of these locations the currents were high enough to induce VF. No metabolic or hemodynamic changes were observed after X26 TASER discharge. Additionally, Dr. Lakkireaddy's group also published research showing that cocaine in fact increases that electrical threshold required to induce VF. As such, a suspect overdosed with cocaine would be even less likely to experience VF during a TASER discharge than a normal suspect.

The FE modeling results presented above support data discussed in section 3.2.2 and indicated with high degree of scientific probability that insignificant, if any, TASER currents reached Mr. Coronel's heart during his confrontation with police officers. If any TASER currents reached his heart, their magnitude would have been insufficient to trigger VF.

256

## 3.5 The concept of delayed VF induction following electrical excitation has no merit

Blackwell and Hayllar conducted a 3-year prospective audit of 212 presentations to the emergency department after electrical injury [50]. In spite of the long follow-up time, they reported no death or representations (i.e. expected or unexpected ECG changes), in any of the 212 patients, that would have been the result of the initial electrical injury [50]. They concluded "only those patients with symptoms, injuries, or initial ECG changes (including QT prolongation) need to be admitted for cardiac monitoring." Based on Blackwell and Hayllar results and evidence already presented above, I opine with a high degree of scientific probability that Mr. Coronel did not experience any delayed VF episodes caused by M26 TASER currents.

## 3.6 Risk assessment of theoretical effects of TASER currents

TASER reported that their devices were used in more than 232,000 human volunteer and 383,000 human suspects during actual law enforcement field deployments [51]. In any of these situations, no evidence was provided that TASER ECDs caused cardiac rhythm disturbances or muscular or skeletal damage. As such, the overall critical risk of using TASER ECDs is estimated at less than $1/(232000+383000) = 0.0000016$

### 3.6.1 EN 60601-1 rational for acceptable levels of VF risk

The EN 60601-1 international standard stipulates accepted regulatory requirements for the safety of electrical medical devices [52]. Particularly, this standard sets the allowed threshold for the patient leakage current for medical devices that have direct contact to patients' hearts. Citing from the standard, we learn that [52]:

"The allowable value of PATIENT LEAKAGE CURRENT for TYPE CF APPLIED PARTS in NORMAL CONDITION is 10 microamperes ($\mu$A) which has a probability of 0.002 for causing ventricular fibrillation or pump failure when applied through small areas to an intracardiac site.

Even with zero current, it has been observed that mechanical irritation can produce ventricular fibrillation. A limit of 10 $\mu$A is readily achievable and does not significantly increase the risk of ventricular fibrillation during intracardiac procedures."

This implies that under normal device operation, the allowed maximum patient leakage current is 10 $\mu$Arms. Although a 10-$\mu$Arms patient leakage current has a 0.002-probability of causing VF or pump failure in humans, the standards accepts this value as being safe. Regulatory bodies, such as the US FDA or the Germany-based TUV, certify electrical medical devices as being safe for use in intracardiac clinical procedures if they comply with the patient leakage current limit above. Intracardiac procedures carry the highest risk for patients. Therefore, by accepting requirements of EN60601-1, these conservative regulatory bodies, including the US FDA, accept that a probability of causing VF of 0.002 represents an extremely low risk. This FDA-accepted probability level of 0.002 is 1250 times higher than the TASER-induced risk estimates above.

257

## 3.7 Opinions

Based on my review of the documentation listed above, as well as my professional education, experience and background, it is my opinion, to a reasonable degree of scientific probability that:

3.7.1 The M26 TASER device generates significantly less current, voltage, power, charge and energy than other medical devices, such as external defibrillators and ablation RF generators, that are approved by the FDA and other international regulatory agencies and deemed safe for medical use.

3.7.2 The voltage, current and charge delivered by the M26 TASER device are, by a very wide margin, significantly below thresholds known to be capable of inducing ventricular fibrillation.

3.7.3 When applied to Mr. Coronel's right shoulder and right back areas, only non-dangerous fractions, if any, of the voltage, current and charge generated by the M26 TASER reached the heart. If any such fraction reached the heart, the residual level was significantly below, by a very wide margin, scientifically accepted thresholds required for induction of VF.

3.7.5 The theoretical risk profile of induction of VF with TASER devices is much lower than that accepted by the EN 60601-1 standard, and, implicitly, by regulatory agencies such the FDA and the CE, for electrical medical devices used in direct contact with the human heart.

3.7.6 Mr. Coronel was toxically overdosed with methamphetamine, amphetamine and cocaine metabolites. The toxic effects cocaine overdose has on the heart muscle may prevent normal propagation of cardiac signals. As such, inhomogeneous refractory period patterns may develop. Such patterns may promote PEA, asystole or VF. Mr. Coronel experienced all of these rhythms. Electrical pulses, such as those delivered by TASER ECDs, are known to not be able to induce PEA or asystole. Methamphetamine and amphetamine can also produce irregular heart activity. It is much more likely that Mr. Coronel's death was caused by the toxic effects of illegal drug overdosing, on the background of his mild heart enlargement and lung congestion, than by the effects of TASER currents. A diseased heart is much more likely to succumb during high level of physical stress, such as during a struggle with enforcement personnel.

3.7.7 Plaintiff contended that the M26 TASER device used to subdue Mr. Coronel directly caused his injury and death. The medical evidence, the autopsy report and the official cause of death do not directly link the TASER device to Mr. Coronel unfortunate demise. In addition, the scientific evidence and results presented above support the autopsy and cause of death statements. Electrical currents produced by the M26 TASER are virtually guaranteed to have had no causal contribution to Mr. Coronel's cardiac rhythm disturbances, and, thereby, to his cardiac arrest. Based on the evidence presented in this case, I opine with a high degree of scientific probability that the M26 TASER device did not cause any significant injury (other than minor skin burns) or death to Mr. Coronel.

3.7.8 Plaintiff contended that the design of TASER devices was negligent, resulting in Mr. Coronel's injury and death. Tests conducted by TASER and other independent research centers showed that M26 TASER devices meet their design specifications. Per my own assessment of TASER ECD functionality and current density distributions in a body

similar to that of Mr. Coronel, I opine that the particular M26 TASER device functioned correctly, as intended, and was safe and efficacious in subduing Mr. Coronel. Based on the evidence presented in this case, I opine with a high degree of scientific and technical probability that the M26 TASER involved in this case met intended specifications, showed no sign of malfunctioning. The design of TASER devices is not and was not negligent.

3.7.9 Plaintiff contended that TASER, in its marketing materials, did not call attention to the risk of using TASER devices. I have reviewed a number of training materials and the information published on TASER's website, including labeling and user's manuals provided with information in this case [9-20, 51]. From the TASER specifications, manuals, warnings and training materials, it should have been evident that TASER devices, while highly safe, were not risk-free. In these public and publicized information, TASER specifically maintains that while TASER devices present police officers with a reasonable, safe and efficacious alternative, these devices are not risk free. It is my opinion that TASER had specifically disclosed that TASER devices were not risk-free.

## 3.8   Conclusion:

Based on my review of the documentation listed above, as well as my professional education, experience and background, to a reasonable degree of scientific probability, it is my opinion that the use of the TASER electronic control devices did not cause or contribute to Mr. Coronel's death.

To a reasonable degree of scientific probability, it is also my opinion that Mr. Coronel's death was caused by acute-on-chronic drug abuse with subsequent metabolic, respiratory, and cardiac failure. The mild cardiac abnormalities found at autopsy could have contributed to his inability to survive the cascade of events.

Prepared by Dorin Panescu, Ph.D.                    Date: May 14, 2008

259

# Appendix A: Dorin Panescu's CV, Patents, Books and Articles.

## EXPERIENCE

Principal Staff Scientist, Cardiac Rhythm Management, St. Jude Medical, Sunnyvale, CA 2005 – present
   Development of implantable medical devices for cardiac rhythm and heart failure control

Vice President, Research and Development, Refractec, Irvine, CA 2004 – 2005
   Design, development and manufacturing of electrical medical devices for ophthalmic surgery

Senior Director, Systems Development, Boston Scientific, San Jose, CA 1996 – 2004
   Design and development of electrical medical devices for cardiac radiofrequency ablation

   Electrical safety testing of cardiac ablation and mapping devices

Senior R&D Engineer, EP Technologies, Sunnyvale, CA 1993 – 1995
   Design and development of electrical medical devices for cardiac radiofrequency ablation

   Electrical safety testing of cardiac ablation and mapping devices

Consultant, University of Wisconsin-Madison, Dept. of Electrical Engineering. 1996 – present
   Cardiac and liver radiofrequency ablation research

Research Assistant, University of Wisconsin-Madison. 1991 – 1993
   Finite element electrical modeling of transthoracic and implantable defibrillators and pacemakers

   Development of a database of ventricular fibrillation episodes, Dane County, Wisconsin

Teaching Assistant, University of Wisconsin-Madison. Spring 1991
   Nonlinear electronic circuits

R & D Engineer, Institute for Automation, Romania. 1989 - 1990
   Development of microprocessor-controlled data acquisition systems

Teaching Assistant, University of Cluj, Romania. 1989 - 1990
   Analog and digital circuits

Production Manager, IAEM (division of ABB), Romania. 1985 - 1989
   Manufacturing of electronic temperature regulators

## EDUCATION

*Ph.D.* Electrical and Computer Engineering, University of Wisconsin-Madison,     August 1993.
*M.S.* Electrical and Computer Engineering, University of Wisconsin-Madison     December 1991
*B.S.* Electronics and Telecommunications, Polytechnic Institute of Timisoara, Romania.   June 1985

## INVITED LECTURES

Seven invited domestic and international lectures related to pacing, defibrillation and cardiac ablation

## PATENTS

Inventor or co-inventor on 130 issued US patents related to cardiac mapping, ablation and imaging

## PUBLICATIONS

Author or co-author on over 90 technical publications related to cardiac pacing, cardiac defibrillation, cardiac radiofrequency ablation, cardiac imaging, analog and digital circuit design, digital signal processing

## AWARDS

2007 – Distinguished Alumnus – University of Wisconsin at Madison
2006 - Fellow – American Institute of Medical and Biological Engineering
2003 - Patent Milestone Award – Boston Scientific
2002 – IEEE-EMBS Early Career Achievement Award
2002 - Patent Milestone Award – Boston Scientific
2001 - John Abele Science and Technology Award – Boston Scientific

2001 - Patent Milestone Award – Boston Scientific
1982 – "Traian Lalescu" Award – Polytechnic Institute of Timisoara, Romania

**PROFESSIONAL AFFILIATION**

Fellow, American Institute of Medical and Biological Engineering
Senior Member, Institute of Electrical and Electronics Engineers (IEEE)
Member, IEEE Engineering in Medicine and Biology Society (EMBS)

Served as:

2005-2008 Chair, Therapeutic Systems and Technologies Technical Committee, IEEE-EMBS
2005 Chair of Industry Relations Committee IEEE-EMBS
2004 Co-chair of the Cardiovascular Systems Tracks at the IEEE–EMBS Conference, San Francisco
2003 Co-chair of the Cardiovascular Systems Tracks at the IEEE–EMBS Conference, Cancun, Mexico
2002 IEEE-USA Medical Technology Committee
1997-1998 Member of the IEEE-EMBS AdCom
1997-1998 IEEE-EMBS Region 6 Representative
1997 Co-chair of the Cardiovascular Systems Theme at the IEEE–EMBS Conference, Chicago.
1997-1998 Chair of Industry Relations Committee IEEE-EMBS

**SELECTED LIST OF PATENTS (out of 130)**

| | |
|---|---|
| 7364546/2008 | Multi-functional medical catheter and methods of use. Inventors: D. Panescu and D. K. Swanson |
| 7194294/2007 | Multi-functional medical catheter and methods of use. Inventors: D. Panescu and D. K. Swanson |
| 6895267/2005 | Systems and methods for guiding and locating functional elements on medical devices positioned in a body. Inventors: D. Panescu, D. W. Arnett and D. K. Swanson |
| 6790206/2004 | Compensation for power variation along patient cables. Inventors: D. Panescu |
| 6746401/2004 | Tissue ablation visualization. Inventors: D. Panescu |
| 6735465/2004 | Systems and processes for refining a registered map of a body cavity. Inventors: D. Panescu |
| 6428536/2002 | Expandable-collapsible electrode structures made of electrically conductive material. Inventors: D. Panescu, D. K. Swanson, J. G. Whayne and T. F. Kordis |
| 6370435/2002 | Systems and methods for examining the electrical characteristic of cardiac tissue. Inventors: D. Panescu, D. K. Swanson, M. S. Mirotznik, D. S. Schwartzman and K. R. Foster |
| 6293943/2001 | Tissue heating and ablation systems and methods which predict maximum tissue temperature. Inventors: D. Panescu, S. D. Fleischman and D. K. Swanson |
| 6289239/2001 | Interactive systems and methods for controlling the use of diagnostic and therapeutic instruments in interior body regions. Inventors: D. Panescu, D. McGee, J. G. Whayne, R. R. Burnside, D. K. Swanson and D. A. Dupree |
| 5925038/1999 | Expandable-collapsible electrode structures for capacitive coupling to tissue. Inventors: D. Panescu, D. K. Swanson, J. G. Whayne and T. F. Kordis |
| 5810802/1998 | Systems and methods for controlling tissue ablation using multiple temperature sensing elements. Inventors: D. Panescu, S. D. Fleischman, J. G. Whayne and D. K. Swanson |
| 5755715/1998 | Tissue heating and ablation systems and methods using time-variable set point temperature curves for monitoring and control. Inventors: R. A. Stern, D. Panescu and D. K. Swanson |
| 5688267/1997 | Systems and methods for sensing multiple temperature conditions during tissue ablation. Inventors: D. Panescu, D. K. Swanson, S. D. Fleischman and T. M. Bourne |
| 5487391/1996 | Systems and methods for deriving and displaying the propagation velocities of electrical events in the heart. Inventor: D. Panescu |
| 5485849/1996 | System and methods for matching electrical characteristics and propagation velocities in cardiac tissue. Inventors: D. Panescu and D. K. Swanson |

## SELECTED LIST OF PUBLICATIONS (out of over 90)

### Books

1. D. Panescu, "Medical Device Industry," in M. Akay, Ed., *Wiley Encyclopedia of Biomedical Engineering*, Hoboken, NJ: Wiley & Sons, 2006.
2. D. Panescu, "Other Time– and Frequency– Domain Techniques," in W. J. Tompkins, Ed., *Biomedical Digital Signal Processing: C-Language Examples and Laboratory Experiments for the IBM PC*, Englewood Cliffs, NJ: Prentice-Hall, 1993.

### Journal Articles

3. D. Panescu,, "Wireless communication systems for implantable medical devices," *IEEE Eng Med Biol Mag.*, vol. 27(3), 2008.
4. D. Panescu,, "Less-than-lethal weapons: Design and Medical Safety of Neuromuscular Incapacitation Devices," *IEEE Eng Med Biol Mag.*, vol. 26(5), pp.57-67, 2007.
5. D. Panescu, "EMBC06: Industry-Academia Partnership Symposium," *IEEE Eng Med Biol Mag.*, vol. 26(2), 2007.
6. D. Panescu, "MEMs in Medicine and Biology," *IEEE Eng Med Biol Mag.*, vol. 25(5), pp. 19-28, 2006.
7. D. Panescu, "Healthcare Applications of RF Identification," *IEEE Eng Med Biol Mag.*, vol. 25(3), pp. 77-83, 2006.
8. D. Panescu, "Vagus Nerve Stimulation for the Treatment of Depression," *IEEE Eng Med Biol Mag.*, vol. 24(6), pp. 68-72, 2005.
9. D. Panescu, "An imaging pill for gastrointestinal endoscopy," *IEEE Eng Med Biol Mag.*, vol. 24(4), pp. 12-14, 2005.
10. D. Panescu, "Cardiac Resynchronization Therapy," *IEEE Eng Med Biol Mag.*, vol. 24(2), pp. 22-26, 2005.
11. D. Panescu, "Conductive Keratoplasty," *IEEE Eng Med Biol Mag.*, vol. 23(4), pp. 16-18, 2004.
12. D.S. Khoury, L. Rao, C. Ding, H. Sun, K.A. Youker, D. Panescu and S.F. Nagueh, "Localizing and quantifying ablation lesions in the left ventricle by myocardial contrast echocardiography," *J Cardiovasc Electrophysiol.*, vol. 15(9), pp. 1088-1090, 2004.
13. D. Panescu, "Seeing clearly with Refractec, Inc.," *IEEE Eng Med Biol Mag.*, vol. 23(3), pp. 8-12, 2004.
14. D. Panescu, "Drug Eluting Stents," *IEEE Eng Med Biol Mag.*, vol. 23(2), pp. 21-23, 2004.
15. D. Panescu, S. D. Fleischman, J. G. Whayne, D. K. Swanson, M. S. Mirotznik, I. McRury and D. E. Haines, "Radiofrequency multielectrode-catheter ablation in the atrium," *Phys. Med. Biol.*, vol. 44, pp. 899-915, 1999.
16. I. D. McRury, D. Panescu, M. A. Mitchell and D. E. Haines, "Non-uniform heating during catheter ablation with long electrodes: Monitoring the edge effect," *Circulation*, vol. 96, pp. 4057-4064, 1997.
17. D. Panescu, "Intracardiac mapping and radiofrequency catheter ablation for the therapy of ventricular tachycardia," *Physiol. Meas.*, vol. 18, pp. 1–38, 1997.
18. D. Panescu, J. G. Webster, W. J. Tompkins and R. A. Stratbucker, "Optimization of transcutaneous cardiac pacing by three-dimensional finite element modeling of the human thorax," *Med. Biol. Eng. Comput.*, vol. 33(6), pp. 769-775, 1995.
19. D. Panescu, J. G. Whayne, S. D. Fleischman, M. S. Mirotznik, D. K. Swanson and J. G. Webster, "Three-dimensional finite element analysis of current density and of thermal profiles during radiofrequency ablation," *IEEE Trans. Biomed. Eng.*, vol. 42, no. 9, pp. 879–890, 1995.
20. D. Panescu, J. G. Webster, W. J. Tompkins and R. A. Stratbucker, "Optimization of cardiac defibrillation by three-dimensional finite element modeling of the human thorax," *IEEE Trans. Biomed. Eng.*, vol. 42, no. 2, pp. 185–192, 1995.
21. D. Panescu, J. G. Webster, W. J. Tompkins, R. L. Staley, J. Johnson, D. Schlageter and R. A. Stratbucker, "A database of cardiac arrhythmias," *IEEE Trans. Biomed. Eng.*, vol. 42, no. 2, pp. 185–192, 1995.
22. D. Panescu, J. G. Webster and R. A. Stratbucker, "A nonlinear finite element model of the electrode-electrolyte-skin system," *Acad Emerg Med.*, vol. 2(1), pp. 46-49, 1995.
23. D. Panescu, J. G. Webster and R. A. Stratbucker, "A nonlinear electrical-thermal model of the skin," *IEEE Trans. Biomed. Eng.*, vol. 41, no. 7, pp. 672–680, 1994.
24. K. P. Cohen, D. Panescu, J. H. Booske, J. G. Webster and W. J. Tompkins, " Design of an inductive plethysmograph for ventilation measurement," *Physiol. Meas.*, vol. 15(2), pp. 217-219, 1994.
25. D. Panescu, J. G. Webster and R. A. Stratbucker, "Modeling current density distribution during transcutaneous cardiac pacing," *IEEE Trans. Biomed. Eng.*, vol. 41, no. 6, pp. 549–555, 1994.
26. D. Panescu, J. G. Webster and R. A. Stratbucker, "Measurement of ventricular volume from blood conductance using two-dimensional finite element analysis," *Physiol. Meas.*, vol. 15(1), pp. 49–56, 1994.
27. D. Panescu, K. P. Cohen, J. G. Webster and R. A. Stratbucker, "The mosaic electrical characteristics of the skin," *IEEE Trans. Biomed. Eng.*, vol. 40, no. 5, pp. 434-439, 1993.

**Appendix B:** List of Past Expert Testimony in previous four years and Expert Fee Rate Sheet.

In the last 4 years, I have testified by deposition or trial in the following cases:

1. Heston vs. TASER
2. Lomax vs. TASER
3. Mann vs. TASER
4. Peterson vs. TASER
5. TASER vs. Chief Medical Examiner Summit County, Ohio

I charge $150/hour for expert witness work and report preparation and $300/hour for deposition and court appearances.

Sincerely,

Dorin Panescu, Ph.D.

# EXHIBIT G