EXHIBIT J

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

ELVIRA TERAN; )
STEPHANIE LIZAOLA, )
AS GUARDIAN AD LITEM FOR: )
ANGELA ALYSSA TERAN, A MINOR CHILD )    Case No. C 06-06947 JW
JENNIFER LISETTE TERAN, A MINOR CHILD) 
AND BRIANA ISABEL TERAN, A MINOR )    Hon. James Ware
CHILD, ET AL., )
                        )
      Plaintiffs, )
                        )
      vs. )
                        )
COUNTY OF MONTEREY; )
COUNTY OF MONTEREY SHERIFF'S )
DEPARTMENT; )
MICHAEL KANALAKIS; BRANDON SMITH; )
WARREN SANO; MIKE DARLINGTON: )
BENJAMIN PAYTON; BRIAN HOSKINS )
EMILY HOWLETT; )
TASER INTERNATIONAL, INC. An )
Arizona Corporation )
                        )
      Defendants. )

### Expert Report: Donald Dawes, M.D.

Pursuant to Fed. R. Civ. P. 26(a)(2), I, Donald Dawes, M.D., hereby submit my report that contains a complete statement of all opinions to be expressed and the bases and reasons therefore; the data and other information I considered in forming the opinions; the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

Donald Dawes, M.D.                  14 May 2008

# Teran v. TASER International, Inc.

## Expert Opinion of Donald M. Dawes, M.D., FACEP

### Qualifications

I am a diplomate of the American Board of Emergency Medicine (ABEM) and a fellow of the American College of Emergency Physicians (ACEP). I am currently practicing emergency medicine in a community hospital in Lompoc, CA. I am also an external medical consultant to TASER International, Inc. (TASER), and have conducted numerous studies on the human effects of conducted electrical weapons (CEW). I am a sworn reserve peace officer in CA and authorized by my department to carry a TASER® X26 CEW for duty having completed the required training course. My educational background includes a B.S. in electrical engineering from Cornell University, and an M.D. from Duke University. I completed my residency in emergency medicine at the Harbor-UCLA program in Torrance, CA. In addition to research and publishing on the human effects of CEWs, I have also been an invited speaker to present on the subject of in-custody death. I have separately supplied my CV that includes a list of publications. I have also separately supplied my fees for expert testimony.

### Prior Expert Testimony

My prior expert testimony is in Lakisha-Neal Lomax v. Las Vegas Metropolitan Police Department, TASER International, Inc., et al.

### Question Reviewed

I have been asked to review this case to offer an opinion as to the association of the TASER device and the death of Mr. Jaime Teran Coronel.

### Documents Reviewed

1) First Amended Complaint for Damages for Wrongful Death
2) Coroner's Report
3) Monterey County Postmortem Examination
4) Internal Affairs Synopsis

1

5) Monterey County Crime/Incident Report
6) Medical Records from Salinas Valley Memorial Hospital
7) Teran Case Appendices A-E

## Facts of the Case

These are the relevant facts of the case by my reading of the supplied documentation:

1) On January 24th, 2006, Monterey County Sheriff deputies responded to a prowler call and found Mr. Coronel on the rooftop of a home in Castroville, CA. He was initially lying prone on the roof, breathing heavily, and mumbling incoherently. Deputies heard him claim he could not breathe. Because of his observed state, deputies called for emergency medical services (EMS) at that time. Deputies ordered Mr. Coronel from the roof and he did not comply. Deputies then climbed onto the roof to make contact with Mr. Coronel. When they touched him to check his responsiveness, he became combative and began thrashing and rolling on the roof. Deputies retreated to a safe distance and attempted to verbally de-escalate Mr. Coronel. His thrashing and rolling continued for 20 minutes. Fearing for his safety and well being, deputies decided to physically control Mr. Coronel when he presented them with a reasonable opportunity. Mr. Coronel struggled with deputies and resisted handcuffing by keeping his arms under his torso in the prone position ("turtling").

2) A TASER M26 device was used in the drive stun mode twice to assist in the physical arrest of Mr. Coronel since his continued resistance was placing officers at risk. He had the TASER device applied twice to the right upper back/shoulder area. After the second application, deputies were able to obtain control of his arms and handcuff him. The download of the device shows 4 timestamps suggesting a maximum exposure of 17 seconds (but could have been less).

3) After Mr. Coronel was handcuffed, he continued to kick at the deputies and resist in the restraints. One of the deputies retrieved "leg irons" from a patrol car and Mr. Coronel was restrained at the legs.

4) While waiting for EMS to bring a litter, Mr. Coronel appeared to calm down. At that time he was noted to have a pulse and was breathing, although his pulse was subjectively weak.

2

5) When Mr. Coronel was checked by EMS after being lowered to the ground, he was apneic, pulseless, and asystolic.

6) Mr. Coronel was transported to Salinas Valley Memorial Hospital. He was removed from life support for anoxic brain death and expired at 1742 on January 30th, 2006.

7) Mr. Coronel was 66 ½ inches tall and weighed 171 lbs and of "average " build. His heart had mild enlargement at autopsy. His toxicology showed both amphetamines (methamphetamine and amphetamine) and cocaine metabolites. All of these levels were in the potentially toxic range.

8) Mr. Coronel had a prior history of chronic crack cocaine abuse.

9) The cause of death at autopsy was listed as "anoxic encephalopathy" due to "cardiorespiratory arrest" due to "acute methamphetamine and cocaine intoxication." Other significant conditions were listed as "TASER application and struggle with police."

10) The Internal Affairs investigation found that the use of the TASER device was within department policy.


## Contributions to the Cause of Death of Mr. Coronel

I partially agree with the ruling of the Coroner. His ruling is that Mr. Coronel died from cardiopulmonary arrest from acute methamphetamine and cocaine intoxication. This may be the case, but I believe, to a reasonable degree of medical certainty, that he was suffering from the excited delirium syndrome, a syndrome that results from chronic drug abuse. In addition, the inclusion of the TASER device exposures as an "other significant condition" is overly inclusive. Mr. Coronel was almost assuredly in a severely compromised state when law enforcement encountered him. His continued exertion, both before physical arrest and during physical arrest, during his contact with law enforcement likely worsened his condition leading to his ultimate cardiopulmonary arrest. The deputies acted appropriately in initially trying to verbally de-escalate the subject, but ultimately deciding that he needed to be removed from the roof for his own safety and for medical treatment. He was in a precarious situation both physically on the roof, and,

3

426

in my opinion, medically. For this reason, the Coroner determination of "accident" is appropriate. The TASER device was a necessary means to effect his arrest. There is no medical data that would suggest a drive stun to the upper back/shoulder would contribute in any way to the death of Mr. Coronel. This is discussed in detail below.

*Excited Delirium Syndrome*

Excited delirium is a syndrome that is characterized by extreme agitation, paranoia, bizarre behavior, delirium, hyperthermia, sweating, undressing, attraction to lights and glass, violence towards inanimate objects, incoherent shouting, unusual strength, imperviousness to pain, and continued struggle even when confronted with overwhelming force with its etiology attributed to chronic illicit drug abuse or chronic psychiatric illness, specifically schizophrenia and mania. It is felt to be a distinct syndrome from the acute drug intoxication syndromes with stimulants such as cocaine, ecstasy, methamphetamine, and phencyclidine (PCP), and from syndromes such as the central serotonin syndrome and neuroleptic malignant syndrome (NMS), although there is significant overlap in these syndromes, and acute abuse of illicit drugs and use or discontinuation of psychiatric medications is often found in excited delirium cases. Not uncommonly, post-mortem drug levels are not as high as might be expected with an acute drug intoxication syndrome. According to Karch, with cocaine-induced excited delirium, blood levels of cocaine are typically low while levels of benzoylecgonine, a cocaine metabolite, are high. Mr. Coronel had no "free cocaine" detected and had a high level of benzoylecgonine. Also in this case, Mr. Coronel had high levels of methamphetamines and amphetamines in his system that makes distinguishing acute drug effects and the excited delirium syndrome more difficult.

Dr. Deborah Mash at the University of Miami has found distinct dopamine transporter differences between control autopsy subjects, cocaine-overdose autopsy subjects (chronic users), and excited delirium autopsy subjects. She has found an expected compensatory increase in the dopamine transporters in the chronic cocaine users, but a lack of this compensatory brain change in excited delirium subjects. In addition, the transporters present in the excited delirium subjects appear to be dysfunctional. She has hypothesized based on this that in acute cocaine abuse in these subjects, because of the lack of the compensatory increase in dopamine transporters and their dysfunction, largely increased amounts of dopamine are present in

4

the nerve synapses leading to the clinical manifestations in the excited delirium syndrome. Whether this is a maladaptive change to chronic drug abuse (a "kindling" effect), a genetic susceptibility, or a combination of both has yet to be elucidated. But this does point to a different etiology of the syndrome than acute drug intoxication. In addition to the distinct dopamine transporter findings in excited delirium subjects, Dr. Mash has found other distinct brain changes in these subjects including elevated heat shock proteins and immediate early gene activation of the c-fos protein, a marker of paranoid aggression. Dr. Mash has documented these findings in both excited delirium subjects with histories of chronic drug abuse and in subjects with chronic mental illness.

The excited delirium syndrome is not a new phenomenon and has been reported in the U.S. medical literature, primarily psychiatric, since the mid-1800's (referred to as acute exhaustive mania, Bell's mania, and psychotic furors). It appears to be consistently associated with numerous in-custody deaths. Between 1915 and 1937, there were 360 cases in which the cause of death was listed as "exhaustion due to mental excitement" in one South Carolina hospital. There appeared to be a decrease in the reporting of this syndrome with the advent of anti-psychotic medications (e.g., chlorpromazine) in the 1960's, and a resurgence in the 1980's with the widespread abuse of cocaine (particularly "crack") and with the increase in the mentally ill released into the community (de-institutionalization). A more recent resurgence may be due to the widespread abuse of methamphetamine. A hyper-sympathetic state, abnormal autonomic reflexes, hyperthermia, electrolyte disturbances (particularly potassium), and a profound metabolic acidosis have been suggested as possible final common pathways in the respiratory and/or cardiovascular collapse in the excited delirium syndrome.

In Stratton, et al., a study out of Los Angeles County, the demographics of their excited delirium victims was described and Mr. Coronel had similar characteristics. In Stratton, et al., 78% tested positive for stimulant drug use, 45% had chronic drug abuse by history, and 56% had autopsy evidence of a chronic disease state. Mr. Coronel tested positive for cocaine and amphetamine abuse, had a prior history of stimulant drug abuse and, at autopsy, was found to have a mildly enlarged heart.

Mr. Coronel had several of the classic behavioral patterns of the excited delirium syndrome. Mr. Coronel was incoherently yelling,

5

"screaming that [they] shot him", and was thrashing and rolling on the roof of the house. Per deputies, he would grab onto fixtures as if someone were trying to pull him off the roof. His common law wife, who had seen Mr. Coronel prior to the law enforcement contact, stated that he was "acting very strangely." He was described as paranoid. She stated he was "higher than usual" and "was freaking out." Anecdotally in the excited delirium syndrome, it is the case that the subjects are felt to have "snapped" with a dramatically different response to the drugs that they have used before. This is attributed to the "kindling" effect discussed above. Another witness had seen Mr. Coronel running around in his backyard. He described his behavior as "very erratic." When he was being physically arrested, he was described as very strong. Also, his continued strong resistance even after being restrained is classic.

Furthermore, in many excited delirium cases there is a classic quiescent period immediately prior to sudden death. This is described in the Stratton, et al paper: "the "cessation of struggle against restraints and onset of shallow or labored breathing is a sign that was described in each of the sudden deaths." It is additionally noted by Stratton et al that "without exception, all cardiopulmonary arrests were unanticipated and preceded by a short period (estimates 5 minutes or less) during which the victim ceased in struggling against restraints and developed a labored or shallow breathing pattern." Mr. Coronel had a period in which he was still breathing and had a pulse but appeared to calm down just before his cardiopulmonary arrest. Per the arrest report, "While waiting for a stokes basket…[Mr. Coronel} seemed to calm down." He was found to have a weak pulse and his chest was noted to be rising and falling indicating breathing. Shortly after this, he sustained a cardiopulmonary arrest.

Finally, in the Stratton, et al. case series of excited delirium deaths, ventricular fibrillation was seen in none of the victims. The unusual aspect of these deaths is that the majority of the primary arrest rhythms were asystole. Per Karch, asystole and pulseless electrical activity (PEA) are the common arrest rhythms in the excited delirium syndrome. These are generally not considered arrest rhythms from electrical injury to the heart (unless extreme currents are used, such as with a lightning strike) and generally not the arrest rhythm found in sudden cardiac deaths in the younger population. Asystole was the arrest rhythm of Mr. Coronel. Profound acidosis, drug overdose, hyper- or hypokalemia, and hypoxia are causes of this terminal rhythm.

6

There are many theories about the sudden collapse in excited delirium subjects after restraint. There is a theory, based on anecdotal observations, that the primary arrest in the excited delirium syndrome is respiratory, rather than cardiac. One theory involves the catecholamine persistence after exertion. Catecholamines drive potassium, released from actively contracting muscles, back into the cells. This is thought to be a protective measure to prevent hyperkalemia. Once the muscle contraction ceases, the catecholamines are still circulating at high levels for a brief period. This leads to a brief period of hypokalemia. In normal hosts, this is of no consequence and is well tolerated. However, in persons already severely compromised, such as in an excited delirium or drug toxic state, this may be of great clinical significance. This period after exercise has been referred to as the "period of peril" by several authors. Hypokalemia can cause respiratory arrest independent of cardiac arrest. Additionally, acidosis, believed to be common in excited delirium deaths, itself can lead to primary respiratory arrest as the muscles of respiration are significantly weakened leading to hypoventilation and brain function, to include medullary control of respiration, is severely compromised.

Death during the "period of peril" has other hypotheses. Catecholamines actually rise briefly immediately after the cessation of exertion. This increase may lead to increased demands on the heart and lead to ischemia. A study by Rywick, et al. showed that electrocardiogram (ECG) ST segment changes after exertion have an equally predictive value for coronary artery disease as ST segment changes during exertion. In addition, it has been theorized that ischemia in this post-exertion period may result from the sudden decrease in venous return with the cessation of exertion in the presence of a persistently elevated heart rate from the catecholamines. Alternatively, changing from the standing to the supine position after exertion increases venous return and therefore ventricular wall stress and may lead to ischemia. It has also been hypothesized that catecholamine depletion can lead to the sudden death. It might be expected that the most significant exertion would occur at the time of restraint, and therefore death from this depletion would occur at the time of restraint. Alternatively, since exertion is likely the most significant at the time of restraint, the increased release of catecholamines might predispose the subject to arrhythmias at that time. Any of these hypotheses may explain the sudden death after restraint in these cases.

7

Acidosis is felt to be one of the common mechanisms of death in the excited delirium syndrome. Exertion alone can cause an acidosis (by the creation of lactic acid). As commented on by Hicks et al, exertion coupled with a sympathomimetic drug can lead to severe acidosis. If psychosis or delirium is present, this can lead to even a more profound acidosis. The consequences of acidosis are systemic and include decreased cardiac contractility, arteriolar dilatation and venous constriction leading to central congestion, increased pulmonary vascular resistance, decreased cardiac output, sensitization to cardiac arrhythmias, decreased respiratory muscle strength and hypoventilation, hyperkalemia, protein degradation, loss of intracellular water regulation, obtundation, coma, and death. Mr. Coronel had a significant period of exertion even before law enforcement contact. One witness encountered him running around his backyard. He said Mr. Coronel exited the yard by climbing his fence. He then observed Mr. Coronel run across the street, climb another fence, and then climb onto the roof of a house. It is very likely his increased respiratory rate and his complaint of not being able to breath was related to a lactic acidosis. The body compensates for this type of acidosis by breathing more deeply and at a faster rate. Patients will often have the complaint of shortness of breath, especially when the patients cannot breath fast or deep enough to fully compensate for the acidosis (when profound) or when their respiratory muscles are beginning to fatigue.

Even during the encounter with law enforcement, but prior to his physical arrest, he continued to have significant exertion. Per the arrest report, "For approximately the next twenty minutes [Mr.] Coronel continued to swing his arms and legs wildly. [Mr.] Coronel would at times get up quickly and quickly crawl on his hands and feet to the crest of the rooftop." So, before his physical arrest, he had significant exertion and was likely severely acidotic. Even after he was physically restrained in handcuffs, he continued to "violently resist" and had to be placed in leg irons. His severe rhabdomyolysis found at the hospital suggests severe exertion (some of this may also be primarily due to the toxic effect of the sympathomimetic drugs). His initial pH at the hospital was 6.8 which is considered profoundly acidotic.

In summary, Mr. Coronel had the demographics, many classic signs and symptoms, and a clinical course that was similar to deaths from the excited delirium syndrome. It is my opinion, to a reasonable degree of medical certainty, that he was suffering from this syndrome.

*Cocaine Toxicity*

As mentioned above, distinguishing between the acute cocaine intoxication syndrome and the excited delirium syndrome is difficult, especially when the subject ingests a large amount of cocaine. The excited delirium syndrome is a syndrome possibly of a "kindling phenomenon" in which manifestations are due to chronic drug abuse. The acute cocaine toxicity syndrome is a syndrome of the direct effects of the cocaine. The two syndromes can occur simultaneously. The effects of cocaine are complicated. Cocaine inhibits cell membrane permeability to sodium and so can inhibit the initiation or transmission of nerve impulses and has both centrally mediated (activation of the vasomotor center) and peripherally mediated (blockade of pre-synaptic catecholamine reuptake) sympathetic activation. Cocaine also blocks the reuptake of serotonin and dopamine. Cocaine produces a myriad of deleterious systemic effects. It causes acute psychosis, agitation, and delirium. It causes seizures, cardiac arrhythmias, coronary vasospasm, myocardial infarction, malignant hypertension, stroke, hyperthermia, acidosis, and rhabdomyolysis. It can also cause myocardial depression and respiratory depression. From a 1992 NIDA monograph on cocaine: "The vasomotor center is initially stimulated producing hypertension and tachycardia; however, later these same medullary centers are depressed with the resultant development of respiratory depression and death." While the autopsy of Mr. Coronel did not show an acute myocardial infarction, given his heavy exertion and cocaine use, it cannot be ruled out that non-infarcting coronary insufficiency caused a cardiac arrhythmia. From a 1992 NIDA monograph on cocaine: "In a normal heart, increased oxygen demand stimulates coronary vasodilation through an autoregulatory mechanism. In the presence of cocaine and the marked increase in sympathetic activity, this autoregulation may be lost and vasoconstriction may take precedence as has been noted in those with established atherosclerotic lesions." Mr. Coronel tested positive for cocaine metabolites. The half-life of cocaine is about 60 minutes. He likely had acutely ingested cocaine. His behavior and death would be consistent with cocaine toxicity.

*Methamphetamine Toxicity*

Also as mentioned above, distinguishing between the acute methamphetamine/amphetamine intoxication syndrome and the excited delirium syndrome is difficult, especially when the subject ingests a large

9

amount of these drugs. Amphetamine is a generic name for racemic beta-phenylisopropylamine or alpha-methlyphenylethylamine. Numerous substitutions of the phenylethylamine structure are possible, creating methamphetamine and 3,4-methylenedioxymethamphetamine (or MDMA). The primary pharmacologic action of these drugs is a sympathomimetic effect mediated through the release of norepinephrine, dopamine, and, especially in the case of MDMA, serotonin. The sympathomimetic effects are similar to cocaine, but with a slower onset and longer duration. Methamphetamines are well known to cause of myriad of cardiac, respiratory, neurologic, and psychiatric problems including cardiac arrhythmias (including ventricular fibrillation), pulmonary hypertension, seizures, stroke, hyperthermia, persistent psychosis, and sudden death. The simultaneous use of amphetamines with other drugs increases the toxicity of amphetamines. Mr. Coronel had combined methamphetamine/amphetamine with cocaine, which would have certainly compounded the toxicity of either drug. Elevated ambient temperature and motor hyper-activity increase the toxicity of these stimulants. Mr. Coronel had a prolonged period of motor hyper-activity as discussed above. His behavior and death would be consistent with methamphetamine/amphetamine toxicity.

*Other Factors*

Another factor may have played a role. Mr. Coronel had an enlarged heart. This alone placed Mr. Coronel at risk for cardiac arrhythmias, but especially so in the context of acute stimulant use and/or heavy exertion. From Afonso, et al. "It is speculated that the increase in left ventricular mass (associated with long-term cocaine use) and the development of contraction band necrosis serve as the underlying anatomic substrate, increasing the propensity for ischemia and arrhythmias."

The Question of the TASER Device Association

The officers in this case used the TASER device in association with other uses of force to effect the arrest of Mr. Coronel. The TASER device was specifically used in an attempt to obtain control of his arms from the "turtling" position, a notoriously difficult position from which to free the arms for handcuffing. There were two applications of the TASER device with a maximum time of 17 seconds by the download of the device (it could have been much less than this depending on how the safety was used and

10

how long the device was actually in physical contact with Mr. Coronel). Both applications were in the drive-stun mode and both were in the right upper back/shoulder area. To my knowledge, there are no studies that suggest cardiac involvement with non-torso exposures. Even the most critical studies (in swine models) suggest only an effect with probe use in the cardiac axis. The difference in this case is both the physical position on the body and the depth of the applied current (probes can enter the body maximally 9 millimeters, whereas the drive stun is all at the skin surface). As will be discussed below, these results in animals have been contradicted by human studies. In addition, in this case, Mr. Coronel was alive and combative for some time after the last TASER device use arguing against an electricity-induced arrhythmia. There are no studies in the world's medical literature that would suggest a link between the two drive-stun applications and the demise of Mr. Coronel.

The following is a review of the current medical literature as it pertains to the safety of TASER devices in human subjects:

*Stress*

There is one study in the medical literature on the effects of the TASER device on the neurohumoral stress cascade. We have conducted a study of the neurohumoral response to the TASER X26 versus oleoresin capsicum (O.C.), commonly known as pepper spray, which was published in the October 2007 supplement to the Annals of Emergency Medicine as an abstract. We have expanded on this study but these results have not yet been published.

The acute stress response in humans is a neuroendocrine cascade initiated by the hypothalamus. The cascade has two components: the sympathetic-adrenal-medulla axis (SAM), and the hypothalamic-pituitary-adrenal axis (HPA). The SAM axis is responsible for the release of catecholamines, primarily epinephrine, from the adrenal medulla chromaffin cells. These cells contain a pool of catecholamines that are available for immediate release. The HPA axis is responsible for the release of adrenocorticotropic hormone (ACTH) and $\beta$-endorphins. ACTH causes the adrenal cortex to produce glucocorticoids (e.g., cortisol) and mineralocorticoids. $\beta$-endorphins modulate pain perception. Cortisol induces an enzyme in the adrenal medulla that is the rate-limiting step in the conversion of norepinephrine to epinephrine. Cortisol also induces

11

gluconeogenesis. Epinephrine release is the key end-result of the neuroendocrine cascade. It produces a number of adaptive physiologic changes in response to stress for a "fight or flight" response, including positive chronotropic and inotropic cardiac effects, increased systemic vascular resistance, increased arterial blood pressure, increased metabolism, and increased thermogenesis. However, it can also produce maladaptive physiologic changes including myocardial ischemia, cardiac dysrythmias, reflex bradycardia (which can cause asystole), pulmonary edema, lactic acidosis, and hyperthermia.

It has been hypothesized that these maladaptive physiologic changes may be contributory to some in-custody deaths. This may be especially the case when the acute stress response is potentiated by the use of cocaine, amphetamines, PCP or other sympathomimetic stimulants or when psychiatric illness induces a greater perceived threat in the law enforcement contact and therefore a greater acute stress response, or when the subject is in a state of excited or agitated delirium. Stress has been shown to precipitate acute cardiomyopathy in humans. Recent literature has shown that salivary markers may be able to be used to quantitatively measure the stress response in subjects exposed to stress. The advantage of salivary markers is eliminating the stress of a needle stick to draw serum measures. Salivary alpha-amylase is a validated measure of the sympathetic response (SAM axis). Salivary cortisol is a validated measure of the HPA axis. Previous studies have demonstrated that these measures peak 10-20 minutes after the presentation of the noxious stimulus, with alpha-amylase peaking at about 10-15 minutes, and cortisol at about 15-20 minutes.

In our study, partially published, we examined the acute stress response to a TASER X26 discharge versus oleoresin capsicum, a commonly used, and generally uncontroversial, use of force option as well as a cold-water tank forearm immersion and a 1-minute defensive tactics drill. We exposed subjects to a 5-second spray of oleoresin capsicum to the eyes, the usual target, and subjects to a standard 5-second TASER X26 exposure with the probes shot into the back from about 7 feet. We exposed subjects to a 45-second cold water (0 °C) forearm immersion and subjects to a 1-minute defensive tactics drill that consisted of trying to retain a simulation weapon in a holster from motivated attackers. We measured alpha-salivary amylase and cortisol at baseline, at 10-15 minutes, 15-20 minutes, and 40-60 minutes. Our results showed that salivary alpha-amylase increased 37.4 at 10-15 minutes with the oleoresin capsicum and decreased

4.5 for the TASER. Salivary alpha-amylase increased by 63.8 for the defensive tactics drill and decreased by 35.3 for the cold-water tank immersion. These results suggest that oleoresin capsicum and the defensive tactics drill (surrogate for exertion) were the most activating of the sympathetic response. Salivary cortisol increased 0.5 with the oleoresin capsicum versus 0.38 with the TASER, 0.25 for the defensive tactics drill, and 0.07 for the cold-water tank immersion at 15-20 minutes. These results suggest oleoresin capsicum was the most activating of the HPA stress response, followed by the CEW and the defensive tactics drill. In this study, the 1-minute defensive tactics drill led to the longest elevation of the HPA marker.

In a study by Stratton, et al. of symptom-limited handgrip versus cold pressor task versus symptom-limited supine bicycle exercise, with bicycle exercise testing, plasma norepinephrine and epinephrine concentrations increased three to six times more than during either the symptom-limited handgrip or cold pressor testing. Additionally, increases in heart rate, systolic blood pressure, rate-pressure product, stroke volume, ejection fraction and cardiac output were significantly greater during bicycle exercise than during the other two tests. The authors concluded that the bicycle exercise testing induced a much greater sympathetic response than either of the two tests.

An animal study by Han et al. examined the effects of cocaine and exertion. In this study, the combination of cocaine and exertion increased epinephrine, norepinephrine, and lactate levels to 2-5 times greater than cocaine or exertion alone, suggesting that the combination of these two sympathoadrenal stimulants amplified the effect. This increase was 11-35 times greater than rest suggesting that both cocaine and exertion, independently, increase these measures significantly over rest. Other animal studies have shown a relationship between restraint stress and sensitization to drugs of abuse. In a study by Pacchioni, A., et al., it was found that a single restraint exposure was sufficient to cause a significantly increased release of dopamine and locomotor activity to an amphetamine challenge in rats. A study by Pudiak, et al. demonstrated a significantly higher mortality with cocaine and restraint in rats compared to cocaine alone. In a study by Pacak, et al., rats were subjected to one of five stressors: cold, hypoglycemia, hemorrhage, pain (formulin injection into a limb), and immobilization. The authors found that immobilization increased ACTH the most, followed by hypoglycemia. Cold stress increased norepinephrine the most, followed by immobilization. Hypoglycemia increased epinephrine the

13

most, followed by immobilization. The immobilization stress was consistently one of the highest stressors by these measures.

Mr. Coronel had a severely elevated neurohumoral stress cascade due to his high level of physical exertion, the sympathomimetic activity induced by his excited delirium, the combined methamphetamine and cocaine abuse, and restraint stress. The notion that two drive-stun discharges of maximally 17 seconds to the right upper back/shoulder would be contributory in this background is not reasonable. Ignoring the sympathomimetic activity from his excited delirium (which would be a large component), and ignoring the contribution from the combined cocaine and methamphetamine abuse (also a very large component) and ignoring the synergistic effect of these drugs on exertion (as discussed above), if we only use our study results which showed an increase of salivary amylase (the marker for sympathetic tone) of greater than 60 in the 1-minute defensive tactics drill compared to the TASER compared to a 5 second (wide probe spread) discharge, then if we extrapolate this to a low estimate of 30 minutes of exertion compared to 17 seconds (highest possible discharge time) of the TASER discharge, we would expect the contribution from the exertion to be 600 times the TASER discharge. Of course, his period of exertion was much longer than this since he left his common law wife at 11:30 pm (at which time she observed him to be compromised) and did not arrest until about 0045 am. Deputies testified he was on the roof thrashing about for 20 minutes before they decided to physically restrain him. So if we use the maximum time, 135 minutes, this would be 2,700 times greater (of course, all of this makes a lot of assumptions, but and is only for rough comparison purposes).

*Cardiac Arrhythmias*

A paper by Ideker and Dosdall used fundamental laws of electro-stimulation and results from animal experiments to derive the probability for the induction of arrhythmias from conducted electrical weapons. In their derivation, they determined that because of the short duration of the TASER pulse, the cardiac cell membrane time constant, and the large distance to the heart from the surface of the body, that the TASER pulse is 2.63 standard deviations less than the minimum strength of a pulse that would stimulate an ectopic beat. They estimated in a normally distributed population, that less than 0.4% of individuals would experience an ectopic beat from the discharge. This derivation assumes the worst case pacing location on the surface of the chest. The size of Mr. Coronel would certainly make him less

14

likely to experience an ectopic beat. Additionally, neither of the discharges in Mr. Coronel was on the chest. In the derivation, it is also commented on that ventricular fibrillation requires a much greater pulse than an ectopic beat. They calculated that the pulse required to cause ventricular fibrillation is 29 times the TASER pulse, again in the optimal pacing location. In addition, because the time between TASER pulses is so long (53 milliseconds apart), there would not be an expected summation effect. Lastly, the authors state that myocardial necrosis from heat generation or from electroporation is unlikely. A study by Holden, et al. used modeling to estimate current densities from the TASER M26 and X26 at the heart and applied this to guinea pig hearts. They determined that ventricular fibrillation only occurred at peak currents > 70 fold for the M26 and > 240 fold for the X26 suggesting a wide safety margin for the devices. These modeling papers suggest that a TASER device will not cause a cardiac arrhythmia. In a case report by Haegeli, in a subject who received a TASER discharge to the chest (sternum), the TASER device did not change the sinus tachycardia of the subject. In a follow-up editorial by Marine, it was reported that the energies were markedly attenuated and no ventricular capture was seen. In this case report, the device was discharged over the heart and the energies at the heart were greatly attenuated and did not appear to capture the myocardium. In the case of Mr. Coronel, the device was discharged by drive stun (at the skin) and on the back, so the energies at the heart would be vanishing small and would not capture the myocardium.

In studies of electrical injury, electrically-induced arrhythmias occur immediately with the electrical stimulation. A review by Chen and Sareen, concluded that "patients with a normal initial electrocardiogram (ECG) result do not develop late dysrhythmias, and those with nonfatal arrhythmias or nonspecific ECG abnormalities typical resolve spontaneously within 24 hours." Ventricular fibrillation (VF) results in immediate unconsciousness. With sustained ventricular tachycardia (VT), which only occurs in abnormal hearts with a substrate for re-entry (e.g., prior myocardial infarction), depending on the rate and victim characteristics, a blood pressure adequate for consciousness may be maintained, but it would likely be symptomatic and be very unlikely that strong physical resistance would be possible. In a study by Pratt, et al., ventricular tachycardia that degenerated into ventricular fibrillation lasted on average 560 beats at a rate of 241 beats per minute. This means the ventricular tachycardia lasted on average 2 minutes. In a study by Viskin, et al., they found that in normal hearts, ventricular fibrillation occurred after a very brief episode of polymorphic tachycardia.

15

From a temporal perspective, to be associated with a TASER device discharge, the collapse would need to be immediate. In this specific case, Mr. Coronel resisted for some time after the last TASER device discharge.

An animal study by McDaniel, et al. found a safety index for ventricular fibrillation with a TASER device to be 15 to 42 times the standard output based on the weight of the animal. This data is in excellent agreement with the theoretical calculations of Ideker and Dosdall. Mr. Coronel was certainly in the higher range of this safety index. In a canine study by the same authors, there were no episodes of ventricular fibrillation with a standard TASER device discharge or with two simultaneous discharges. Even in the swine study by Jauchem, et al., with a prolonged exposure (up to 3 minutes), there was no evidence of cardiac muscle damage as measured by serum troponin.

A study by Nanthakumar, et al. in swine claimed cardiac electrical capture with a standard discharge in 78% of thoracic discharges. The mean ventricular rate was 324. This rate would not be tolerated without syncope in humans, and in none of the human studies, nor in the estimated greater than 673,000 volunteer exposures in training, has syncope during the exposure occurred (admittedly most training exposures are in the back, but this is exactly the area of contention in this case). Furthermore, in this study, there was only one episode of ventricular tachycardia that was not sustained, and one episode of ventricular fibrillation, but both of these occurred with the intravenous administration of epinephrine that can independently cause these arrhythmias. Also in this study, there was no electrical capture of the heart in non-thoracic discharges. In a study by Valentino, et al. in swine, it was found that the TASER device exposure caused myocardial capture at rates of 300. This was also only found in thoracic discharges (and per the authors, only in the cardiac axis). Again, this is not consistent with human experience. In direct contradiction to this study, we conducted an ultrasound study in humans (published in the October 2007 supplement to the Annals of Emergency Medicine) that showed no evidence of cardiac capture. In half of the subjects, normal sinus rhythm was documented by ultrasound. In the other half, motion artifact precluded a definitive statement, but the heart rates were never above 160. In this study, the ultrasound was done after exertion and the mean heart rate was lower during the application than immediately after the exertion. In another unpublished study with the exposure on the chest in the cardiac axis, there was also no evidence of myocardial capture.

16

In an animal (swine) study by Webster, et al., which has been much criticized for its methodology, the "dart-to-heart" distance required to induce ventricular fibrillation was 17 millimeters (mm). Dr. Webster, acknowledging the methodologic flaws has re-examined his model and is amending his findings. The findings will likely be a greatly reduced dart-to-heart distance of 5 mm (publication is pending). The drive stuns in this specific case were orders of magnitude away from this distance to the heart. A more recent animal study by Lakkireddy, et al. examined the point of delivery of the electrical discharge on the ventricular fibrillation thresholds. There were no episodes of ventricular fibrillation at any of the 5 positions tested (including a worst-case point of maximal impulse position), and the ventricular fibrillation threshold was 5-50 times the standard discharge depending on the location.

In another important study by Lakkireddy, et al. demonstrated no episodes of ventricular fibrillation with a standard discharge and an increase in the ventricular fibrillation threshold by 1.5 to 2 times with cocaine use. This may be the result of the sodium channel blockade by cocaine (type I anti-arrhythmic-like). Blockade of the sodium channels increase the threshold for excitation. The arrhythmogenicity of cocaine may lie in its other toxic effects, such as sympathetic activation. There have been no published studies to date on the effect of methamphetamine on ventricular fibrillation threshold. However, our study group has done some preliminary work in sheep and with exposures up to 40 seconds in duration with a standard TASER X26, we have found no episodes of ventricular fibrillation.

Several human studies have been performed as well. One of the original human studies by Ho, et al. demonstrated no ECG or serum troponin changes with a 5-second discharge. Several other authors, including Levine, et al., Barnes, et al., Sloane, et al., and Vilke, et al. have verified these original results. Ho et al. also published a study in which subjects were exposed to an exhaustive physical exertion regimen (creating an acidotic pH) and then were subjected to 15-second continuous discharges. This study showed no evidence of ECG changes. This study also showed no change in serum troponin. A study by Moscoti, et al. exposed subjects to the same 15-second continuous discharge, but after obtaining a legal level of alcohol intoxication. There was no change to serum troponin in this study.

17

In addition to prospective human studies, there have been several retrospective studies. A study of in-custody death events by Ho, et al. showed that conducted electrical weapons were never associated with instantaneous collapse in these cases. Less than one-third of the in-custody deaths even had a TASER device used during the arrest (this number is consistent with the Stratton and Ross series as well). In a study by McManus et al. of TASER device-related injuries, there were no deaths, no arrhythmias, or other cardiac-related complaints. In a new study by Bozeman, et al of 962 field uses, there were no cardiac problems and no deaths. The only major injuries were two head traumas (secondary to falls) and one with rhabdomyolysis that was not clearly linked to the TASER device exposure.

In summary, the preponderance of the animal and all of the human studies do not support any assertion that conducted electrical weapons induce malignant cardiac arrhythmias. In this case, even the most critical animal study findings would not support that the drive stuns to the back/shoulder caused a cardiac arrhythmia. Furthermore, it should be noted that the presenting rhythm of Mr. Coronel, captured immediately at his collapse, was not ventricular tachycardia or fibrillation, but asystole. This is not an electrically-induced arrhythmia (lightning can cause cardiac stand-still and asystole, but it takes this level of energy, and even then, the natural pacemaker usually resets). Asystole is a rhythm from acidosis, drug overdose, and hyper or hypokalemia.

*Breathing*

In the Jauchem, et al. animal study, which has frequently been referenced to demonstrate the negative respiratory effects of conducted electrical weapons, the animals had apnea with every exposure. This result has not been replicated in humans. The Jauchem et al study has some methodological problems making its interpretation difficult, including the fact that animals were heavily sedated and not ventilated.

Ho et al. found that a 15-second exposure of the TASER X26 across the diaphragm (abdomen to upper thorax) did not impair the measured respiratory variables. In fact, tidal volume, respiratory rate, and end-tidal oxygen increased and end-tidal carbon dioxide decreased during the 15-second exposure. This study was supported by a study by Chan et al.

441

Furthermore, we have conducted a follow-up study to the breathing study with 18 enrolled subjects in which we duplicated the methodology (including a 15-second continuous discharge from the TASER X26), but added venous blood gas and electrolyte sampling. In this study, there was no significant change in electrolytes or pH. The mean pH change in this study was -0.00289. This would not be considered clinically significant. In another study currently accepted in a national publication, we also examined the effect of a trapezius (at the base of the neck) TASER X26 drive-stun exposure on the diaphragm using ultrasound. We found that the diaphragm was able to have normal excursion. Therefore, no argument can be made about the upper back/shoulder exposure and respiratory impairment in this case (and in our study, the exposure was much closer to the phrenice nerve than the exposures in this case).

*Electrolytes*

In the original Ho et al. study, electrolytes, including potassium, were followed serially after the TASER device exposure and no changes were found. Bicarbonate, a surrogate for pH, showed no evidence of a metabolic acidosis. A criticism of this paper was the short duration of exposure. As referenced above, we also conducted a follow-up study to the breathing study with a 15-second continuous exposure and found the mean change in pH was -0.00289. There were no significant electrolyte changes. The Vilke, et al. study also found no significant electrolyte changes.

*Rhabdomyolysis*

Mr. Coronel developed severe rhabdomyolysis. This can result from stimulant toxicity, serotonin syndrome (a specific toxicity of some stimulants), and extreme exertion. In a Ho et al study, 66 subjects were exposed to a 5-second discharge in the back from a TASER X26. Serum chemistries were analyzed serially. The mean creatine kinase (CK) was found to rise slightly from 185 to 242. This rise, while statistically significant in the study, was certainly of no clinical significance. In an unpublished study, the civilian CEW, the C2, was studied with exposures from 20-30 seconds in a trans-thoracic exposure. In this study, the largest change in CK at 24 hours was 82 representing a trivial change clinically. In both of these studies, the exposures were to a large muscle mass group because of probe spread. In this specific case, the deputies used the TASER device in the drive-stun mode on Mr. Coronel. The spread in this mode is

19

trivial and very little muscle capture occurs. The effect on CK in this mode would be trivial. Mr. Coronel had a CK of greater than 20,000 that almost assuredly was the result of his struggle, excited delirium, and poly-stimulant toxicity. The physician who stated that it was ambiguous whether the TASER device contributed to the rhabdomyolysis obviously does not know the literature on conducted electrical weapons, and, from my estimation, does not know the literature on rhabdomyolysis since he failed to consider some very prominent causes which Mr. Coronel had.

*Exertion*

A Ho et al study examined the effects of a 15-second continuous TASER X26 discharge immediately after a short-duration, maximal intensity exercise regimen. In this study of 38 subjects, the mean venous pH at baseline was 7.38. After the maximal intensity exercise regimen, the mean pH to dropped to 7.23. After the 15-second continuous TASER discharge, the mean pH remained flat at 7.22. The recovery pH returned to baseline at 7.39. Additionally, lactate had a mean of 1.65 at baseline, increased to 8.39 after the exertion, and then increased to 9.85 after the exposure, and returned to baseline at recovery. The maximal intensity exercise regimen was brief. It consisted of 30 seconds of push-ups followed by a brief run on the treadmill at 8 miles-per-hour (mph) at an 8% grade. Most study subjects only performed the run for a few minutes. This data suggest that physical struggle to obtain restraint might be more detrimental to subjects who are already acidotic than an application of the TASER device.

Vilke, et al. also looked at exertion and had subjects exercise to 85% of their maximum heart rate and then exposed them to a 5 second TASER device exposure. They found pH and lactate did not change from post-exercise compared to 1 minute and 10 minutes post discharge.

*Temperature*

We conducted a study of core body temperature in 21 subjects exposed to a 15-second continuous exposure from the TASER X26. In this study, we found no core body temperature rise with the exposure.

*Demographic*

Ho, et al. used an internet search technique to look at all in-custody deaths in a 12 month period. In this study, the TASER device was used in 30% of the 162 deaths. In no case was the TASER device associated with "immediate" death. In the Stratton et al case series, a TASER device was only used in 28% of the cases (and pepper spray was used in 33% of the cases). In this series, the most associated factors were forceful struggle (100%), stimulant drug use (78%), established natural disease states (56%), and obesity (56%). In a study by Ross, et al., a TASER device (or other "stun gun") was only used in 21% of cases. In this study, none of the deaths were attributed to the TASER device. This data demonstrates that a TASER device is used in the minority of in-custody deaths, and other factors, many of which Mr. Coronel demonstrated, are more associated with these deaths.

Conclusion

In summary, to a high degree of medical certainty the prevailing evidence does not support that conducted electrical weapons would have any significant contributory role in the cardiac, respiratory, blood chemistry, thermal regulatory, or stress hormone derangements that might be the result of the excited delirium syndrome or poly-drug toxicities of Mr. Coronel. In my opinion, to a high degree of medical certainty, the TASER device was not contributory to the death of Mr. Coronel. His pre-existing heart disease (predisposing him to arrhythmias), his excited delirium, his combined methamphetamine and cocaine toxicity, and his prolonged heavy exertion, both before and after arrest, all produced a dangerous combination that led to his ultimate death.

5/12/08

_____

Donald M. Dawes, MD, FACEP

## References

### Excited Delirium

Ross DL and TC Chan. Sudden deaths in custody. 1st ed. Totowa, New Jersey: Humana Press, 2006.

Di Maio TG and VJM Di Maio. Excited delirium syndrome cause of death and prevention. 1st ed. Boca Raton, Florida: Taylor & Francis Group, 2006.

Stratton SJ, Rogers C, Brickett K, and G Gruzinski. Factors associated with sudden death of individuals requiring restraint for excited delirium. Am J Emerg Med, 2001; 21:187-191.

Karch, S., Stephens, B. Drug Abusers Who Die During Arrest or In Custody. J R Soc Med, 1999; 92:110-113.

Mash, Deborah. "New and Recent Research Findings: Stimulants and the Brain." Institute for the Prevention of In-Custody Death. Annual Meeting. Las Vegas, Nevada. November 2006.

Hick JL, SW Smith and MT Lynch. Metabolic acidosis in restraint-associated cardiac arrest: a case series. *Acad Emerg Med*, 1999; 6: 239-43.

Karch, S., ed. Drug abuse handbook. 2nd ed. NBew York: CRC Press, 2006.

### Drugs

Levis J., et al. Cocaine-associated chest pain. Emerg Med Clin North Am, 2005; 23(4): 1083-103.

Afonso L, et al. Crack whips the heart: a review of the cardiovascular toxicity of cocaine. Am J Cardiol, 2007; 100(6): 1040-3.

Callaway C., Clark, R. Hyperthermia in Psychostimulant Overdose. Annals of Emergency Medicine, 1994; 24: 68-76.

O'Connor, et al. Cerebrovascular and cardiovascular complications of alcohol and sympathomimetic drug abuse. Med Clin N Am, 2005; 89: 1343-1358.

Ford, M., Delaney, K., Ling, L., and Erickson, T. ed. Clinical Toxicology, 1st ed., W.B. Saunders, 2001.

Rusyniak, D. and Sprague, J., Toxin-induced hyperthermic syndromes. Med Clin N Am, 2005; 89: 1277-1296.

Greene, J. et al. Adolescent abuse of other drugs. Adolesc Med, 2006; 17: 283-318.

Prybys, K. et al. Deadly drug interactions in emergency medicine. Emerg Med Clin North Am, 2004; 22 (4): 845-863.

Sorer, H., ed. Acute cocaine intoxication: current methods of treatment. NIDA Research Monograph 123, 1992.

Albertson, T., et al. Methamphetamine and the expanding complications of amphetamines. West J. Med, 1999; 170: 214-219.


*Conducted Electrical Weapons*

McDaniel WC, Stratbucker RA, Nerheim M, et al. Cardiac safety of neuromuscular incapacitating defensive devices. PACE, 2005; 28: S284-7.

McDaniel W, and R Stratbucker. Testing the cardiac rhythm safety of the thoracic application of Tasers. Europace, 2006;8: 58P23.

Jauchem J, Sherry C, Fines D, and M Cook. Acidosis, lactate, electrolytes, muscle enzymes, and other factors in the blood of sus scrofa following repeated TASER exposures. Forensic Sci Int, 2006; 161: 20-30.

Lakkireddy, D, Wallick, D, Ryschon, K, et al. Effects of Cocaine Intoxication on the Threshold for Stun Gun Inducation of Ventricular Fibrillation. J Am Coll Cardio, 2006; 48:805-11.

Nanthakumar, K, Billingsley, I, Masse, S, et al. Cardiac Electrophysiological

23

Consequences of Neuromuscular Incapacitating Device Discharges. J Am Coll Cardio, 2006; 48: 798-804.

Webster, J., Will, J., Sun, H., et al. Can Tasers directly cause ventricular fibrillation? IFMBE Proc, 2006, 14: 3307-3310.

Lakkireddy, D., Wallick, D., Ryschon, K., et al. Cardiovascular Safety Profile of Electrical Stun Guns (TASER): Impact of Point of Delivery on Ventricular Fibrillation Thresholds. 2007,

Ho JD, Miner JR, Lakireddy DR, et al. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. Acad Emerg Med, 2006; 13: 589-595.

Levine SD, Sloane C, Chan T, Vilke G, and J Dunford. Cardiac Monitoring of subjects exposed to the TASER. Acad Emerg Med, 2005; 12: S71.

Barnes Jr., D., Winslow, J., et al. Cardiac Effects of the TASER X26 Conducted Energy Weapon. Ann Emerg Med, 2006; 48: S102.

Ho, JD, Dawes, DM, et al. Absence of Electrocardiographic Change Following Prolonged Application of a Conducted Electrical Weapon in Physically Exhausted Adults. Acad Emerg Med, 2007; 14: S128-S129.

Sloane, C., Vilke, G., et al. Serum Troponin I Measurement of Subjects Exposed to the TASER X26. Acad Emerg Med, 2007; 14: S103-S104.

Vilke, G., Sloane, C., et al. Cardiovascular and metabolic effects of the TASER on human subjects. Acad Emerg Med, 2007; 14:S104-S105

Vilke G., Sloane, C., et al. Does the TASER Cause Electrical Changes in Twelve Lead ECG Monitoring of Human Subjects? Acad Emerg Med, 2007; 14:S104.

Levine, S., Sloane, C., Chan, T., et al. Cardiac monitoring of human subjects exposed to the TASER. J Emerg Med, 2007; In press.

Ho JD, Reardon RF, and WG Heegaard. Deaths in police custody: an 8 month surveillance study. Ann Emerg Med, 2005;46 (suppl): S94.

24

McManus J, Forsyth T, Hawks R, et al. A retrospective case series describing the injury pattern of the advanced M26 TASER in Multnomah County, Oregon. Acad Emerg Med, 2004; 11: 587.

Ho, JD, Dawes, DM, et al. Respiratory effect of prolonged electrical weapon application on human volunteers. Acad Emerg Med, 2007: In Press.

Chan, T., Sloane, C., et al. The impact of the TASER weapon on respiratory and ventilatory function in human subjects. Acad Emerg Med 2007 (Supplement 1); 14: S191-192S.

Bozeman, W., Winslow, J., et al. Injury Profile of Electrical Conducted Energy Weapons. Ann Emerg Med, 2007; 50 (3): S65.

Dawes, D., Ho, J., et al. 15-second conducted electrical weapon application does not impair basic respiratory parameters, venous blood gases, or blood chemistries and does not increase core body temperatures. Ann Emerg Med, 2007; 50 (3): S132.

Dawes, D., Ho, J., et al. The Neuroendocrine effects of the TASER X26 conducted electrical weapon as compared to oleoresin capsicum. Ann Emerg Med, 2007; 50 (3): S132.

Ho, J., et al. Ultrasound measurement of cardiac activity during conducted electrical weapon application in exercising adults. Ann Emerg Med, 2007; 50 (3): S108.

Dawes, D., Ho, J., et al. 15-Second Conducted Electrical Weapon Exposure Does Not Cause Core Temperature Elevation in Non-Environmentally Stressed Resting Adults. Forensic Sci Int, 2007; Forensic Sci Int, 2008; 176: 253-257.

Vilke, G., Sloane, C., et al. Physiologic effects of the TASER on human subjects after exercise. Ann Emerg Med, 2007; 50 (3): S55.

Ideker, R. and Dosdall, D. Can the direct cardiac effects of the electrical pulses generated by the TASER X26 cause immediate or delayed sudden cardiac arrest in normal adults? Am J Forensic Med Pathol, 2007; 28: 195-201.

25

Ho, J, et al. Prolonged TASER use on exhausted humans does not worsen markers of acidosis. Am J Emerg Med, 2008; In press.

Holden, S. et al., Electromagnetic modeling of current flow in the heart from TASER devices and the risk of cardiac dysrhythmias. Phys Med Biol, 2007; 52: 7193-7209.

Haegeli, L., et al. Effect of a Taser shot to the chest of a patient with an implantable defibrillator. Heart Rhythm, 2006; 3:339-341.

Marine JE: Stun guns: A new source of electromagnetic interference for implanted cardiac devices. Heart Rhythm 2006; 3:342-344.

*Arrhythmias*

Pratt, C., Francis, M., et al. Analysis of ambulatory electrocardiograms in 15 patients during spontaneous ventricular fibrillation with special reference to preceding arrhythmic events. J Am Coll Cardiol, 1983; 2 :789-797.

Chen, E. and Sareen, A. Do children require ECG evaluation and inpatient telemetry after household electrical exposures? Ann Emerg Med, 2007; 49: 64-67.

Viskin, S., Lesh, M. et al Mode of onset of malignant ventricular arrhythmias in idiopathic ventricular fibrillation. J Cardiovasc Electrophysiol, 1997; 8: 1115-1120.

*Stress*

Wittstein, I., Thiemann, D., et al. Neurohumoral Features of Myocardial Stunning Due to Sudden Emotional Stress, NEJM, 2005; 352(6): 539-548.

Kirschbaum C, Hellhammer DH. Salivary cortisol in psychoneuroendocrine research: recent developments and applications. Psychoneuroendocrinology, 1994; 19: 313–333.

Chatterton , Jr , JrRT, Vogelsong KM, Lu YC, Ellman AB, Hudgens GA: Salivary □-amylase as a measure of endogenous adrenergic activity. Clin Physiol, 1996; 16: 433-448.

Rhind, S., et al. Contribution of exertional hyperthermia to sympathoadrenal-mediated lymphocyte subset redistribution. J Appl Physiol, 1999; 87: 1178-1185.

Stratton, J, et al. Comparative plasma catecholamine and hemodynamic responses to handgrip, cold pressor and supine bicycle exercise testing in normal subjects. Am J Med Sci, 1992 Sep; 304(3): 150-3.

Han, D., Kelly, K., et al. Cocaine and exercise: temporal changes in plasma levels of catecholamines, lactate, glucose, and cocaine. Am J Physiol Endocrinol Metab, 1996; 270: 438-444.

Pacchioni, A., et al. A single exposure to restraint stress induces behavioral and neurochemical sensitization to stimulating effects of amphetamine: involvement of NMDA receptors. Ann NY Acd Sci, 2002; 965: 233-46.

Pudiak, C., and Bozarth, M. Cocaine fatalities increased by restraint stress. Life Sci, 1994; 55: 379-382.

Pacak, K. and Palkovits, M. Stressor specificity of central neuroendocrine responses: implications for stress-related disorders. Endocrin Rev, 2001; 22(4): 502-548.

*Post-Exercise Peril*

Dimsdale JE, Hartley LH, Guiney T, Ruskin JN, Greenblatt D. Postexercise peril. Plasma catecholamines and exercise. JAMA, 1984; 251: 630-632.

Hagberg, J., Hickson, R., et al. Disappearance of norepinephrine from the circulation following strenuous exercise. J Appl Physiol, 1979; 47: 1311-1314.

Young, D., Srivastava, T., et al. Potassium and catecholamine concentrations in the immediate post exercise period. Am J Med Sci, 1992; 304(3): 150-153.

Coplan, N., Gleim, G, Nicholas, J. Exercise-related changes in serum catecholamines and potassium: effect of sustained exercise above and below lactate threshold. Am Heart J, 1989; 117(5): 1070-5.

Fletcher, G., Balady, G., et al. Exercise Standards: A Statement for Healthcare Professionals From the American Heart Association. Circulation, 1995; 91:580

Rywik, T., Zink, R. Independent Prognostic Significance of Ischemic ST-Segment Response Limited to Recovery From Treadmill Exercise in Asymptomatic Subjects. Circulation. 1998; 97 :2117-2122.

Fee Schedule for Donald M. Dawes, M.D., FACEP

Last update: November 5th, 2007

### Home Hourly Billing Rate:

$300.00 per hour, billed in 15-minute increments, for time spent working on a case

(reviewing documents, writing opinions, testifying at trial, providing depositions) at

home location (Santa Barbara, CA).

### Travel Billing Rate:

Each day away from home location will be billed at $ 2,700 per day (business hours 8 am

– 5 pm). For time spent working on a case after business hours, the rate will be $300.00

per hour, billed in 15-minute increments. Travel days will be billed as: 4 hours or less =

$1200, > 4 hours = $2,700. Travel requiring greater than 9 hours will be billed $2,700

plus $300 per hour for each additional hour.

Note that reasonable travel expenses are to be reimbursed (lodging, meals, transportation, parking, internet and phone charges, etc.). I will be responsible for making my own travel arrangements unless another arrangement is agreed upon in advance. Business Class (International) or First Class (Domestic) transportation fare will be allowable for travel away from home location that exceeds 2 hours flight time.

Donald M. Dawes, M.D.
301 Loyola Drive
Santa Barbara, CA  93109
(805) 966-3935 (home)
(805) 452-4574 (cell)
DonaldDawes@aol.com

Employment

| | |
|---|---|
| June 2005 – present | Medical Consultant, TASER International, Scottsdale, AZ |
| Dec 2005 – present | Emergency Physician, Lompoc District Hospital |
| Jan 2004 – Dec 2005 | Emergency Physician, Santa Ynez Valley Cottage Hospital and Lompoc District Hospital |
| Aug 2003 – Dec 2004 | Emergency Physician, Santa Barbara Cottage Hospital, Goleta Valley Cottage Hospital, Lompoc District Hospital, and Santa Ynez Valley Cottage Hospital. |
| Jul 2002 – Jul 2003 | Emergency Physician, part-time at multiple Southern California Kaiser Permanente locations, at Antelope Valley Hospital in Lancaster, CA, and at St. John's Medical Center in Santa Monica, CA. Additionally, intermittent locum tenens assignments through Vista Staffing Solutions based in Salt Lake City, Utah. |
| Jun 1999 - Jun 2002 | Resident Physician, Department of Emergency Medicine, Harbor-UCLA Medical Center, Torrance, CA. Certificate of completion of postgraduate training in emergency medicine. |
| Nov 1997 – Mar 1998 | MCAT Instructor, Kaplan Educational Center, Durham,NC. |

| | |
|---|---|
| Nov 1994 – Jun 1995 | Research Assistant, Joint Center for Radiation Therapy, Peter Mauch, M.D., P.I., Boston, MA. |
| Jun 1994 – Aug 1994 | Organic Chemistry Laboratory Teaching Assistant, Bryn Mawr College, Bryn Mawr, PA. |
| Oct 1991 – May 1992 | Network Engineer, AT&T, Morristown, NJ. |
| Mar 1990 – Oct 1991 | Proposal Manager, AT&T, Morristown, NJ. |
| Jul 1989 – Feb 1990 | Computer Operator, Strategic Air Command, USAF, Blytheville, AR. Honorable discharge Aug 1993. |

## Licensing

| | |
|---|---|
| Nov 00 – present | California state medical license. |
| Oct 03 – present | Hawaii state medical license. |

## Certifications

FELLOW ACEP

ABEM Diplomate

ACLS, ATLS

CA POST Level II Reserve Peace Officer

TASER M26/X26 Instructor

## Education

| | |
|---|---|
| Nov 2004 | International School of Tactical Medicine, Tactical Emergency Medicine 1: Basic Tactics & Medicine Course |

| | |
|---|---|
| Jan 2004 – June 2004 | Ventura County Police and Sheriff's Reserve Academy, CA POST Level II Certification. |
| Aug 1995 – May 1999 | Duke University, School of Medicine, Durham, NC. M.D. awarded May 1999. |
| Jun 1993 – May 1994 | Bryn Mawr College, Post-baccalaureate Pre-medical Program, Bryn Mawr, PA. Certificate of completion May 1994. |
| Sep 1992 – Jun 1993 | University of California at San Diego, Department of Computer Science, San Diego, CA. Partial completion of M.S. in computer science. |
| Aug 1990 – May 1992 | Stevens Institute of Technology, Department of Electrical Engineering and Computer Science, Hoboken, NJ. Partial completion of M.S. in computer science. |
| Aug 1985 – May 1989 | Cornell University, College of Engineering, Ithaca, NY. B.S. in electrical engineering awarded May 1989. |

Publications_____

Ho J, Dawes D, Bultman L, et al: Respiratory Effects of Prolonged Conducted Electrical Weapon Application on Human Volunteers; Acad Emerg Med 2007; 14(3): 197-201.

Ho J, Dawes D, Johnson M, et al: Impact of Conducted Electrical Weapons in a Mentally Ill Population: A Brief Report. Am J Emerg Med 2007; 25(7): 780-5.

Ho, JD, Dawes, DM, et al. Absence of Electrocardiographic Change Following Prolonged Application of a Conducted Electrical Weapon in Physically Exhausted Adults. Acad Emerg Med, 2007; 14: S128-S129.

Ho, JD, Dawes, DM, at al. Physiological Effects of Prolonged Conducted Electrical Weapon Discharge on Acidotic Adults. Acad Emerg Med, 2007; 14: S63.

Moscoti, RM, Ho, JD, Dawes, DM, et al. Physiological Effects of Prolonged Conducted Electrical Weapon Discharge on Intoxicated Adults, Acad Emerg Med, 2007; 14: S63-S64.

Dawes, D., Ho, J., et al. 15-Second Conducted Electrical Weapon Exposure Does Not Cause Core Temperature Elevation in Non-Environmentally Stressed Resting Adults. Forensic Sci Int, 2007; in press.

Dawes, D., Ho, J., et al. The Neuroendocrine effects of the TASER X26 conducted electrical weapon as compared to oleoresin capsicum. Ann Emerg Med, 2007; 50 (3): S132.

Ho, J., Dawes, D., et al. Ultrasound measurement of cardiac activity during conducted electrical weapon application in exercising adults. Ann Emerg Med, 2007; 50 (3): S108.

Dawes, D., Ho, J., et al. 15-second conducted electrical weapon application does not impair basic respiratory parameters, venous blood gases, or blood chemistries and does not increase core body temperatures. Ann Emerg Med, 2007; 50 (3): S132.

Dawes, D., Ho, J., et al. Breathing parameters, venous blood gases, and serum chemistries with exposure to a new wireless projectile conducted electrical weapon in human volunteers. Ann Emerg Med, 2007; 50 (3): S133.

Bigner S, Matthews M, Rasheed BKA, Wiltshire R, Friedman H, Friedman A, Stenzel T, Dawes D, McLendon R, Bigner D: Molecular genetic aspects of oligodendrogliomas including analysis by comparative genomic hybridization. American Journal of Pathology, 155 (2), 1999, 375-386.

Van Os R, Dawes D, Mislow JMK, Witsell A, Mauch PM: Host conditioning with 5-fluorouracil and kit-ligand to provide for long-term bone marrow engraftment. Blood, 89 (7), 1997, 2376-2383.

Ongoing contributor to 24/7 News police newspaper.

Presentations_____

Oct 2007    TASER Use of Force, Risk Management, and Legal Strategies, Lawrenceville, GA. Dawes, D: Medical Aspects of In Custody Death.

Oct 2007    Land Warfare Conference, Adelaide, Australia. Dawes, D.: Update of Electronic Control Device Human Effects Research.

Oct 2007    Research Forum, American College of Emergency Medicine, Seattle, WA. Abstract presentations (see publications).

Sept 2007   Fourth Mediterranean Emergency Medicine Congress, Sorrento, Italy. Absract presentations (see publications).

Aug 2007    TASER Use of Force, Risk Management, and Legal Strategies, Taunton, MA. Dawes, D: Medical Aspects of In Custody Death.

Jul 2007    TASER Use of Force, Risk Management, and Legal Strategies, San Diego, CA. Dawes, D: Medical Aspects of In Custody Death.

Jun 2007    TASER Use of Force, Risk Management, and Legal Strategies, Dallas, TX. Dawes, D: Medical Aspects of In Custody Death.

Apr 2007    TASER Use of Force, Risk Management, and Legal Strategies, St. Louis, MO. Dawes, D: Medical Aspects of In Custody Death.

Jan 2007    Santa Ana District Attorney's Office, Santa Ana, CA, Dawes, D: Medical Aspects of In Custody Death.

Nov 2006    1st Annual Conference of the Institute for the Prevention of In Custody Death, Las Vegas, NV. Ho J, Dawes D: Human Research on Conducted Electrical Weapons.

June 2006   US Department of Defense and National Institute of Justice Human Electro-Muscular Incapacitation Device Conference, Quantico, VA.Ho J, Dawes D: Conducted Electrical Weapon Human Research Update.

| June 2006 | Annual Meeting of the National Alliance for the Mentally Ill, Washington, D.C. Ho J, Dawes D, et al: Beneficial Impact of Conducted Electrical Weapons in the Mentally Ill Population. Poster presentation. |
|---|---|

## Expert Testimony

| Apr 2007 | Lakisha Neal-Lomax v. Las Vegas Metropolitan Police Department, TASER International, Inc., et al (NV) |
|---|---|

## Honors

| 2004 | Academic Achievement Award Ventura County Police and Sheriff's Reserve Academy |
|---|---|
| 1998 | Alpha Omega Alpha (Duke University School of Medicine) |
| 1998 | Association of Pathology Chairs Honor Society (Duke University School of Medicine) |
| 1995 | Joseph E. Markee Memorial Award in Anatomy (Duke University School of Medicine) |
| 1992 | MICRO Fellowship (University of California at San Diego) |
| 1989 | Graduation with Distinction (Cornell University) |
| 1985-1989 | Engineering Dean's List, seven of eight semesters (Cornell University) |
| 1985 | AFROTC Scholarship (Cornell University) |

## Memberships

ACEP

Alpha Omega Alpha Honor Society (Duke)

CA Reserve Peace Officer Association

**Volunteer Activities**

| | |
|---|---|
| Mar 05 – present | FBI Sponsored Southern CA TEMS Task Force, LA, CA |
| Oct 04 -present | Santa Barbara Police Department, Reserve Officer and SWAT Operator and Medic, SB, CA |
| Aug 03- Dec 03 | Ventura County Sheriff Search and Rescue Team, Flight Physician, Camarillo, CA |

**References**

Letters available upon request.