# EXHIBIT K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELVIRA TERAN, ET AL.,    )
           )
    PLAINTIFF (S), )  CASE NO. C 06-06947 JW
           )
VS.         )
           )
           )
TASER INTERNATIONAL, INC., )
ET AL.         )
           )
    DEFENDANT (S) )

Expert Report: John G. Peters, Jr., Ph.D., M.B.A., CLS
209 South Stephanie Street
Suite B249
Henderson, Nevada 89012
Telephone: 717.538.5940

  Pursuant to Fed. R. Civ. P. 26(a)(2), I, John G. Peters, Jr., Ph.D., hereby submit my report
that contains a complete statement of all opinions to be expressed and the bases and reasons
therefore; the data and other information I considered in forming the opinions; the exhibits or list
of references I used as a summary of or support for the opinions; my qualifications, including a
list of all publications authored within the preceding ten years; the compensation to be paid for
the study and testimony time; and a listing of any other cases in which I have testified as an
expert at trial or by deposition within the preceding four years.

_John G. Peters, Jr., Ph.D._
John G. Peters, Jr., Ph.D.

May 14, 2008

**ABSTRACT**

See APPENDIX A.

**PARTICIPANT LIST**

See APPENDIX B.

**TIMELINE & ACTIVITY**

See APPENDIX C.

**SUMMARY OF FACTS**

See APPENDIX D.

**CASE MATERIALS REVIEWED OR CONSIDERED**

See APPENDIX E.

**RIGHT TO AMEND**

I reserve the right to amend these opinions based upon additional testimony and/or discovery documents.

**OPINION STANDARDS**

Expressed opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

**OPINION METHODOLOGY**

The following opinions were developed using one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review. These research methodologies may have included Literature Review, Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study.

The documents reviewed are classified in the social sciences as *archival records*. According to Graziano and Raulin (1997), archival records are "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and/or experts. The review and analysis of archival records is an accepted research methodology in the social sciences, and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, plus conducting observations are methodologies that are used in the social sciences.

# PRE-INCIDENT OPINIONS

*Pre-Incident Opinions* are those professional opinions that focus on events that took place prior to the instant matter.

1. **The training resources offered by TASER International, Inc. (TASER) in 2006 met or exceeded recognized law enforcement educational and/or training standards.**

A content analysis of TASER instructional lesson plan Versions 8.0 (2002), Version 9.0 (May 2003), Version 10.0 (July 2003), 10.1 (November 2003), Version 11 (January 2004), Version 12 (January 2005) surfaces that they comport to generally accepted lesson plan format and design. Since that time several other versions of the TASER training program have been developed and produced.

As a law enforcement program instructional designer, certified online instructor, certified online instructional designer, and former university professor who has taught instructional design at the college level, in my professional opinion, the TASER instructor training, Versions 8.0, 9.0, 10.0, 10.1, 11.0, and 12.0 meet and/or exceed the criteria of reasonable training content, product warnings, and outcome-based training. Versions 8.0, 9, 10 10.1, 11.0, 12.0 (January 2005), 13 (January 2006), and 14 (2007) of the TASER instructional lesson plans were also reviewed with the similar findings. As a general matter, I am familiar with all TASER instructional lesson plans and training materials for the ADVANCED TASER®[1] M26™ and TASER® X26™ Electronic Control Devices (ECDs or devices).

According to Dick, Carey, and Carey (2001), there are three domains of learning that are to be included in the instructional design of a reasonable training program, such as TASER's: intellectual skills (p. 39), attitudes (pp. 40-41), and psychomotor skills (p. 40). Intellectual skills include the "forming of concepts, applying rules, and solving problems" (p. 39). The authors' note that "with these skills the learner can classify things according to labels and characteristics, can apply a rule, and can select and apply a variety of rules in order to solve problems" (p. 39). Version 6.0, and through present versions, of the TASER instructor training program include the development of intellectual skills through the teaching of the historical development of TASER devices, ECD technologies, stun versus neuro-muscular incapacitation (NMI), basic concepts of electricity, including, but not limited to TASER waveforms, energy, coulombs, voltage, amperes, watts, power, joules, averages, delivered vs. stored electrical characterstics, etc., common effects of NMI, TASER M26 operation, dataport downloads, probe and drive stun deployments, probe placement techniques, probe trajectory, weapon management, use-of-force, tactical considerations, causes of limited effectiveness, medical studies, policy considerations, controlling and/or cuffing under power, drive stun, potential injuries, etc. (Instructor Certification Course, *Lesson Plan v.9.0*, 2003; *v.10.0*, 2003).

The TASER instructor-candidate must also take a written examination, which is another form of testing of the learner's intellectual skills (see M26 written assessment instruments).The

---

[1] AIR TASER, M26, and X26 are trademarks of TASER International, Inc. TASER® and ADVANCED TASER® are registered trademarks of TASER International, Inc.

learner is also required to be able to *explain* information about the TASER ECDs (Instructor Certification Course, *Lesson Plan v. 8.0*, 2002; *Lesson Plan v. 9.0*, 2003; *Lesson Plan v. 10.0*, 2003; *Lesson Plan v. 11, 2004; Lesson Plan v. 12.0*, 2005).

Attitude, or affective domain, is contained throughout the TASER 2002, and subsequent, *Lesson Plans* in a variety of locations and formats. In short, affective domain focuses upon the learner's attitude regarding classroom rules, safety, respect, etc.

Psychomotor skill characteristics generally require the learner to execute muscular actions, with or without equipment, to achieve special results (Dick, Carey, and Carey, 2001, p. 40).The 2003 Instructor Certification Course, *Lesson Plan v. 9.0*, has several psychomotor skills requirements, including, but not limited to: an aiming drill, a first firing drill, a live fire drill, and a reloading drill. The *Lesson Plan* also requires the learner to demonstrate these psychomotor skills through the use of objectives.

The instructor and other training offered by TASER is a service that it provides to law enforcement rather than a product. It is well known by trainers and training providers that training is a service and not a product, permitting the end user, in this case Monterey County (CA) Sheriff's Department instructors to add or delete information that they deemed appropriate.

As additional background, TASER has several layers of TASER ECD instructor: Chief Instructor, Director of Training, Training Board, Senior Master Instructors, Master Instructors, Advanced Instructors, and Instructors. TASER has published 16 versions of its training program (currently up to Version 14). TASER also publishes Training Bulletins on an as-needed basis. The substance of these Training Bulletins is published on TASER's Website (www.taser.com), and is incorporated into the succeeding training program version. TASER provides a current training CD(s) or DVD(s) with every TASER ECD shipped (as well as a Product Manual), and every TASER ECD instructor receives a CD or DVD and a manual as part of the training program. With each Training Bulletin or training version release, TASER either emails, faxes, or mails Training Bulletins and training CDs or DVDs to all currently certified instructors in its database (over 30,000). Instructors are required to go to TASER's Website and ensure latest version training and updates within 72 hours prior to presenting a training program. TASER also requires, for TASER instructor certification, its instructors to repeat its instructor programs every two years for updates and refreshers.

## 2. Monterey County TASER-trained ECD officers are educated use-of-force users.

I am familiar with law enforcement training that is conducted within the State of California, and the Peace Officer Standards and Training (P.O.S.T.) domains of training California law enforcement officers receive regarding use-of-force, techniques, weapons, tactics, options, incident realities, etc. based upon literature review, interviews, coupled with having taught many law enforcement officers both inside the State of California and outside of it. California law enforcement officers, depending upon their specialty, receive specialized training in use-of-force, use-of-force equipment, such as handguns, rifles, pepper spray, and use-of-force tactics and techniques, and therefore, in my professional opinion, are sophisticated use-of-force users when it comes to the application of force both inside and outside of a classroom. California

law enforcement officers know that any use-of-force has a risk of causing or contributing (in some way) to serious bodily injury. These law enforcement officers also know that any use-of-force application is multifactorial, unpredictable, and often filled with numerous unknown, or unverified, factors and conditions. These officers also understand that each suspect may have varying degrees of special susceptibilities and/or conditions.

### 3. TASER warnings met or exceeded other law enforcement manufacturer product warnings about its products to the purchasers and users of its products.

Warnings about the TASER ECDs met or exceeded other law enforcement manufacturer product warnings to the people who and governmental entities that purchased and used it. This opinion is partially based upon my knowledge about and experience in writing product warnings for law enforcement equipment and techniques, an extensive review of like law enforcement use-of-force equipment and techniques warnings, and finally based upon a content analysis of TASER's product warnings. TASER has provided written, audio-visual, demonstrative, and experiential warnings about its products in the TASER device Product Manual, on TASER's Website, and extensively in the TASER training programs, and has also provided verbal, visual (including video and audio examples), demonstration, and other warnings, which supplement and reinforce the written warnings, during instructor training classes (M26 written warnings; training CDs/DVDs; Product Manuals; TASER's Website – www.taser.com; and Instructor Certification Course). Also, TASER training materials and Website include extensive research and other information, *Lesson Plans 8.0, 9.0* (2003), and *12.0* (2005) as previously listed and discussed.

Also, a law enforcement manufacturer, or any other product manufacturer, cannot possibly warn against that which the product does not cause. Warnings are to be based upon a foundation of scientific, medical, and/or other professional evidence of defect, proof, foreseeable use, condition, etc. to some foreseeable degree of certainty or probability. Warnings, to be useful and/or valid, are not to be based on rumor, innuendo, speculation, myth, unsubstantiated statements, etc.

I have conducted a content analysis of the very limited warnings provided by the manufacturer of the following use-of-force products supporting the conclusion that TASER's myriad of warnings are far more thorough, focused, and complete than those reviewed.

### NOVA XR-5000 Series Stun Gun, NOVA Spirit L.E.S. II, and NOVA Electronic Riot Shield

NOVA National Training, Inc. and NOVA Law Enforcement Division have produced a training manual about the reasonable uses of the NOVA stun gun products. While the 1987 training manual contains a history of stun gun technology, including safety data and medical research, it is far below the information provided by TASER about its electronic pulse technology products. The 1987 NOVA manual only contains four pages on these three topics (*NOVA Law Enforcement Training Manual & Operational Guide in the Use of Electronic Non-lethal Control Devices*, 1987, pp. 18-21).

464

Regarding "location of application", the 1987 NOVA manual identifies the areas where the NOVA products can be applied, but fails to separate out the NOVA hand-held devices from the NOVA electronic shields (*NOVA Law Enforcement Training Manual & Operational Guide in the Use of Electronic Non-lethal Control Devices*, 1987, p. 41), and also fails to explain why the rationale and medical implications of those areas of the body are designated "unacceptable".

## DO-RITE Sticks

Manufactured by the DO-RITE® Corporation, the DO-RITE sticks are designed as a non-lethal, temporary restraining device, resembling martial art nunchakus. The undated (late 1980s) training brochure only depicts how the sticks can be used, without any written warning(s) about its misuse, or ability to seriously injure or kill a person.

## Flex-Baton Police Nunchaku

The 1990 training manual on the Flex-Baton Police Nunchaku provides limited warnings on page 6. Specifically, the warning advised the reader to "avoid head contact" with the Flex-Baton. Although the manual is chocked-full of pictures that demonstrate how to use the Flex-Baton, the warning(s) are very limited, and fail to provide the reader with reasonable warnings about this product that can cause serious bodily injury or death.

## The BodyGuard Restraining Systems Owner's Manual and Instructions for Use

This undated, five-page, typed *Owner's Manual and Instructions* (approx. mid 1990s) fails to identify potential injuries to the person on whom the device is placed. Although there is a mention on page 3 about positional asphyxiation, the manual fails to explain it, etc.

Manufactured by BioGuardian Systems, Inc., the undated four-page *Training Outline* fails to provide any warnings about the inherent or potential dangers and/or risks to the use of this product on "violent subjects" (p. 2).

## SABRE H2O Series and Dual Propellant System (pepper spray)

While this 2005, eight-page product brochure discusses company history, formulations, advantages, consistency, other products, and electronic immobilization device compatibility, it fails to provide any warnings about its product to the potential purchaser.

## ASP Tactical Handcuffs

The 2004 brochure about this product does contain information about avoiding handcuff neuropathy by double-locking the handcuffs, which should prohibit the handcuffs from being over tightened. The product brochure also warns against striking the edge of the targeted wrist with a double-locked handcuff, because the wrist might fracture. Finally, the brochure warns against over tightening handcuffs because they can cause soft tissue or nerve damage. There is also mention of how an uncontrolled subject can use the handcuffs as a weapon against the officer.

## ASP Baton Basic Certification Course Syllabus

Approximately one-half page of this 1996 44-page book (excluding appendices), discusses "target areas" with the metal baton (*ASP Basic Certification (ABC) Course Syllabus*, 1996, p. 36). The book is only specific about its warning not to strike the head, neck, spine, sternum, or groin (p. 36).

## Tuff Tie Restraint

The undated (approx. 1990), one-page "Directions for Use" only says that "it is almost impossible to cut off circulation at the wrists" regarding the use of this handcuff-like device. No other warnings are provided regarding the device's potential injury.

## The Immobilizer Restraint Device

The 1981, 25-page training manual fails to warn of potential injury to the user or others. Even though this device is used to wrap around a person's legs and then forcefully throw the person to the ground, there are no warnings of any kind in the training manual, which was produced by the manufacturer.

## FLEX-CUF Restraining Tie Instruction Manual

This undated (approx. 1970s), eight-page instruction manual fails to provide warnings about the potential injury to those people who have the plastic "handcuffs" applied to them. There is no mention of potential wrist injury, arm, back, etc. injury.

## The WRAP

This undated (approx. 1995), five-page *Basic Application Manual* contains limited warning on its first page. Only one specific warning focuses on the shoulder harness system: "The shoulder harness system should never be over tightened to the point that it interferes with the subject's ability to breathe freely" (p. 1).

## RIPP Restraint for the Law Enforcement, Corrections & Medical Fields

This undated (approx. 1980s), 11-page booklet identifies several pieces of restraint equipment, while also providing instruction on how they can be applied. The only so-called "warning" is a disclaimer that tells the buyer that (s)he assumes all liability about the use of the various products. No other warnings are provided about these restraint products.

## The Source

The instructor's manual provides very limited warnings to the user about the use of this device. One of the first electronic "stun" technology devices, there are very few warnings about the use of the "stun" section of the flashlight, which is advertised as a "non-lethal weapon." The

only "warning" found in Universal Safety Corporation's *Instructions for maintenance and use*, is the following: "**Do not** touch lamp with fingers for several minutes until cool." The lesson plan only warns users against using *The Source* as follows: "Source should not be used against neck for choking." "Do not use Source to strike at the head or throat." (Smith, undated, no page).

### Electronic Batons

Similar to cattle prods, these devices were manufactured in the United States in the 1980s, and failed to have any warnings associated with them. There was no medical testing of these devices, and the devices were used solely at the risk of the buyer and his or her agents.

### TALON Glove

Another electronic device enclosed in a glove, it failed to provide reasonable warnings about its use. The device is no longer manufactured.

### Metallic Restraints

Most handcuff and metallic restraint directions that come with the product fail to warn against the over tightening of the handcuffs and/or metallic restraints, and the potential injuries that can be caused. This is true for most handcuffs and leg irons. Few, if any, mention of potential injury warnings are found in product literature or directions.

### Kel-Lite

The first heavy-duty flashlight manufactured primarily for law enforcement use, there were no warnings that came with the product regarding how it should be used. When the *Kel Lite Manual of Defensive Tactics* (cir. 1970) was published, the only warning given to the reader was "Head blows should definetly [sic] be avoided" (p. 21).

### Lamb Baton

The *Lamb Method of Baton* was developed by former Boston Police Officer, Arthur Lamb. It essentially involved two basic movements, so it was a very popular baton method in the 1970s. In *A Handbook for Use of the Baton: The Lamb Method* published by Harper & Row Publishers, Inc. (1977), the only pseudo-warning is found on page 12: "From the kneecap, the baton is swung with a wide circular motion backhand, striking the opponent's collarbone. It should be stressed here that the collarbone is a secondary target. Though in this instance a blow to the collarbone would probably not result in permanent injury, the risk of injury is greater than a blow to the knee. Therefore, it should be resorted to only when necessary" (Smith, 1977, p. 12).

### The SX-24 Police Baton Owner's Manual

Published by Monadnock Lifetime Products, Inc., the *Owner's Manual* fails to tell the user the areas of the body to avoid when using the baton. However, there is one warning to the

user: "The SX-24 police baton was not designed for use against such things as trees, telephone poles, concrete structures or other extremely rigid objects. Such intentional abuse could result in an immediate or latent component failure of the baton. Use against such extremely rigid and hard objects constitutes intentional abuse since it goes far beyond the normal and reasonable conditions relating to training and/or practices or activity associated with law enforcement, security or correction. If the SX-24 police baton is subjected to such abuse a failure in its function is possible and could result in an injury to the user or bystander. Such abusive usage of the SX-24 police baton is strongly discouraged by Monadnock Lifetime Products, Inc." (Monadnock Lifetime Products, Inc., November 1988, inside front cover).

### The PR-24X Police Baton Owner's Manual

Published by Monadnock Lifetime Products, Inc., this manual offers the same basic "warning" to the user as contained in the previous entry. Again, there are no warnings to the user about what target areas of the body are to be avoided, etc.

### Clubs

Published by Monadnock Lifetime Products, Inc. the training manual offers very limited warnings, and advocates the use of the baton for air chokes and other potentially lethal techniques. While the training manual does note the "temple" as a very susceptible vital spot which if struck with sufficient force may cause unconsciousness or death" (Monadnock Lifetime Products, Inc., 1968, p. 4), it fails to instruct the user not to strike a person in this area. It does teach to use a short baton, known as a yawara, to strike the head or neck (p. 8), when the opponent attempt to punch.

In *Section V. Techniques with the Baton*, the training manual teaches how to apply a "Japanese strangle" (baton placed alongside the neck) and the "American strangle" (baton placed across the throat) (Monadnock Lifetime Products, Inc., 1968, p. 18). In the latter technique, there is no warning to the user that it this technique, even when applied correctly, can cause serious bodily injury or death.

After conducting primary content analysis research on the above-referenced product literature and/or training documents, it surfaces that TASER has extensive warnings about the potential effects and injuries its products may cause through reasonable use. No other manufacturer's product literature, research, or supporting documentation, about electronic use-of-force products has the extensive international safety documentation, studies, warnings, etc. as that of the TASER-brand products. This also is true, in most every case, for non-electronic use-of-force products. Therefore, based upon the foregoing content analysis research, in my professional opinion, the warnings provided by TASER are not only reasonable, but also some of the most complete warnings and support documentation and information provided by any manufacturer of use-of-force products, techniques, or systems.

Versions *7.0, 7.1, 8.0, 9.0, 10.0, 10.1, 11.0,* and *12.0* of the TASER training materials and warnings that were in effect at the time of the TASER ECD deployment to capture and to control Mr. Jaime Teran Coronel (Mr. Coronel) on January 24, 2006 were, in my professional

opinion to a reasonable degree of professional certainty, thorough, complete, and available to all TASER ECD instructors. Making available each "newer" version of TASER ECD training and warnings is consistent with the service that TASER offers to its instructors. In my professional opinion, no other law enforcement manufacturer of weaponry has such an extensive, timely, and complete training service.

### 4. TASER does not set policy for agencies regarding TASER ECD use, deployment, training and/or policies or procedures.

Each law enforcement agency is expert in and responsible for its own use-of-force deployment and post-deployment policies and procedures (Instructor Certification Course, *Lesson Plan* versions 7.0, 7.1, 8.0, 9.0, 10.0, 10.1, 11.0, and 12.0. Each law enforcement agency that adopts TASER products has a duty to establish its own policy, procedure, training, etc. regarding the electronic device(s). This is not only reasonable, but also responsible for the manufacturer, as it does not have any ministerial authority over the government entity or the law enforcement agency or the user of the product. A reasonable government entity administrator or board member knows that the entity, or employer, has a duty to train its employees in core tasks, and also to regulate employee discretion about a product through the use of written policies, procedures, and/or other guidelines. A reasonable administrator or board member also knows that guidance in the format of sample policies and other documents can be obtained from such organizations as the United States Department of Justice (DOJ), including the National Institute of Justice (NIJ), the Bureau of Justice Statistics (BJS), and the Civil Rights Division (CRD), the International Association of Chiefs of Police (IACP), the National Sheriffs' Association (NSA), Americans for Effective Law Enforcement (AELE), Federal Bureau of Investigation (FBI) National Academy (FBI NA), Police Executive Research Forum (PERF), National Organization of Black Law Enforcement Executives (NOBLE), state Peace Officer Standards and Training Boards (including the Florida Department of Law Enforcement, the Georgia Association of Chiefs of Police, etc.), professional consultants, national, state, and local governmental risk management organizations (including the Michigan Municipal Risk Management Authority (Law Enforcement Advisory Committee), Intergovernmental Risk Management Authority, League of Minnesota Cities, and others), and similar organizations, and institutions of education and training. In my professional opinion, TASER has no duty to set policies for agencies that purchase its products. Further, government entities and law enforcement agencies have a duty to develop such policies and directives to reasonably guide user discretion and to also provide reasonable guidance about the electronic device.

### 5.     TASER ECDs are designed to protect.

TASER's ECDs are designed specifically to protect the safety of law enforcement officers performing their official duties in arresting or otherwise taking into custody, capturing, or controlling unpredictable, resisting, struggling, assaultive, and/or potentially violent criminal suspects or those in need of being captured, controlled, and/or restrained.

### 6. The County of Monterey, California is a knowledgeable use-of-force user, purchaser, and educated consumer.

Government entities that purchase law enforcement equipment investigate such equipment, conducting research and evaluation on it prior to investing public monies on such products. As a former law enforcement administrator, town finance committee member, former president of a municipal Civil Service Commission, and seminar presenter on public budgeting, few, if any, government entities spend large amounts of public monies without first conducting product reviews, comparing similar products, obtaining information, studies, and data from sources other than the manufacturer, etc. prior to putting a product bid out for response. This extensive process educates the government entity about the product, including its primary and secondary features, benefits, limitations, utilities, risks, warnings, etc.

Law enforcement agencies have many research resources available to them, including, but not limited to: law enforcement publications (there are many), numerous specifically devoted to law enforcement products (*e.g.*, Police, Law and Order, The Police Chief, Law Enforcement Technology); law enforcement organizations, including international, national, state, and local organizations (*e.g.*, International Association of Chiefs of Police, Fraternal Order of Police, National Sheriff's Association); law enforcement advisory groups (*e.g.*, International Association of Chiefs of Police, Americans for Effective Law Enforcement); law enforcement training organizations and groups (*e.g.*, the former American Society for Law Enforcement Training and the Justice Systems Training Association, International Law Enforcement Educators and Trainers Association, International Association of Law Enforcement Firearms Instructors, and many others); groups critical of law enforcement, especially critical of law enforcement use of force; state standards and training organizations, boards, or groups; the Internet and Websites specifically devoted to law enforcement (*e.g.*, www.police.com, www.officer.com, www.policeone.com, www.forcescience.org); legal research databases (*e.g.*, WESTLAW®, LEXIS®, Findlaw®); and many other resources.

Since many of the products, services, and training programs purchased by government entities focus on use-of-force equipment and techniques (*e.g.*, handguns, rifles, machineguns, shotguns, ammunition, impact projectiles and launchers, batons, chemical irritants, chemical weapons, special team weapons systems, defense and arrest tactics, lateral vascular neck restraints, pressure point control tactics, specialty restraint systems and/or equipment, etc.), these government entities have extensive knowledge and experience about use-of-force equipment and techniques, their operations, tactics, benefits, limitations, and risks, because they have a duty to conduct such research and analyses, and know that no use-of-force product, technique, or option always works, is free from limitations, or is risk free.

Limited injuries from TASER ECD deployments have been reported in the literature, but to date, no scientific research studies that have used the human model when testing TASER ECDs has shown the delivered electrical energy from TASER products to cause death or serious bodily injury. As of January 1, 2008 there have been over 637,000 TASER ECD deployments on law enforcement officers during training exercises, and 514, 000 in field applications. On some occasions people have been injured, and on rare occasions, people have temporally died after struggling with law enforcement officers who deployed an ECD in an effort to assist in capturing them. To date, no death has been scientifically proven to have been directly caused by a TASER ECD.

On October 10, 2007, the U.S. Justice Department announced the results from a two-year Wake Forest study that concluded that the use of TASER ECDs by law enforcement agencies inflict very few serious injuries on their targets. Of the 962 people tracked between July 2005 and June 2007, only three of these people (or 0.3%) sustained moderate or severe nonfatal injuries that required hospitalization. Furthermore, 216 people sustained mild injuries (abrasions, minor cuts, etc.). In total, the study found that 99.7% of the people who had received a TASER ECD deployment either had no injuries or only mild injuries (Tuttle, 2007).

Therefore, the extensive available literature strongly supports my professional opinion that government entities are knowledgeable use-of-force users, purchasers, and thus educated consumers. Government entities know far more about use-of-force equipment, its operations, etc., than the general public and even more than other departments operating within the government entity, for which the equipment was not purchased. This knowledge enables government entities to know that any use-of-force has the capability of causing, resulting in, or contributing to, being temporal to, or in close proximity to death or serious bodily injury.

## INCIDENT OPINIONS

*Incident Opinions* are those opinions that focus on the actions of the parties during the incident under review.

### 7. TASER devices are intended to provide a viable force option.

TASER's electronic control products are designed specifically to protect the safety of law enforcement officers performing their official duties in arresting or otherwise taking into custody, capturing, or controlling unpredictable, resisting, struggling, assaultive, and/or potentially violent criminal suspects or those in need of being captured, controlled, restrained, and/or have their assaultive behaviors thwarted.

### 8. TASER had no control over the actions taken by Deputy Hoskins toward Mr. Coronel.

As aforementioned, each law enforcement agency is expert in and responsible for its own use-of-force deployment and post-deployment policies and procedures (see, for example, Instructor Certification Course, *Lesson Plan v. 8.0*, 2002). Each law enforcement agency that adopts TASER products, or any use-of-force tool, technique, or system, has a duty to establish its own policy, procedure, training, etc. regarding the electronic device(s). This is not only reasonable, but also responsible for the manufacturer, as it does not have any ministerial authority over the governmental entity or the user of the product.

Scientific and other research indicates that TASER ECD products have been used to save lives, rescue hostages, and reduce injures to law enforcement officers, suspects, and others (see, for example, Instructor Certification Course, *Lesson Plan v.8.0*, 2002; medical studies and other research studies and results disclosed by TASER, information, reference and resource materials on www.ipicd.com and www.ecdlaw.info).

Public policy is also important to this discussion. Scientific and other surveys conducted by TASER and others indicate that the public supports the use of the TASER ECDs at the discretion of law enforcement officers (see TASER research and survey results). TASER's ECDs are designed to assist law enforcement in capturing criminal suspects when necessary without the use of a firearm. Without such an effective and non-lethal tool (as defined by the United States Department of Defense), officers would be faced with the choice of firing bullets at a potentially dangerous offender or allowing for his escape. If forced to choose between the risk to a criminal suspect and the safety of law enforcement officers and the public, public policy strongly supports the use of TASER's ECDs.

9. **TASER had no control over the actions taken by Deputies Smith, Sano, Darlington, Payton, Hoskins, the other officers, and/or other medical professionals toward Mr. Coronel.**

As aforementioned, each law enforcement agency is expert in and responsible for its own use-of-force deployment and post-deployment policies and procedures (Instructor Certification Course, *Lesson Plan v. 6.0*, 2000, pp. 55, 67, 69). Each law enforcement agency that adopts TASER products, or any use-of-force tool, technique, or system, has a duty to establish its own policy, procedure, training, etc. regarding the electronic device(s). This is not only reasonable, but also responsible for the manufacturer, as it does not have any ministerial authority over the governmental entity or the user of the product.

It is my professional and scientific opinion that Mr. Coronel's demise came from conduct and/or conditions that were not controlled, caused, or precipitated by TASER. No representative of TASER was at the scene, and there is no indication that the TASER ECD did anything other than what it was designed to do with proper use. In fact, there is ample testimony and evidence that the TASER ECD did not work on Mr. Coronel as intended, because he continued to resist and struggle during and after the first deployment cycle of the TASER ECD. Mr. Coronel continued his bizarre and violent behavior, causing Deputy Hoskins to believe that additional reasonable ECD deployments were needed.

10. **Monterey County Sheriff's Deputies who struggled with Mr. Coronel used force that was not excessive for the totality of the circumstances, was objective reasonable based upon their training, national use-of-force standards, and the totality of the circumstances.**

Law enforcement officers are taught about use of force in the law enforcement academy, and also in-service, as well as other training programs authorized by their agency and the state. Officers are taught that the national standard regarding the use of deadly and non-deadly force that amounts to a 4th Amendment seizure is one of objectively reasonable force, under the United States Constitution's Fourth Amendment, based upon the totality of the circumstances known to the officer at the moment the force was used (**Lethal and Less Lethal Force**, 2006, p. 12-2; **Police Civil Liability and the Defense of Citizen Misconduct Complaints**, 2005, section 62).

Officers are taught, among other things, "reasonableness contemplates careful consideration of the facts and circumstances of the incident including: (1) the severity of the crime at issue, (2) whether the person poses an immediate threat to the safety of officers or others, and (3) whether the person is actively resisting arrest or attempting to evade arrest or flight" (**Understanding & Managing Law Enforcement Liability: Critical Areas of Concern**, 1993, p. 86; also *Legal Defense Manual*, Brief #92-3). Applying these standards and criteria to the encounter with Mr. Coronel in my professional opinion, the Deputies use of force was reasonable and not excessive based upon the totality of the circumstances known to them at the time.

Law enforcement officers are taught that there are generally two categories of force: deadly and non-deadly. Deadly force is that degree of force that an actor uses with the purpose of causing, or which he knows to create a substantial risk of causing death or *serious bodily harm*. According to Black's Law Dictionary and law enforcement training materials on the use of force, serious bodily harm is bodily injury that (1) creates a substantial risk of death; (2) causes serious, or (3) permanent disfigurement; or (4) results in long-term loss or impairment of the functioning of any bodily member of organ (Commission on Accreditation of Law Enforcement Agencies Standards, Chapter 1, Glossary, pp. 1-4, March 1991, revision; Black's Law Dictionary, 5th ed., p. 631). However, the line between deadly and non-deadly force has effectively been removed by the U.S. Supreme Court in *Scott v. Harris,* 127 S.Ct. 1769, 167 L.Ed.2d 4297 (2007).

The Monterey County Sheriff's Office *900.00 Use of Force* policy defined reduced lethality force as "Force that is intended to incapacitate a subject with a reduced possibility of causing great bodily harm or death" (p. 1; Bates stamp, 732). Providing guidance to California law enforcement officers, the *California Penal Code, 835a* informs law enforcement officers that they can use reasonable force to effect an arrest, and this section was included in the Monterey County Sheriff's Office force policy: "Any Peace Officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrests, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance" (p.1; Bates stamp, 732).

After Mr. Coronel was seen on a neighbor's rooftop, Deputy Smith and Deputy Sano climbed a ladder to gain access to the rooftop and to Mr. Coronel and then approached and touched Mr. Coronel's waist to check for responsiveness (Smith, 1/24/06, p. 19). After touching Mr. Coronel's waist area, Mr. Coronel suddenly began to swing his arms yelling, "Fuck you" (p. 19). Deputies Smith and Sano maintained a distance of about 6-10 feet away from Mr. Coronel (p. 19). Deputy Sano removed his TASER M26ECD, while Deputy Smith removed his PR-24 side-handle baton in case Mr. Coronel should suddenly attack them (p. 19).

Deputy Sano reportedly spoke to Mr. Coronel in a calm voice, telling him that the deputies were there to help him (Smith, 1/24/06, p. 19). Mr. Coronel continued swinging his arms at the Deputy Smith and Deputy Sano, and would also kick at them while lying on the roof (p. 19). Mr. Coronel was incoherently yelling and screaming that the deputies had shot him, that

he was dying, and the he needed help (p. 19). Deputy Sano continued to speak in a calm voice to Mr. Coronel in an attempt to get him to calm down from his excited state (p. 19).

As Deputy Sano attempted to calm him through speaking, Mr. Coronel continued to thrash and roll around on the roof (Smith, 1/24/06, p. 19). Deputy Smith saw that Mr. Coronel's hands, knuckles, and forearms were scraped and bleeding (p. 19). According to Deputy Smith, Mr. Coronel would grab onto the roof's ventilation fixtures as if someone were trying to pull him off the roof (p. 19), even though no one had grabbed Mr. Coronel (p. 19).

While on the roof monitoring Mr. Coronel, Deputy Darlington developed a plan for the safe seizure of Mr. Coronel. The plan consisted of waiting for Mr. Coronel to roll onto his stomach, and then Deputies Darlington, Payton, Sano, and Smith would grab Mr. Coronel and handcuff him (Smith, 1/24/06, pp. 19-20; Darlington, 1/24/06, p. 30). If the proposed plan failed, Deputy Hoskins would have his TASER ECD deployed and ready to be used (Smith, 1/24/06, p. 20).

A short time after Deputy Darlington formulated and discussed his plan with the other deputies on the rooftop, Mr. Coronel rolled onto his stomach (Smith, 1/24/06, p. 20). Deputy Smith climbed on top of Mr. Coronel and used his body weight to restrict Mr. Coronel's leg movements (p. 20). Deputies Sano, Payton, and Darlington attempted to grab Mr. Coronel's arms (p. 20). Mr. Coronel "balled his hands into fists and held them tightly underneath his body" (p. 20). Although the deputies repeatedly told Mr. Coronel to give them his hands, he refused (p. 20).

After Mr. Coronel failed to comply with the deputies' commands to give them his arms, Deputy Hoskins deployed his TASER M26 ECD in "drive stun" mode to Mr. Coronel's upper right shoulder area (Smith, 1/24/06, p. 20; Hazel, August 23, 2006, p. 7). The TASER ECD drive stun had no apparent effect on Mr. Coronel, as he continued to resist the deputies' efforts to control and handcuff him (Smith, 1/24/06, p. 20).

While Mr. Coronel continued to resist the deputies, Deputy Hoskins deployed a second TASER M26 ECD drive stun mode to Mr. Coronel (Smith, 1/24/06, p. 20; Hoskins, 1/24/06, p. 27). The TASER ECD drive stun was to Mr. Coronel's upper right quadrant of the back and appeared to have some effect, as Mr. Coronel produced his arms (p. 20), although Deputy Hoskins and Deputy Payton both reported that the TASER ECD drive stun application appeared to have no effect on Mr. Coronel (Hoskins, 1/24/06, p. 27; Payton, 1/24/06, p. 29). Deputy Smith was then able to handcuff Mr. Coronel (Smith, 1/24/06, p. 20).

After being handcuffed, Mr. Coronel began kicking his legs toward Deputy Smith (Smith, 1/24/06, p. 20). Sergeant Greathead, who had joined the deputies on the rooftop, assisted in the restraint of Mr. Coronel's legs (p. 20). Sergeant Greathead directed Deputy Howlett to get a pair of leg irons from his patrol vehicle (p. 20). Sergeant Greathead was concerned that Mr. Coronel would injure a deputy or himself by his kicking (p. 20).

Deputy Howlett returned with the leg irons and they were applied to Mr. Coronel's ankles (Smith, 1/24/06, p. 20). During the application of the leg irons, Deputy Sano and Deputy

Hoskins told Mr. Coronel to relax, as Mr. Coronel would often tense up and fight against the restraints (p. 20; Hoskins, 1/24/06, p. 27). After securing Mr. Coronel, a Stokes Basket was brought to the rooftop by two North County Fire Department (NCFD) Firefighters for the safe removal of Mr. Coronel from the rooftop (Smith, 1/24/06, p. 20).

In my professional opinion to a reasonable degree of professional certainty, coupled with my education, training, and experience, Deputies Smith, Sano, Darlington, Payton, and/or Hoskins used objectively reasonable force, including the TASER ECD, on Mr. Coronel. Sergeant Greathead's decision to use leg irons on Mr. Coronel was also objectively reasonable and consistent with training, given the bizarre and violent behavior of Mr. Coronel. At no time, based upon the tense, uncertain, and rapidly evolving situation created by Mr. Coronel did Monterey County peace officers use force that was excessive for the violently resisting and struggling Mr. Coronel. It was Mr. Coronel who had control of how much responsive force was used against him. The Deputies' use-of-force also followed Monterey Sheriff's Office policy: "While various levels of force exist, each deputy is expected to respond with only the level of force that reasonably appears appropriate under the circumstances at the time to successfully accomplish the legitimate law enforcement purpose in accordance with this policy" (Monterey County Sheriff's Office, **900.00 Use of Force**, pp. 1-2).

## POST-INCIDENT OPINIONS

The next category of opinions discuss scientific research, cause and effect research, human subject research limitations, and future research issues and are in response to innuendo, speculations, allegations, claims, etc. anticipated to be made by the Plaintiff and/or by opposing expert reports and depositions. I am prepared to speak about various scientific research methodologies that have been used to study the safety of the TASER ECDs. In addition to being academically trained in qualitative and quantitative research methodologies, descriptive and inferential statistics, I have experience teaching these subjects to graduate level learners, including doctoral students. Often an untrained person will inappropriately attempt to substitute (so called) common sense or correlation for cause and effect, and/or as a substitute for the scientific method. Often times, these substitutions are the bases for unfounded speculations, scientifically unsupported conclusions, generalizations, and misinterpretation of data, activity, and so forth. These unscientific observations often result in the creation of simple, but erroneous allegations of "cause and effect" associations and conclusions of the TASER device being the direct cause of some seemingly unexplainable event.

> 11. **Scientific research has been used in the majority of research studies regarding TASER ECDs**

Graziano and Raulin (2000) say "science uses systematic, disciplined thinking to gain **knowledge** about nature. It placed heavy demands on the adequacy of its information and on the processes applied to that information" (p. 7). "In short, science is concerned with things that can be publicly observed and tested. If propositions or questions do not contain implications for such public observation and testing, they are not scientific questions" (Kerlinger, 1964, p. 5). "Research is systematic inquiry that uses disciplined methods to answer questions or solve problems" (Polit & Beck, 2004, p. 3).

Most individuals have limited knowledge, and often phobias (scientifically baseless irrational fears), about electricity. Many individuals remember being shocked when inserting a piece of metal or coin into an electrical outlet, or touched the spark plug of a car or lawn mower, or when as a small child being scolded by their parents for getting too close to an electrical outlet or device. These emotionally charged unpleasant experiences are usually recalled when discussing electricity, but applying such experiences to the use of TASER ECDs is not the use of scientific research, but is merely examples of one way of generalizing or attempting knowing about things.

The literature surfaces six "ways of knowing". They are:

- *Tenacity*: a willingness to accept ideas as valid because they have been accepted for so long or repeated so often that they seem true.

- *Intuition*: accepting ideas as valid because they 'feel' intuitively true.

- *Authority:* accepting ideas as valid because some respected authority asserts that the ideas are true.

- *Rationalism:* developing valid ideas using existing ideas and principles of logic.

- *Empiricism:* gaining knowledge through observation.

- *Science:* a process that combines the principles of rationalism with the process of empiricism, using rationalism to develop theories and empiricism to test the theories. (Graziano & Raulin, 2000, p. 9).

Many individuals naively attempt to argue (without scientific bases) that because a scientific study was funded by a particular company, individual, or by the government, that it is somehow inherently non-scientific, and the knowledge gained is somehow unreliable. While unethical researchers may attempt to skew research findings toward a particular pre-determined outcome, when the steps of the scientific method are rigorously followed, such unethical findings are more easily identified and such practices are greatly minimized. Also, many product manufacturers (including drug manufacturers) fund most, if not all, of their own research. When compared with the vast array of independent studies conducted on TASER ECDs, it is easily seen that TASER has only conducted a fraction of the studies. Many of the most detailed and exhaustive studies were completed by government entities in the United States and other countries, including the United Kingdom and Canada. And, many of the TASER funded studies have now been replicated with virtually identical results by government funded researchers.

Scientific research, according to Kerlinger (1964) "is systematic, controlled, empirical, and critical investigation of hypothetical propositions about the presumed relations among natural phenomena" (p. 11). Accordingly, there are specific steps to the scientific research model. They are:

- Initial idea

- Problem definition

- Procedures design

- Observation

- Data analysis

- Interpretation, and

- Communication (Graziano & Raulin, 2000, p. 44).

These seven steps outline the phases of a research project. "The essence of the scientific method is the insistence that all propositions be subjected to an empirical test. Only after this has been done does the scientist decide to accept or reject a proposition" (Cozby, 1981, p. 5). These phases generally apply to both quantitative and qualitative research designs, although Cresswell (1994) notes that "the format is much less standardized in **qualitative** designs than quantitative designs" (p. 13).

Peters (2002) noted "the quantitative design permits the investigator to view reality as being objective, and something that can be objectively measured" (Week 2, p. 1). A **quantitative** study ". . .is an inquiry into a social or human problem, based on testing a theory composed of variables, measured with numbers, and analyzed with statistical procedures, in order to determine whether the predictive generalizations of the theory hold true" (Cresswell, 1984, p. 2). In contrast, a **qualitative** study "is defined as an inquiry process of understanding a social or human problem, based on building a complex, holistic picture, formed with words, reporting detailed views of informants, and conducted in a natural setting" (pp. 1-2). "Unlike the quantitative approach where the investigator remains distant from the study and eliminates his or her values, the investigator in the qualitative approach interacts with those studied, and admits his or her values and biases" (Peters, 2002, Week 2, p. 1). Quantitative studies have been used in the majority of TASER device research.

Regardless of the type of research study, qualitative or quantitative, **theories** play an important role. Graziano and Raulin (2000) define theory as "a formalized set of concepts that organizes observations and inferences and predicts and explains phenomena" (p. 37). "In a theory, concepts are knitted together into a coherent system to describe or explain some aspect of the world" (Polit & Beck, 2004, p. 29). TASER device studies generally include theories about electricity, the heart, possible physiologic effects, theorized injury, and so forth. **Variables** are also used in quantitative studies.

"Concepts are generally referred to as variables" (Polit & Beck, 2004, p. 29). Nachmias and Nachmias (1981) note ". . . to move from the conceptual to the empirical level, concepts are converted into *variables*" (p. 58). There are several classifications of variables. Graziano and Raulin (2000) identify six classes of variables: behavioral, stimulus, organismic, independent,

dependent, and constant (p. 59). For purposes of this opinion, only **independent variables, dependant variables,** and **constant variables** will be discussed.

*Independent variables* are those variables that are "actively manipulated by the researcher to see what [their] impact will be on other variables" (Graziano & Raulin, 2000, p. 59). *Dependent variables* are those variables that the investigator hypothesizes "will be affected by the independent-variable manipulation" (p. 59). A *constant* is "any variable that is prevented from varying (i.e., held constant)" (p. 59). Polit and Beck (2004) provide the following example of a constant: "If it rained continuously and the temperature was always 70° F, weather would not be a variable, it would be a **constant**" (p. 29).

"The investigator's concepts first appear as variables, and ultimately as hypotheses" (Peters, 2002, Week 2 pp. 1-2). "A **hypothesis** is a statement of the researcher's expectations about relationships between the variables under investigation: Polit & Beck, 2004, p. 49). An example of a hypothesis is: A human being who is standing in water when shocked by the M26 TASER (independent variable) will be electrocuted (death by electricity) (dependent variable). Most quantitative research studies would then be conducted to confirm or disprove this hypothesis using statistical analysis and procedures.

Although there are other important aspects to the conducting of scientific research (e.g., data analysis, validity, reliability, sampling, research design, etc.), purpose, time, and space prohibit them from being discussed. I am prepared to speak about various scientific research methodologies that have been used to study the safety and effects of the TASER ECDs either at deposition or trial, if so requested.

The foregoing discussion about scientific research serves as part of the bases for my professional opinion that the majority of TASER-brand weapon research has been done according to the rigorous standards of the scientific method.

12. **Newspaper, magazine, tabloid, and/or electronic articles, radio, television, and electronic news reports, editorials, memos, and other non-scientific reports, and opinions about medicine, health issues, causes of death, electricity, TASER ECDs, TASER, and law enforcement tactics and procedures are not bases for, or proof of, causation.**

The fallacy that "if it's in print, it must be true," is an old axiom that research studies confirm most people believe (Better Business Bureau, 1993, December, p. 1). Most recently, this "belief" has been extended to "[i]f it is in the paper it must be true," (Card, 2006, March 24), and "[i]f it's on the Internet, it must be true" (Napoli, 2005). Unless a literature review is conducted to scientifically confirm or refute the information contained in articles that people read or sound bites that they hear, the information gets passed along or retained and often times is wrongly accepted as "true". This is also true for textbooks.

Most people are aware of the poem, "[t]he Midnight Ride of Paul Revere", which tells of his (alleged) ride through the Boston countryside to warn people that the British were coming.

The poem's story has been accepted by many people as true, but in reality, Revere was stopped and detained by British soldiers outside Boston and never completed his alleged infamous ride as described in the poem. Mr. William Dawes completed the journey that is wrongly attributed to Paul Revere.

In earlier times, most people believed the world to be flat, or that the sun revolved around the earth. Science has shown the fallacy of these two beliefs, but during their time, those who were advocating a different belief were often called heretics and in some cases even put to death for challenging these widely held and stridently believed "truths" that were eventually scientifically shown to be fallacious.

In today's environment, vitamins serve as one example of how many people believe in what a store clerk, newspaper article, or other publication tells them about the efficacy of the vitamin they are considering taking or are taking. In many cases, there is no rigorous scientific study conducted on the vitamin using statistical analysis and rigorous research methodology to determine whether or not the claims about a particular vitamin(s) are valid.

When a literary device that attempts to convince an audience by using words that conceal a dubious claim, this is known as a *slanter* (Epstein, 2002, p. 195).Epstein (2002) argues "slanters are bad because they try to get us to assume a dubious claim is true without reflecting on it" (p. 195). Examples include, but are not limited to such sensational headlines such as "Another Taser death," "Another pepper spray death," etc. Often the story that follows is comprised of witness interviews and other non-scientific information that is used for what is known as *proof substitute*.

According to Epstein (2002), "a *proof substitute* is a word or phrase that suggests the speaker has a proof, but no proof is actually offered" (p. 199).When *slanters* or *proof substitutes* are used, it shifts the burden of proof to the other party. The other party, say, the first person to claim that the world is round, is now faced with the monumental task of "disproving" the opposition's claim. As scientific researchers know, it takes more evidence to disprove a claim, than to prove it. As Epstein noted, "It's easier to ask for a disproof of your claims than to prove them yourself" (p. 219).

For example, if someone made the claim, "There are purple mice on the dark side of the moon eating black cheese," most people would say the claim is false. However, when the claimant demands the non-believers to "prove him wrong", the burden of proof has now shifted to the people who are sure he is wrong, but cannot scientifically prove it. This is analogous to electricity, TASER, and TASER ECDs, plus other tactics, techniques, and equipment used by law enforcement officers throughout the world.

Many times people will generalize from their personal experiences (Epstein, 2002, p. 277). "For science, especially the health sciences, generalization along with analogy dominates reasoning from experiments" (p. 277). If people who read a newspaper or hear a sound bite about a death attributed to a TASER ECD, even though there are other intervening variables, they may conclude a claim about the ECD, TASER, law enforcement, or the tactics used by law enforcement officers and then generalize to make their argument. Generalizations are arguments,

such as "electricity kills", where people make an analogy to other forms of electricity, which are different than the electricity output of TASER ECDs.

Reasoning by analogy is quite common because "we have a desire to be consistent in our lives, to see and apply general principles" (Epstein, 2002, p. 251). When people reason by analogy, they are beginning with a comparison. In the aforementioned example, the analogy may be comparing high-line power, household current or lawn mower or automobile engine coil wire current to TASER ECD current. While analogies have their place, usually they are not made explicit enough to serve as good arguments. While comparisons are very suggestive, they are often incomplete arguments lacking scientific evidence to support the claim(s).

Since many people, including lawyers, medical professionals, and members of the judiciary, only know about TASER products based on what they read in a newspaper, magazine, Internet, or from what they hear on the radio or television, in my professional opinion, it is very easy for them to wrongly develop non-scientific erroneous conclusions based upon misperceptions, analogies, speculations, and generalizations about electricity, the efficacy of TASER ECDs, and causation issues, which are not based upon scientific research or scientific findings.

13. **Statements such as "further research is needed" appearing in peer-reviewed journal articles or research reports are consistent with scientific research article and report format and do not imply that the research findings are flawed and/or unreliable.**

The following sentence from an article about ECD scientific research in the medical journal *Lancet*: "the authors found that 'future research on what other cardiac effects tasers [sic] and related devices would have in people with pacemakers is needed'" is an example of what often times opponents cite to imply that because "future research" is stated as needed, this inappropriately questions the validity and reliability of the reported scientific research study. Additionally, some critics will take the statement that additional research is needed and imply that since such research presently does not exist then therefore the opposite negative must be true – that since no scientific proof exists, the absence of proof must be construed to the negative. In my professional opinion, language and phrases such as "future research is needed" is consistent with scientific research methodology, training, and scientific research article writing, and can even be found in high school science fair reports.

The bases for this opinion are several. First, research texts that are commonly used in the education and training of scientific researchers instruct such learners to identify areas for future research based upon the limitations of their research study. Silverman (2000) advised readers to identify "future research that might follow from your findings, methods, or concepts used" (p. 254). Francis (1988) advises scientific writers to include "[w]hat new research will have been made possible by your having done the study" and "what further research may be suggested" (p. 73). Graziano and Raulin (2000) write: "Suggesting directions for future research is a natural part of any well designed, well-executed research project" (p. 370). Educational institutions also publish standard scientific research paper components.

Massachusetts Institute of Technology (MIT) (n.d.) identifies a standard component of a scientific research paper as "recommend areas for future study and explain your choices" (p. 6). Columbia University in its publication *Writing A Scientific Research Article*, advised writers to include in their discussion section of the article "What further research would be necessary. . ." (p. 2). It is recommended this phrase be included in high school research projects (http://corporate/britannca.com/library).

In my professional opinion to a reasonable degree of professional certainty, authors who include "future research" issues are not implying that the validity or reliability of their research findings are inferior; rather, they are including a standard component of a scientific research paper. To infer anything else is contra to what is written by the researchers.

**14. TASER warnings and instructions advised end users to take photographs of injuries and to seek professional medical treatment.**

TASER lesson plans advised end users (i.e., municipalities, law enforcement administrators) to draft policies and procedures that included the taking of photographs of possible or existing injuries that may have resulted from the struggle with officers and/or a TASER ECD deployment, and to seek professional medical treatment for the injured person (see for example, *Version 7.0*, 2001, PowerPoint slide #84; *Version 9.0*, 2003, PowerPoint slide #129; Version *10.0*, June 2003, pp. 31, 35, 144, 151; *Version 10.1*, November 2003, p.151; *Version 11.0*, 2004, pp. 117, 136, 137, 160, 161).

## Exhibits

Exhibits to be used within this case include, but are not limited to, any and all documents, references, materials, videos, etc. found on the www.ipicd.com, www.taser.com, and www. ecdlaw.info websites; weapons, warnings, etc. referenced or found herein; TASER Reference Sheets (TRFs), IPICD Reference Sheets, and LAAW International Reference Sheets; TASER training versions, materials, and bulletins; ECD, in-custody death, arrest-related death, and other reference materials; and other materials, demonstrative, aids, etc.

## Curriculum Vitae

Pursuant to Fed. R.Civ.P. 26(a)(2) my current Curriculum Vitae containing a list of my relevant formal education, training, experience, publications authored, and a listing of any cases in which testimony (deposition and/or trial) as an expert has been taken is attached hereto and made an integral part hereof.

## Compensation

I have invoiced my published and customary flat fee of $5000.00 that includes initial retainer, materials review, report generation, etc. Deposition testimony is invoiced at a flat daily rate of $2000.00 per day, if the deposition is taken at my location and pre-paid, or $2750.00 if taken other than at my location, plus direct expenses. On-site visits are invoiced at $2750.00 per

day, plus direct expenses. Time for trial testimony is invoiced at $2000.00 per day at my location, or $2750.00 per day other than at my location, plus direct expenses.

# References

Aldisert, R. J. (1997). *Logic for lawyers: A guide to clear legal thinking* (3rd ed.). South Bend, IN: National Institute for Trial Advocacy.

American Psychological Association. (2001). *Publication manual of the American psychological association* (5th ed.). Washington, D.C.: Author.

Armament Systems and Procedures, Inc. (1996). *ASP basic certification (abc) course syllabus*. Appleton, WI: Author.

A.S.P. (2004). *Tactical handcuffs*. Appleton, WI: Author.

Beers, M. H., & Jones, T. V. (2004). *The merck manual of health & aging*. Whitehouse Station, NJ: Merck Research Laboratories.

Better Business Bureau. (1993, December). If It's In Print, It Must Be True. Retrieved from www.bbbsilicon.org/topic002p.htm.

BioGuardian Systems, Inc. (n.d. a). *The bodyguard restraining systems owner's manual and instructions for use*. Mesa, AZ: Author.

BioGuardian Systems, Inc. (n.d..b). *Bodyguard restraint system training outline*. Mesa, AZ: Author.

Canadian Police Research Center. (2005, August).*Review of conducted energy     devices: Technical Report TR-01-2006.*

Card, H. (2006, March 24). If It Is In The Paper It Must Be True. Retrieved from www.nysut.org/html.

Columbia University. (n.d.). *Writing a scientific research article*. Retrieved from http://www.columbia.edu/cu/biology/ug/research/paper.html

Cook, T. D., & Campbell, D. T. (1979). *Quasi-experimentation: design & analysis issues for field settings*. Boston: Houghton Mifflin Company.

Cozby, P. C. (1981). *Methods in behavioral research* (2nd ed.). Palo Alto, CA: Mayfield Publishing Company.

Cresswell, J. W. (1994). *Research design: Qualitative & quantitative approaches*. Thousand Oaks, CA: Sage Publications.

Dick, W., Carey, L., & Carey, J. O. (2001). *The systematic design of instruction* (5th ed.). New York: Longman.

Do-Rite Corporation. (n.d.). *Law enforcement techniques.* Idaho Falls, ID: Author..

ECD Legal Resources at www.ecdlaw.info

Epstein, R. L. (2002). *Critical thinking.* Belmont, CA: Wadsworth/Thompson Learning.

Francis, F. B. (1988). *The proposal cookbook: A step by step guide to proposal design and writing* (5th ed.). Bloomington, MN: MicroFutures, Inc.

Gravetter, F. J., & Wallnau, L. B. (1999). *Essentials of statistics for the behavioral sciences* (3rd ed.). Pacific Grove, CA: Books/Cole Publishing Company.

Graziano, A. M., & Raulin, M. L. (2000). *Research methods: A process of inquiry* (4th ed.). Boston: Allyn and Bacon.

Graziano, A. M., & Raulin, M. L. (1997). *Research methods: A process of inquiry* (3rd ed.). New York: Longman.

Hess, J. (1990). *Flex-baton police nunchaku: Alternatives to deadly force training manual.* Upland, PA: Diane Publishing Company.

Ho, J.D., Miner, J. R., Lakireddy, D.R., Bultma, L.L., & Heegard, W.G. (2006). Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. *Acad. Emergency Medicine.*

Institute for the Prevention of In-Custody Deaths, Inc. Website-www.ipicd.com

IACP (1988). *Training Key #497: The TASER.* Alexandria, VA: Author.

IACP (2003). *Training Key #567: The advanced TASER.* Alexandria, VA: Author.

IACP National Law Enforcement Policy Center (2005, August). *Concepts and issues paper: Electronic control weapons.* Alexandria, VA: Author.

IACP National Law Enforcement Policy Center (1998, February). *Concepts and issues paper: Electronic restraint Device: The TASER.* Alexandria, VA: Author.

Keller, D. A. (n.d.). *Kel-lite manual of defensive tactics.* Los Angeles: Author.

Kerlinger, F. N. (1964). *Foundations of behavioral research* (2nd ed.). New York: Holt, Rinehart and Winston, Inc.

Kroll, M. (2006). *Scientific basis for the TASER weapon cardiac safety.* In *TASER use of force, risk management, and legal strategies.* Scottsdale, AZ:TASER International, Inc.

---

Maier, A., Nance, P., Price, P, Sherry, C. J., Reilly, J. P., Klauenberg, B. J., & Drummond, J. T. (2005). *Human effectiveness and risk characterization of the electro muscular incapacitation device--A limited analysis of the TASER Part I-- technical report*. Human Effects Center of Excellence.

Massachusetts Institute of Technology. (n.d.) *Writing a scientific research paper*. Retrieved from http://www.umech.mit.edu

Minium, E. W., King, B. M., & Bear, G. (1993). *Statistical reasoning in psychology and education* (3rd ed.). New York: John Wiley & Sons, Inc.

Monadnock Lifetime Products, Inc. (1981). *The immobilizer restraint device*. Fitzwilliam, NH: Author.

Monadnock Lifetime Products, Inc. (1988). *Owner's manual: The pr-24 police baton*. Fitzwilliam, NH: Author.

Monadnock Lifetime Products, Inc. (1988). *Owner's manual: The sx-24 police baton.*. Fitzwilliam, NH: Author.

Monadnock Lifetime Products, Inc. (1968). *Clubs.*. Fitzwilliam, NH: Author.

Nachmias, D., & Nachmias, C. (1981). *Research methods in the social sciences*. New York: St. Martin's Press.

Napoli, L. (2005, March 2005). If it's on the Internet, it must be true. Retrieved from www.globetechnology.com/servlet/story/RTGAM.20050310.gtgulliblemar10/BN story/technology

NOVA National Training, Inc. (1987). *NOVA law enforcement training manual & operational guide in the use of electronic non-lethal control devices. Warrenville Heights, OH: Author.*

Osborn, M., & Osborn, S. (1997). *Public speaking* (3rd ed.). New York: Houghton Mifflin, Co.

Peerless Handcuffs. (n.d.). *Handcuff operations insert*. Springfield, MA: Author.

Peters, Jr., J. G. (2006b, May-June). Sudden Death, "Excited" Delirium, and Issues of Force: Part II—Electronic Control Devices. *Police & Security News*.

Peters, Jr., J. G. (2002). Week 2: Research designs and data collection. In Regent University, *Methods of social science research*. Virginia Beach, VA: Regent University.

Polit, D. F., & Beck, C. T. (2004). *Nursing research: Principles and practices* (7th ed.). Philadelphia: Lippencott Williams & Wilkins.

Ripp Restraints, Inc. (n.d.). *Restraints for the law enforcement, corrections, & medical fields*. Orange City, FL: Author.

Rubin, H. J. (1983). *Applied social research*. Columbus, OH: Charles E. Merrill    Publishing Company.

Safe Restraints, Inc. (n.d.). *The wrap basic application manual*. California: Author.

Security Equipment Corporation. (2005). *SABRE h20 series and dual propellant system*. Fenton, MO: Author.

Silverman, D. (2000). *Doing qualitative research: A practical handbook*. (London: Sage Publications.

Smith, E. N. (1977). *A handbook for use of the baton: The lamb method*. New York: Harper & Row Media.

Smith, J. A. (n.d.). *The source instructor's manual*. Largo, FL: Universal Safety    Corporation.

TASER International, Inc.'s Website – www.taser.com.

TASER International, Inc.'s Research Compendium.

TASER International, Inc.'s TASER M26 and TASER X26 Product Manuals.

TASER International Inc.'s Training Bulletins.

Tuttle, S. (2007). TASER Electronic Control Devices (ECDs): Field Data and Risk Management. [PowerPoint]. Scottsdale, AZ: TASER International, Inc.

# APPENDIX A

Teran, et al. v. TASER International, Inc.

## ABSTRACT

On Tuesday, January 23, 2006 27-year-old Jaime Teran Coronel (Mr. Coronel) appeared paranoid, freaked out, and higher than usual when his common-law wife, Ms. Stephanie Lizaola (Ms. Lizaola) saw him near their home in Castroville, California shortly before midnight. About 30 minutes later, now January 24, 2006, Mr. Coronel, who had a history of illicit drug use and abuse and a long criminal history, was observed in the backyard of a nearby residence. The owner of the residence called the police, reporting a "prowler". Monterey County Sheriff's deputies responded to the caller's residence, and by the time they arrived Mr. Coronel had left the backyard and climbed onto the roof of a residence located across the street. Deputies climbed on the roof where they saw Mr. Coronel rolling around and saying that he was having difficulty breathing. After developing a plan to capture him because they feared that he would roll off the roof, deputies attempted to grab Mr. Coronel's arms and legs when he rolled onto his stomach. Violently resisting the deputies' efforts to capture, control, and restrain him, Mr. Coronel was very strong, preventing the deputies from getting his arms so they could apply handcuffs. One deputy deployed his ADVANCED TASER® M26 electronic control device (ECD) in drive stun mode against Mr. Coronel's back area, with the first of two reported contacts having no apparent effect. Mr. Coronel's arms were obtained by the deputies after the second ECD contact; he was handcuffed and had leg irons applied. Firefighters and paramedic personnel were staged nearby the residence, and immediately responded after Mr. Coronel was restrained. Mr. Coronel was placed into a basket and lowered to the ground. Once on the ground Mr. Coronel was unresponsive, had a presenting cardiac rhythm or asystole, was provided with emergency medical care, and was taken to the hospital. Hospital toxicology results showed D-methamphetamine and d-amphetamine were detected in the blood at levels of 1.02 mg/L and 0.28 mg/L respectively. There was also a low concentration of cocaine metabolite (benzoylecognine) and ecognine methyl ester, but no free cocaine. Mr. Coronel died in the hospital on Monday, January 30, 2006.

# APPENDIX B

Teran, et al. v. TASER International, Inc.

## PARTICIPANT IDENTIFICATION LIST

| NAME | ACTIVITY |
|---|---|
| Jamie Coronel | Decedent; High on illegal narcotic; fought Monterey County deputies |
| Stephanie Lizaola | Common law wife of Mr. Coronel; mother of their three children; observed Mr. Coronel two times prior to his confrontation with deputies |
| Justin Coffer | Person who called the police after his yard was entered by Mr. Coronel |
| Monterey County (CA) Sheriff's Deputy Brandon Smith | First deputy to arrive on the scene and see Mr. Coronel on the rooftop |
| Monterey County Sheriff's Deputy Warren Sano | Second deputy to arrive on the scene |
| Monterey County Sheriff's Deputy Howlett | Deputy who arrived on the scene |
| Monterey County Sheriff's Deputy Michael Darlington | Deputy who arrived on the scene; formulated plan to capture Mr. Coronel when he was on the rooftop |
| Monterey County Sheriff's Deputy Benjamin Payton | Deputy who arrived on the scene and struggled with Mr. Coronel |
| Monterey County Sheriff's Deputy Bryan Hoskins | Deployed two TASER® M26 Electronic Control Device drive stuns to Mr. Coronel's back |
| Monterey County Sheriff's Sergeant Denis Greathead | Sergeant who arrived on scene; directed Deputy Howlett to obtain leg irons to be placed on Mr. Coronel |
| North County Fire Department Firefighters | Arrived on the scene, staged, and then responded to the scene when requested |
| West Med Ambulance | Arrived and staged on scene. Treated Mr. Coronel and transported Mr. Coronel to hospital |
| Salinas Valley Memorial Hospital | Hospital where Mr. Coronel was transported, admitted, and where he died |
| Raymond R. Carillo, M.D. | Performed medical assessment on Mr. Coronel |
| John Massaro, M.D. | Pronounced Mr. Coronel dead on January 30, 2006 |
| John R. Hain, M.D. | Forensic pathologist who performed autopsy on Mr. Coronel on February 1, 2006 |

Teran, et al. v. TASER International, Inc.

## TIMELINE and ACTIVITY

| TIME | DATE | ACTIVITY |
|---|---|---|
| 10:00 p.m. | 1/23/06 | Ms. Stephanie Lizaola (Ms. Lizola), Mr. Coronel's common-law wife, saw him and noted he seemed fine. At the time Ms. Lizola had a restraining order against Mr. Coronel. |
| 11:30 p.m. | 1/23/06 | Ms. Lizaola saw Mr. Coronel near her house and reported him as being paranoid, freaked out, and higher than usual (on drugs). |
| 12:07 a.m. | 1/24/06 | Mr. Justin Coffer heard his dogs barking, sees Mr. Coronel in his backyard, and calls the police. |
| 12:07 a.m. | 1/24/06 | Monterey County Sheriff's Deputies Brandon Smith and Warren Sano were dispatched to Justin Coffer's residence. |
| 12:18 a.m. | 1/24/06 | Deputy Smith arrived at Justin Coffer's residence and spoke to him. Shined flashlight on neighboring rooftop and saw Mr. Coronel on the roof. Requested fire department be sent to scene. |
| 12:24 a.m. | 1/24/06 | Fire department and ambulance dispatched to the scene. |
| 12:33 a.m. | 1/24/06 | Fire department and ambulance arrived on scene. |
| ECD data download | 1/24/06 | ADVANCED TASER® M26 electronic control device (ECD) shows four data download points (305 to 308) all between :30 and :43 (or 13 seconds). Total possible maximum ECD discharge, not delivery, of 17 seconds. |
| 5:42 p.m. | 1/30/06 | Mr. Coronel died in the hospital. |

489

Teran, et al. v. TASER International, Inc.

## SUMMARY of FACTS

### Evidence-based Personal History of Mr. Jaime Teran Coronel

Historical evidence and information are critical ingredients to understanding the information surrounding the bizarre behavior, seizure, struggle, and death of Mr. Jaime Teran Coronel (Mr. Coronel) during the early morning hours on Tuesday January 24, 2006 and his death at 5:42 p.m. on Monday January 30, 2006 (Jenkins, **Monterey County Sheriff's Coroner: Jaime Teran Coronel**, March 2, 2006, p. 1).

### Mr. Coronel Physical Characteristics: February 1, 2006

On Wednesday, February 1, 2006, Mr. Coronel weighed 171 pounds, and was 5 foot 6 inches in height (Jenkins, **Monterey County Sheriff's Coroner: Jaime Teran Coronel**, March 2, 2006, p. 1). Born on Sunday, August 13, 1978, Mr. Coronel was a white male who was 27 years of age ( p. 1).

### Mr. Coronel's Prior Illegal Substance Abuse History

Mr. Coronel had a history of illegal substance use and abuse. According to Ms. Stephanie Lizaola (Ms. Lizaola) who was the common law wife of Mr. Coronel and the mother of their three daughters ages 8, 6, and 4 (Opseth, **Supplemental Report**, 1/24/06, p. 1).

### Mr. Coronel's Prior Criminal Record

### Table 1 Mr. Coronel's Arrest and/or Citation History

| DATE | OFFENSE |
|------|---------|
| 8/4/2000 | Vehicle tampering; Under the influence of a controlled substance and H & S; Possession of Narcotic Paraphernalia |
| 10/8/2000 | Resisting and obstructing a peace officer |
| 12/6/2000 | Resisting and obstructing a peace officer |
| 12/12/2001 | Second degree burglary: felony |
| 5/3/2002 | Second degree burglary: misdemeanor |
| 10/14/2002 | Battery on a peace officer |
| 2002 | Violated his probation by committing another burglary |
| 5/14/ 2003 | Second degree burglary: felony |
| 2004 | Violated his parole in Santa Cruz County (CA) for committing the following crimes: Possession/mfg/sell dangerous weapons, etc.; Obstruct/etc. public officer; Possession of burglary tools |
| 2005 | Violated his parole, Use/under the influence of a controlled substance |

**Source:** Jorgensen, **Supplemental Report**, 1/24/06, p. 3; Hazel, **Letter to Sheriff Michael Kanalakis**, August 23, 2006, p. 8).

### 10:00 p.m., 1/23/06: Ms. Lizaola Observed Mr. Coronel's Behavior

Ms. Lizaola told Monterey County Sheriff's Detective Opseth that she saw Mr. Coronel at approximately 10:00 p.m. when she dropped off their daughters at her mother's residence (Opseth, **Supplemental Report**, 1/24/06, p. 1), and did not observe anything unusual about Mr. Coronel's behavior (p.1).

### 11:30 p.m., 1/23/06: Ms. Lizaola Observed Mr. Coronel "Freaking Out"

At approximately 11:30 p.m. on Monday, January 23, 2006 Ms. Lizaola observed Mr. Coronel near their home on Main Street in Castroville, California (Hazel, August 23, 2006, p. 3). The time was approximately 37 minutes prior to Deputies from the Monterey Sheriff's Department being dispatched to the scene (p. 3). Ms. Lizaola described Mr. Coronel's behavior as "paranoid" (p. 3), and when she asked him what was wrong, Mr. Coronel did not respond and quickly left the area (p. 3). According to Ms. Lizaola, Mr. Coronel appeared to be "freaking out" and under the influence of his preferred drug—cocaine (p. 4). Ms. Lizaola told investigators that she knew Mr. Coronel was "higher than usual" when she observed him at 11:30 p.m. (p. 4). After Mr. Coronel walked away from her, Ms. Lizaola returned to her home (p. 4).

### 12:07 a.m., 1/24/06: Justin Coffer Heard His Dogs Barking

Mr. Justin Coffer (Mr. Coffer) heard his two dogs barking in the back yard shortly after midnight (Smith, 1/24/06, p. 21). When Mr. Coffer looked into his back yard, he saw Mr. Coronel in the yard and asked him what he doing in the back yard (p. 21). Mr. Coronel did not respond, and began to run around the back yard (p. 21). Mr. Coffer described Mr. Coronel's behavior as "very erratic", and after his dogs almost cornered Mr. Coronel in the back yard, Mr. Coronel climbed over the fence and ran across the street (p. 21). Mr. Coffer called the police to report the person in his backyard at approximately 12:07 a.m. (CAD, **Incident History Detail**, 1/24/06, p. 1).

### 12:07 a.m., 1/24/06: Monterey County Sheriff's Deputies Sano and Smith were Dispatched

At approximately 12:07 a.m. on Tuesday, January 24, 2006, Monterey County Sheriff's Deputies Brandon Smith and Warren Sano were dispatched to 11367 Del Monte Avenue #A about a reported prowler (Smith, 1/24/06, p. 19). Dispatch advised the responding deputies, who were responding in separate police vehicles, that the suspect was in the back yard of the residence (p. 19). Prior to arrival at the Del Monte Avenue address, dispatch advised the responding deputies that the suspect had left the back yard, climbed on top of the roof of a beige colored house across the street (p. 19).

### 12:13 a.m.: Mr. Coronel Climbed Onto a Roof

After Mr. Coffer saw Mr. Coronel run across the street, he saw Mr. Coronel climb a fence, then get onto the carport, and then onto the roof of a neighboring residence (Smith, 1/24/06, p. 21).

**12:18 a.m., 1/24/06: Deputy Smith Arrived on Scene**

Arriving at the Del Monte Avenue address at approximately 12:18 a.m. on January 24, 2006, Deputy Smith located Mr. Coffer who was standing on his front porch (Smith, 1/24/06, p. 19). Mr. Coffer told Deputy Smith that the person who was previously in his back yard was now "laying on the roof" of a neighboring residence (p. 21).

**Deputy Smith Illuminated Mr. Coronel with a Flashlight**

Shining his flashlight onto the roof of the neighboring residence, Deputy Smith saw a young Hispanic male who was wearing a white tee-shirt lying across the crest of the roof (Smith, 1/24/06, p. 19). The young male was later identified as Mr. Coronel (p. 19). Deputy Smith saw Mr. Coronel breathing heavily, and also heard Mr. Coronel mumble to himself that he could not breathe (p. 19).

**Deputy Smith Requested North County Fire Department**

After seeing and hearing Mr. Coronel, Deputy Smith contacted dispatch and provided his location, a description of the young Hispanic male, and also requested North County Fire Department (NCFD) respond to the scene (Smith, 1/24/06, p. 19).

**12:24 a.m., 1/24/06: NCFD and West Med Ambulance Dispatched**

NCFD and West Med Ambulance were dispatched to the scene on January 24, 2006 at approximately 12:24 a.m. (Jenkins, 3/1/06, p. 2).

**12:33 a.m., 1/24/06: NCRD and West Med Ambulance Arrived on Scene and Staged**

NCFD and West Med Ambulance personnel arrived at the scene at approximately 12:33 a.m. (p. 2), and staged until they were called to the scene at approximately 12:45 a.m. (p. 2).

**Monterey County Deputy Sano Arrived on the Scene**

After Deputy Sano arrived on the scene, Deputy Smith pointed out where Mr. Coronel was located, and told Deputy Sano that they needed to check the back of the residence to see if they could gain access to the roof (Smith, 1/24/06, p. 19). Deputy Smith found a large extension ladder hanging on the back fence of the residence, and then told Deputy Sano fhow it could be used to gain access to the roof (p. 19).

**Monterey County Deputy Howlett Arrived on the Scene**

After telling Deputy Sano about locating the ladder and how it could be used to gain access to the roof, Monterey County Deputy Howlett arrived on the scene (Smith, 1/24/06, p. 19). Deputies Smith and Sano obtained the ladder while Deputy Howlett watched Mr. Coronel who

was still on the roof (p. 19). Deputy Smith placed the ladder on the south side of the residence (p. 19).

## Additional Monterey County Sheriff's Deputies Arrived on the Scene

Monterey County Sheriff's Deputies Michael Darlington, Bryan Hoskins, Benjamin Payton, and Sergeant Denis Greathead arrived on the scene (Smith, 1/24/06, p. 19).

## Deputies Smith and Sano Climbed the Ladder

Deputy Smith and Deputy Sano climbed the ladder to the roof of the residence where Mr. Coronel was located (Smith, 1/24/06, p. 19). The deputies saw Mr. Coronel lying face down on the roof, with his arms spread out to his sides (p. 19). Deputy Smith reported hearing Mr. Coronel mumble incoherently to himself (p. 19).

## Deputy Sano Made Physical Contact with Mr. Coronel

After climbing the ladder and getting onto the roof, Deputy Sano approached and touched Mr. Coronel's waist to check for responsiveness (Smith, 1/24/06, p. 19). After touching Mr. Coronel's waist area, Mr. Coronel suddenly began to swing his arms yelling, "Fuck you" (p. 19). Deputies Smith and Sano maintained a distance of about 6-10 feet away from Mr. Coronel (p. 19). Deputy Sano removed his TASER® M26 (M26) electronic control device (ECD), while Deputy Smith removed his PR-24 side-handle baton in case Mr. Coronel should suddenly attack them (p. 19).

## Deputy Sano Tried to Calm Mr. Coronel

Deputy Sano reportedly spoke to Mr. Coronel in a calm voice, telling him that the deputies were there to help him (Smith, 1/24/06, p. 19). Mr. Coronel continued swinging his arms at the Deputy Smith and Deputy Sano, and would also kick at them while lying on the roof (p. 19). Mr. Coronel was incoherently yelling and screaming that the deputies had shot him, that he was dying, and the he needed help (p. 19). Deputy Sano continued to speak in a calm voice to Mr. Coronel in an attempt to get him to calm down from his excited state (p. 19).

## Mr. Coronel Thrashed Around on the Roof

As Deputy Sano attempted to calm him through speaking, Mr. Coronel continued to thrash and roll around on the roof (Smith, 1/24/06, p. 19). Deputy Smith saw that Mr. Coronel's hands, knuckles, and forearms were scraped and bleeding (p. 19). According to Deputy Smith, Mr. Coronel would grab onto the roof's ventilation fixtures as if someone were trying to pull him off the roof (p. 19), even though no one had grabbed Mr. Coronel (p. 19).

## Deputy Darlington Formulated a Plan to Take Mr. Coronel into Custody

Deputy Smith reported that after approximately 20 minutes of talking to Mr. Coronel on the rooftop, Deputies Darling, Payton, and Hoskins joined him and Deputy Sano on the roof (Smith,

1/24/06, p. 19). The deputies' observed Mr. Coronel and concluded that he appeared to be under the influence of a narcotic, and was a risk of falling off the roof, landing on the ground below (p. 19). Deputy Darlington developed a plan for the safe seizure of Mr. Coronel (p. 19).

Deputy Darlington's plan consisted of waiting for Mr. Coronel to roll onto his stomach, and then Deputies Darlington, Payton, Sano, and Smith would grab Mr. Coronel and handcuff him (Smith, 1/24/06, pp. 19-20; Darlington, 1/24/06, p. 30). If the proposed plan failed, Deputy Hoskins would have his TASER ECD deployed and ready to be used (Smith, 1/24/06, p. 20).

## Mr. Coronel Rolled onto his Stomach

A short time after Deputy Darlington formulated and discussed his plan with the other deputies on the rooftop, Mr. Coronel rolled onto his stomach (Smith, 1/24/06, p. 20). Deputy Smith climbed on top of Mr. Coronel and used his body weight to restrict Mr. Coronel's leg movements (p. 20). Deputies Sano, Payton, and Darlington attempted to grab Mr. Coronel's arms (p. 20). Mr. Coronel "balled his hands into fists and held them tightly underneath his body" (p. 20). Although the deputies repeatedly told Mr. Coronel to give them his hands, he refused (p. 20).

## TASER M26 ECD Deployment #1: Drive Stun to Upper Right Shoulder Area

After Mr. Coronel failed to comply with the deputies' commands to give them his arms, Deputy Hoskins deployed his TASER M26 ECD in "drive stun" mode to Mr. Coronel's upper right shoulder area (Smith, 1/24/06, p. 20; Hazel, August 23, 2006, p. 7). The TASER ECD drive stun had no apparent effect on Mr. Coronel, as he continued to resist the deputies' efforts to control and handcuff him (Smith, 1/24/06, p. 20).

## TASER M26 ECD Deployment Data Download

The time on a TASER M26 ECD data download is subject to clock drift when compared to the correct time of the world atomic clock. However, the time sequence or intervals between closely entered time stamps are accurate.

```
Line 305) 01/24/06 07:41:30, Tuesday
Line 306) 01/24/06 07:41:35, Tuesday
Line 307) 01/24/06 07:41:40, Tuesday
Line 308) 01/24/06 07:41:43, Tuesday
```

The TASER M26 ECD data download shows four data point entries relevant to the incident with Mr. Coronel (data download lines 305-308). The data download relevant to the incident with Mr. Coronel shows the following:

- ECD shows four data download points (305 to 308) all between :30 and :43 (or 13 seconds).

- The four data points (305 to 308) show a maximum possible duration of ECD discharge, not delivery, as 17 seconds. The first three data points (305-307) could not have exceeded 12 seconds of discharge, and may have been less. The fourth data point (308) could not

exceed five seconds. Thus, 12 seconds plus five seconds yields a maximum TASER ECD discharge, not delivered energy, time of 17 seconds.

- The first three data download points (305-307) show two possible types of interpretations:

  o Trigger held back - the officer pulled the trigger on the ECD and held it back for a minimum of ten seconds, and a maximum of 12 seconds. The M26 ECD creates a data point when the trigger is pulled. Then, if the trigger is held back an additional data point is created at each five second (lines 306 and 307) interval. Thus, one interpretation is that the officer pulled the trigger and held the trigger back for at least ten seconds, but, not more than twelve seconds, thus producing the three data entries; or

  o The officer pulled the trigger more than once and engaged the safety, and then re-pulled the trigger at exactly five second intervals. Meaning, an M26 ECD trigger pull creates a data entry. However, the M26 does not show how long the M26 discharged (within a five second cycle). Thus, each discharge could be as long as five seconds or as short as one second. Thus, an alternate explanation is that the officer pulled the trigger (causing a data entry), engaged the safety ,thus, stopping the ECD discharge, and then again pulled the trigger causing another data point entry.

- The third to fourth data entry is only three seconds, thus, this is an example of the officer pulling the ECD trigger, creating a data entry, then, since the two data entries are only three seconds apart, the officer engaged the safety (stopping the discharge) ,and then again (the fourth data entry) pulled the trigger.

- The last trigger pull (data entry "308) resulted in a discharge from one to a maximum of five seconds (or one cycle). Because had the officer continued to hold the trigger back there would have been an additional data point entry at the next five second interval (or, at 41:48).

Prior to the incident involving Mr. Coronel, the TASER M26 ECD had last been discharged three days prior.

```
Line 303) 01/21/06 06:06:26, Tuesday
Line 304) 01/21/06 22:11:00, Saturday
```

TASER M26 ECD data download lines 303 and 304 show that the ECD had been discharged twice approximately three days prior to the incident with Mr. Coronel.

Lines 309 to 314 reading "Data Record not initialized" means that there were no additional trigger pulls, or device discharges, after the trigger pull (discharge) entered on line "308".

```
Line 308) 01/24/06 07:41:43, Tuesday
Line 309) Data Record not initialized
```

**TASER M26 ECD Deployment #2: Drive Stun to Upper Right Quadrant of Back**

While Mr. Coronel continued to resist the deputies, Deputy Hoskins deployed a second TASER M26 ECD drive stun mode to Mr. Coronel (Smith, 1/24/06, p. 20; Hoskins, 1/24/06, p. 27). The TASER ECD drive stun was to Mr. Coronel's upper right quadrant of the back and appeared to have some effect, as Mr. Coronel produced his arms (p. 20), although Deputy Hoskins and Deputy Payton both reported that the TASER ECD drive stun application appeared to have no effect on Mr. Coronel (Hoskins, 1/24/06, p. 27; Payton, 1/24/06, p. 29). Deputy Smith was then able to handcuff Mr. Coronel (Smith, 1/24/06, p. 20).

**Mr. Coronel Kicked his Legs**

After being handcuffed, Mr. Coronel began kicking his legs toward Deputy Smith (Smith, 1/24/06, p. 20). Sergeant Greathead, who had joined the deputies on the rooftop, assisted in the restraint of Mr. Coronel's legs (p. 20). Sergeant Greathead directed Deputy Howlett to get a pair of leg irons from his patrol vehicle (p. 20). Sergeant Greathead was concerned that Mr. Coronel would injure a deputy or himself by his kicking (p. 20).

**Leg Irons Applied to Mr. Coronel**

Deputy Howlett returned with the leg irons and they were applied to Mr. Coronel's ankles (Smith, 1/24/06, p. 20). During the application of the leg irons, Deputy Sano and Deputy Hoskins told Mr. Coronel to relax, as Mr. Coronel would often tense up and fight against the restraints (p. 20; Hoskins, 1/24/06, p. 27). After securing Mr. Coronel, a Stokes Basket was brought to the rooftop by two NCFD Firefighters for the safe removal of Mr. Coronel form the rooftop (Smith, 1/24/06, p. 20).

**Mr. Coronel was Removed from the Rooftop**

After the leg irons were applied to Mr. Coronel, deputies noticed that he had "relaxed considerably" (Smith, 1/24/06, p. 20). Deputy Smith checked Mr. Coronel's radial pulses and found them to be weak (p. 20). A firefighter checked Mr. Coronel's carotid pulse and confirmed that Mr. Coronel had a weak pulse (p. 20). Deputy Hoskins reported that he saw Mr. Coronel's chest rise and fall (Hoskins, 1/24/06, p. 27). After safely securing Mr. Coronel into the Stokes Basket, he was lowered to the ground and awaiting West Med Ambulance personnel (Smith, 1/24/06, p. 20).

**CPR was Performed on Mr. Coronel**

After Mr. Coronel was on the ground, it was determined by West Med Ambulance personnel that he was unresponsive and not breathing (Hoskins, 1/24/06, p. 27). As soon as Mr. Coronel was removed from the Stokes Basket, West Med and NCFD Firefighters began cardiopulmonary resuscitation (CPR) on him (Smith, 1/24/06, p. 20). Deputies Darlington and Howlett rolled Mr. Coronel onto his back so medical personnel could attend to him (Darlington, 1/24/06, p. 30).

Mr. Coronel's breathing was apneic, pupils were dilated, and capillary refill was absent (Jenkins, 3/1/06, p. 2). Mr. Coronel "was asystole, with no motor or verbal responses" (pp. 2-3), and while being transported to Salinas Valley Memorial Hospital (SVMH), he "regained sinus rhythm pulses and blood pressure" (p. 3).

## Mr. Coronel Arrived at the SVMH

When Mr. Coronel arrived at the SVMH emergency room, he was "comatose, with anoxic brain injury and acute renal failure" (Jenkins, 3/1/06, p. 1). Toxicology results showed "D-methamphetamine and d-amphetamine [were] detected in the hospital admission blood at levels of 1.02 mg/L and 0.28 mg/L respectively. Also present [was] a low concentration of cocaine metabolite (benzoylecognine) and ecognine methyl ester, but no free cocaine" (Hain, 2/15/06, p. 5).

"Laboratory assessment on admission shows a creatinine of 2.3, which has risen rapidly today to a value of 5.6. CPK is unmeasurable but greater than 20,000" (Carrillo, 1/25/06, p. 5). Mr. Coronel was comatose upon hospital admission (p. 5), and on Wednesday, January 25, 2006 had a temperature of 100.2° F (Fahrenheit) (p. 6). The assessment by Raymond R. Carillo, M.D. of Mr. Coronel was: "This is a 27-year-old gentleman who likely has acute renal failure on the basis of rhabdomyolysis. It is difficult to impossible to determine whether this rhabdomyolysis could be secondary to drug usage versus taser [sic] gun usage versus some combination. No other known exacerbating factors are indicated. Certainly, given his state of mind at the time that he was encountered, volume depletion could be playing some role" (p. 7).

### 5:42 p.m., 1/30/06: Mr. Coronel Died

On January 30, 2006, eight days after being admitted to the hospital, Mr. Coronel died at 5:42 p.m. after being taken off life support (Jenkins, 3/1/06, p. 1). John Massaro, M.D. of SVMH listed the principal diagnosis of Mr. Coronel as "Anoxic Brain Damage", and secondary diagnoses as: "Rhabdomyolysis; Acute Renal Failure, unspecified; Convulsions; Pneumonitis due to Inhalation of Food or Vomitus; Acidosis; Amphetamine/Sympathomimetic Abuse unspecified use; and, Cocaine abuse unspecified use" (SVMH, **Coding Summary**, 1/31/06, p. 1).

### 9:30 a.m., 2/1/06: Autopsy Performed on Mr. Coronel

On Wednesday, February 1, 2006 at 9:30 a.m. Forensic Pathologist John R. Hain, M.D. performed an autopsy on Mr. Coronel (Hain, 2/15/06, p.1). Dr. Hain listed the following as the "cause of death":
- Anoxic encephalopathy (8 days) due to
- Cardiorespiratory arrest (8 days) due to
- Acute methamphetamine and cocaine intoxication (8 days) (p. 5).

Dr. Hain listed "[TASER ECD] application and struggle with police" as contributing conditions, and the manner of death to be "accident" (Hain, 2/15/06, p. 5).

# APPENDIX E

Teran, et. al. v. TASER International, Inc.

## CASE MATERIALS REVIEWED OR CONSIDERED

I. **PLEADINGS**

    a.    **First Amended Complaint for Damages for Wrongful Death and Survival Action, Jury Trial Demanded,** filed October 22, 2007;

II. **DEPOSITIONS**

    a.    **Deposition of Deputy Brandon Smith,** February 26, 2008;

    b.    **Deposition of Deputy Benjamin Payton,** February 21, 2008;

    c.    **Deposition of Deputy Bryan Hoskins,** February 25, 2008;

    d.    Deposition of Sergeant Denis Greathead, October 2, 2007;

    e.    **Deposition of Deputy Michael Darlington,** October 1, 2007;

III. **DEFENDANT RESPONSES**

    a.    **Defendant Brain Hoskins' Responses to Plaintiff Elvira Teran's Interrogatories – Set One,** March 13, 2008;

    b.    **Defendant Brandon Smith's Reponses to Plaintiff Elvira Teran's Interrogatories,** March 13, 2008;

    c.    **Defendant Michael Kanalakis' Responses to Plaintiff Elvira Teran's Interrogatories – Set One,** March 13, 2008;

    d.    **Defendant Warren Sano's Responses to Plaintiff Elvira Teran't Interrogatories – Set One,** March 13, 2008;

    e.    **Defendant Benjamin Payton's Responses to Plaintiff Elvira Teran's Interrogatories – Set One,** March 13, 2008;

    f.    **Defendant Mike Darlington's Responses to Plaintiff Elvira Teran's Interrogatories – Set One,** March 13, 2008

g.     **Defendant County of Monterey Sheriff's Offices' Responses to Plaintiff Elvira Teran's Request for Production of Documents – Set One,** March 13, 2008;

h.     **Monterey County Defendants; Witness List and Initial Disclosures – Part One,** February 12, 2007;

i.     **Monterey County Defendants; Witness List and Initial Disclosures – Part Two,** February 12, 2007;

j.     **Monterey County Defendants; Witness List and Initial Disclosures – Part Three,** February 12, 2007;

k.     **Monterey County Defendants; Witness List and Initial Disclosures – Part Four,** February 12, 2007;

l.     **Defendant TASER'S Initial Disclosures Pursuant to Federal Rules of Civil Procedure, Rule 26 (a)(1),** filed February 16, 2007;

m.     **Defendant TASER'S Supplemental Disclosures Pursuant to Federal Rules of Civil Procedure, Rule 26 (a)(1),** filed April 2, 2007;

n.     **Defendant TASER'S Second Supplemental Disclosures Pursuant to Federal Rules of Civil Procedure, Rule 26 (a)(1),** filed June 19, 2007;

o.     **Defendant TASER'S Fourth Supplemental Disclosures Pursuant to Federal Rules of Civil Procedure, Rule 26 (a)(1) and Rule 26 (e)(1),** filed March 19, 2008;

## IV.   PLAINTIFF RESPONSES

a.     **Plaintiffs' Statement of Initial Disclosures,** February 13, 2007;

b.     **Plaintiff's Initial Disclosures – Email Correspondence,** Part 18;

c.     **Plaintiff's Initial Disclosures – Email Correspondence,** Part 19;

d.     **Plaintiff's Initial Disclosures – Email Correspondence,** Part 20;

e.     **Plaintiff's Initial Disclosures – Email Correspondence,** Part 21;

f.     **Plaintiff's Initial Disclosures – Newspaper Articles,** Part 23;

g.     **Family Photos;**

## V.    INVESTIGATIVE REPORTS

a.    **Teran v. County of Monterey, et al. - Investigative Documents Binder,** Volume One:
1. Coroner's Report
2. Internal Affairs Investigation - Case IA #06-08

b.    **Teran v. County of Monterey, et al. – Investigative Documents Binder,** Volume Two:
1. Salinas Valley Memorial Hospital Medical Records of Jaime Coronel

c.    **Teran v. County of Monterey, et al. – Investigative Documents Binder,** Volume Three:
1. Salinas Valley Memorial Hospital – Statement of Account
2. Westmed Ambulance Inc. – Statement of Account
3. Mehl's Colonial Chapel – Statement of Account
4. Pajaro Valley Public Cemetery – Statement of Account
5. Death Certificate
6. Email Correspondence
7. Police Records
8. News Articles, and

d.    **Teran v. County of Monterrey, et al. – Investigative Documents Binder,** Volume Four:
1. Salinas Valley Memorial Hospital Medical Records of Jaime Coronel.

CURRICULUM VITAE

## EDUCATION:

**Post-Graduate Courses/Programs:** TASER® Armorer Certification Course (March 2008) ■
Excited Delirium (IACP, 2007) ■ Investigation of In-Custody Deaths (IACP, 2007) ■
Panel on Excited Delirium (IACP, 2007) ■ LAPD Use-of-force Incidents: From Initiation
to Conclusion (IACP, 2007) Update on electronic Control Weapons: Review of the
Recent medical Publications and Recommendations (IACP, 2007) ■ Today's electronic
Control Weapons: Policies and Training (IACP, 2007) ■ Legal Issues: Hiring and
Retention (IACP, 2007) ■ TASER® Instructor (March 2007) ■ *Legal, Psychological and
Biomechanical Aspects of Officer-Involved Lethal and Less Lethal* Force (AELE, 2007) ■
Panel *on Electronic Control* Weapons (IACP, 2006) ■ *Electronic Control Weapons: The
Tactical, Medical, and Legal Barriers to Successful* Deployment (IACP, 2006) ■ *Police
Civil Liability and the Defense of Citizen Misconduct Complaints* (AELE), 2006 ■
TASER® Master Instructor Course (non-instructor, 2006) ■ TASER Conference, 2006 ■
*Non-disciplinary Employment and Labor Law* (AELE, 2006)■ *Jail and Prisoner Legal*
Issues (AELE), 2006)■Discipline *and Internal* Investigations (AELE, 2005)■Criminal
*Justice Agency Compliance & Auditing,* (AELE), 2005 ■ *Police Civil Liability and the
Defense of Citizen Misconduct Complaints* (AELE), 2005 ■ *Current Issues in Less Lethal*
Technology (IACP), 2005 ■ *Legal Developments in Use of Force, with Special Emphasis
on* TASERS (IACP), 2005 ■ *Open Discussion on Police* Suicide, 2005 ■ *TASER Use and
Law Enforcement: Medical and Legal* Issues (IACP), 2005 ■ *TASER Master Instructor*
Course (non-instructor), 2005 ■ TASER Conference, 2005 ■ *Sudden & In-Custody
Death, Restraint Asphyxia Medical Update* (E.R. physician seminar), 2005 ■
Fundamentals *of Effective Online Teaching,* 2003, Walden University ■ *Employment and
Labor Law in Pennsylvania,* 2002, Lorman Educational Services ■ *Competency-Based
Curriculum Development in Professional* Psychology, Capella University, 2001■
Practicum *in On-line Graduate Teaching in Professional* Psychology, Capella University,
2001 ■ Mentoring *Graduate Students in Professional* Psychology, Capella University,
2001 ■ On-*line Teaching and Training in Professional* Psychology, Capella University,
2001 ■ Intellectual *Property in Cyberspace 2000,* Berkman Center for Internet &
Society, Harvard Law School ■ *Violence Against Women 2000,* Center for Internet &
Society, Harvard Law School ■ *Certified On-Line Instructor,* Walden Institute, 2000 ■
*Governmental Accounting and Finance,* Suffolk University, Boston, MA, 1979 ■
*Research Methodology, Criminal Justice Management,* University of Baltimore,
Baltimore, MD, 1975.

**Doctor of Philosophy** (Applied Management & Decision Sciences), Walden University,
Minneapolis, MN, 1999. Dissertation: The Patterns, Practices, and Managerial Impact of
Sexual Harassment in a Southern Sheriff's Department with a Comparative Analysis to

the United States Merit Systems Protection Board Findings. (Accredited by North Central Association of Colleges)

**Master of Business Administration** (Marketing/Management), *With Distinction*, Graduate School of Management, Babson College, Wellesley, MA, 1978. (Accredited by New England Association of Colleges)

**Master of Science** (Public Relations), School of Public Communication, Boston University, Boston, MA, 1976. (Accredited by New England Assoc. of Colleges)

**Bachelor of Science** (Criminal Justice), *Summa Cum Laude*, University of Baltimore, Baltimore, MD, 1975. (Accredited by Middle States Assoc. of Colleges)

**Associate in Applied Science** (Police Science), *Cum Laude*; **Certificate in Corrections**, *Cum Laude*, Northern Virginia Community College, Annandale, VA, 1972. (Accredited by Southern States Assoc. of Colleges)

## PROFESSIONAL EXPERIENCE:

2005 – Present. **Institute for the Prevention of In-Custody Deaths, Inc.** Henderson, NV. President, Chief Learning Officer. Administrative, teaching, plus curricula design, operational guidance, and implementation of in-custody death identification, prevention, and investigative programs (including jail suicide) for criminal justice, emergency responders, correctional, and medical agencies across the globe. Developer of informational video, text, instructor and basic training materials, etc. for training classes, in addition to identifying and synthesizing the literature on sudden and in-custody deaths (e.g., metabolic acidosis, agitated delirium, "excited delirium", asphyxia issues, etc.). Developed and sponsored the first and second international sudden death, excited delirium Conference in November 2006, and November 2007.

1982 - Present: **Defensive Tactics Institute, Inc.** Henderson, NV. Founder, Vice Chairman, Chief Operating Officer, and senior instructor. President, 1982 - 1995. Administrative, marketing, public relations, financial, curricula design, teaching, plus the design, implementation and evaluation of less-than-lethal and non-lethal instructor and basic training programs for criminal justice agencies across the globe. Develop policies, procedures, rules and regulations for agencies on use-of-force training and equipment. Programs include, but are not limited to: prisoner restraint and transport; in-custody death; cultural diversity; sexual harassment; tactical handcuffing; TACTICAL OC®, defensive tactics, expandable & straight baton, firearm disarming and retention, tactical flashlight™, instructor development, Kubotan®, Kubotai®, edged weapons, and others.

1982 - Present: **John G. Peters, Jr. & Associates**, Las Vegas, NV. International Consultant and project manager. Consulting areas include police, correctional, security, and municipal practices; criminal justice products; civilian use-of-force; management studies; organizational diagnosis of criminal justice agencies; and, sexual harassment surveys and studies. Sexual harassment database is the largest identified that focuses upon criminal justice agencies.

Statistical data analysis of TASER® voluntary self-exposures and field uses. Consulted in over 200 legal cases as an expert witness.

1982: **United States Secret Service Defensive Tactics Advisory Panel**, Washington, D.C. Member. One of four defensive tactics instructors in the United States appointed to this pioneering panel. The Panel's purpose was to design and update existing self-defense tactics for the U.S. Secret Service (including the Presidential Protection Detail, and the Uniformed Division).

1982 - 1995: **Reliapon Police Products, Inc.**, Albuquerque, NM. Founder. President. Former Chairman of the Board, and Vice President of Marketing and Communications (1983 - 1994). Responsibilities included the overseeing of administrative, marketing, public relations, financial, and senior management matters of this specialized mail order, wholesale, video production, and publishing firm. Recruited and managed nationwide sales representatives. Products sold in the United States and abroad. Sold the company in 1994. Supervised six people.

1992 - 1994: **Institute for Liability Management**, Gallagher-Bassett Services, Inc., Itasca, IL. Senior Associate. Responsible for the conducting of police department Liability Assessment Profile Surveys (LAPS), the review of LAPS, plus the consultation/ implementation of LAPS; the development and review of high-risk policies; the teaching of courses including: Use-of-Force Instructor, Supervisory Responsibility and Liability Management, Pursuit Liability and Management, etc.; and, criminal justice practices consultation.

1989 - 1991: **Impact Productions, Inc. and Impact Duplications**. Albuquerque, NM. Co-founder. Writer-Producer for video productions and scripts. Wrote and produced two criminal justice informational videos: ASP Tactical Baton and Defensive Tactics With Electronic Restraints.

1982 - 1985: **Tri-Sector Professional Development Institute, Inc.** Albuquerque, NM. Founder. Administrative, marketing, public relations, and other duties, including curricula design and teaching, consulting, plus the design, implementation, and evaluation of management and related training programs for governmental, corporate, and non-profit agencies. Programs included: public budgeting, criminal investigation management, management by objectives, first-line supervision, discipline, civil liability, and the writing of policies, procedures, and rules and regulations.

1979 - 1982: **PR-24 International Institute, Inc.**, Braintree, MA. President and founder. Administrative duties, training, plus the design, implementation, and evaluation of the PR-24 baton, Kubotan®, and other defensive tactics programs for criminal justice agencies. Instructed the *Los Angles Police Department, the California Highway Patrol, the North Carolina Highway Patrol, the Las Vegas Metro Police, plus others*. Edited and published an international newsletter for instructors. Hosted the first PR-24 International instructor seminar.

1978 - 1979: **Public Systems Evaluation, Inc.**, Cambridge, MA. Senior Research Associate. Responsibilities included the conducting of literature reviews, attitudinal surveys, and topic area leadership in a project designed to assess and extend research findings in the area of police field

services. Became one of the nation's leading authorities in the *management of criminal investigations*. Visited major California police departments in 1979 to obtain research and management reports on criminal investigation management.

1977 - 1978: **Braintree Police Department**, Braintree, MA. Staff Executive. In this *new* position, reported to, and assisted the Police Chief. Director of both the Administrative Bureau (7 divisions), the Planning and Research Unit, and liaison to the Auxiliary Police. Functionally reorganized the police department within the first three months. Responsible for the department budget (excess of $1 million). Tasks included writing, editing, and implementing policies, procedures, rules and regulations, Special Orders, General Orders, special investigations, interviewing applicants, discipline, etc.

6/77 - 12/77: **Waltham Police Academy**, Waltham, MA. Consultant. In this new position, assisted the Academy Director with planning, organizing, coordinating, scheduling, and teaching.

1973 - 1977: **York County Sheriff's Department**, York, PA. Deputy Sheriff. Assignments included all areas of the criminal justice system: courts, corrections, and police. Assigned to the District Attorney's Fugitive Squad in 1974. Extensive experience in investigations and security techniques and applications.

1972 - 1973: **Northern York County Regional Police Department**, Dover, PA. Police officer (self-defense specialist). Pennsylvania's *first* regional police department. Conviction rate: criminal arrests--100%; traffic arrests--95%. Designed and instructed self-defense programs, including the PR-24 baton.

3/72 - 7/71; 6/69 - 6/70: **Federal Bureau of Investigation**, Washington, D.C. Clerk. Assigned to the Files and Communications Division. Received extensive training in public speaking. Instructed FBIRA Judo Club. Received a *Letter of Commendation* from then FBI Director, J. Edgar Hoover.

## ACADEMIC EXPERIENCE:

2005-2006: **Neumann College**, Aston, PA. Adjunct faculty. Responsible for teaching in the Master of Leadership degree program. Designed and taught online facilitator course for undergraduate and graduate faculty.

8/00- 12/04: **Millersville University**, Millersville, PA. Adjunct faculty. Responsible for the teaching of *public speaking*. Nominated for *Faculty of the Year, 2001* by Student Senate.

5/03 – 8/04: **Walden University**, Minneapolis, MN. Adjunct Faculty, School of Management/Public Administration. Supervised doctoral students in public administration areas, including but not limited to criminal justice, public safety, etc.

6/02 – 8/03: **Regent University**, Alexandria, VA. Assistant Professor. Responsible for the teaching of management, leadership, research, statistics, human resource management, independent study, and other business management courses; also, On-line course development. Serve on Admissions Committee and Curriculum Committee, in addition to advising students. Integral part of the SACS review for program accreditation.

3/00 – 9/01: **Walden Institute**, Bonita Springs, FL. Faculty. Responsible for teaching the Institute's on-line *Certified Online Instructor Course*.

9/00 – 6/02: **Regent University**, Alexandria, VA. Adjunct faculty, Degree Completion Program. Responsible for teaching orientation, management, and statistics courses in Regent's *new* Degree Completion Program (DCP). Lead instructor for Groups #1A, 5A and 9A. On-line course developer for the Regent DCP.

1/01 – 3/02: **Capella University**, Minneapolis, MN. Core Faculty. First, full-time core faculty in organizational psychology. Responsible for teaching doctoral- and master-level courses in *organizational psychology, statistics, research methods, personnel, and psychology of leadership* in the School of Psychology. Served on doctoral- and master-level dissertation/thesis and comprehensive examination committees. Coauthored, rewrote, and updated *organizational psychology* on-line course. Primary designer of *Police Psychology* certificate program, including *police organizational culture* course.

1/01 – 5/01: **Elizabethtown College**, Elizabethtown, PA. Adjunct faculty. Responsible for teaching *Organizational Training & Design*, and *Advanced Public Relations*.

2000 – 1/01: **Capella University**, Minneapolis, MN. Adjunct Faculty. Responsible for teaching doctoral- and master-level courses in *organizational psychology, statistics, research methods, personnel, and psychology of leadership* in the School of Psychology. Serve on doctoral and comprehensive committees.

1998 –1/01: **Eastern College**, St. Davids, PA. Affiliate faculty. Responsible for teaching MBA courses (*statistics foundations, business research methods, issues in management, strategic thinking I & II*) and undergraduate courses (*research methodology & statistics; leadership; human resources, ethics, marketing; etc.*) in the School of Professional Studies. Designed, *Information and Business Process Systems*, as an on- ground and on-line course in the Management of Information Systems program and the Adult Intensive Track. Primary instructor for DCP Group # 208.

8/99-5/00: **Millersville University**, Millersville, PA. One-year, full-time, temporary faculty appointment. Responsible for teaching three undergraduate courses: *introduction to public relations, public relations writing (writing lab)*, and *public speaking*.

1996 - 1998: **University of Alabama--Tuscaloosa**. Adjunct faculty. Responsible for teaching criminal justice courses in the Advanced Police Academy.

1978 - 1980: **Northern Essex Community College**, Haverhill, MA. Lecturer. Responsible for teaching four courses: *Senior Seminar* (Police/Security Management); *Security Administration; Principles of Loss Prevention;* and *Introduction to Security*. Subject areas included the analysis, the design, the management, and the implementation of police-security programs via a systems approach. Received the highest faculty evaluation of both full-time and part-time faculty.


## PROFESSIONAL COMMUNITY EXPERIENCE:

2000 - 2005: **Civil Service Commission**, Millersville, PA. Appointed January 2000 to serve a six-year term by the Millersville Borough Council. Elected president in April 2000.

1989 - 1994: **Academy Estates Residents' Association, Inc.**, Albuquerque, NM. Elected President in 1989, 1990, 1991, and 1994 and Vice President, 1992 by members of the Association.

1988 - 1991: **Sunport Optimist Club**, Albuquerque, NM. Chairperson, Finance Committee, 1988 - 1989. Within six months, guided the Club from a negative to a positive cash flow. Also served as co-editor of the Club's weekly newsletter.

1979 - 1982: **Town of Braintree (MA) Finance Committee.** Member, General Government Sub-Committee. Responsible for the review and analysis of general town government budgets. Voted on all town budgets, including schools, police, fire, and highways. Served during pre- and post-Proposition 2 ½ (similar to California's Proposition 13).

1979 - 1982: **Town Meeting Member,** Braintree, MA. Elected position. Voted on all financial, administrative, and other matters that affected the Town of Braintree. Town Meeting members approved all budgets, etc.


## OTHER PROFESSIONAL:

**Training Advisor:**  AMTRAK® Police Department (1996 - present). Instruct and consult on various police management and training issues (e.g., sexual harassment and instructor development).

El Paso County (CO) Sheriff's Department (former).

Routt County (CO) Sheriff's Department (1991 - 1994). Draft, review, and recommend policies, rules, regulations, plus conduct training (former).

Fairbanks (AK) Police Department (former).

Pulaski County (AR) Sheriff's Department (former).

**Member:** International Association of Chiefs of Police; Justice Research & Statistics Association; *Certified Litigation* Specialist Academic Committee, Americans for Effective Law Enforcement; Faculty, Americans for Effective Law Enforcement; Academy of Criminal Justice Sciences; Malignant Hyperthermia Association of the United States; American Correctional Association (professional member); International Police Association (professional member); Who's Who in the East; Beta Gamma; Wilson Honor Society; Phi Theta Kappa; Lambda Alpha Epsilon; United States Combat Judo Association; United States Judo Association; and, United States Judo Federation.

**Consultant:** Various federal, state, city, county, local, and international criminal justice agencies including, but not limited to: Chattanooga Police Department; Department of Energy Central Training Academy, Winnebago County Sheriff's Police (IL), Seattle Police Department, Oregon State Police, Tuscaloosa Police Department, Public Agency Training Council, plus corrections, security, and military agencies. Consulted with agencies in Canada, United Kingdom, and Australia. Former Advisory Board member to the Northern Essex Community College Criminal Justice Program.

**Academic Awards:** Dissertation nominated for academic award (1999).

M.B.A., *With Distinction*, Babson College. <u>Second highest grade point average</u> certificate, College of Liberal Arts, University of Baltimore; B. S. awarded, *Summa Cum Laude*; A. A. S. and Certificate in Corrections awarded, *Cum Laude*, Northern Virginia Community College.

Elected into <u>Beta Gamma</u>, <u>Wilson</u>, and <u>Phi Theta Kappa</u> National Honor Societies.

**Professional Awards:** Certified Litigation Specialist: police liability, correction liability; public employment liability; Certificates of Appreciation: U. S. Secret Service; Fairbanks (AK)Police Department; University of Alabama; U. S. Coast Guard; Escambia County (FL) Sheriff's Department; MSG, U. S. Marine Corps; plus more.

Letters of Commendation: Albuquerque (NM) Police Department; Bureau of Indian Affairs; Federal Bureau of Investigation; Washington State Criminal Justice Training Commission; California Highway Patrol; University of Alabama--Tuscaloosa; plus many more.

Honorary Citizen: Louisville, KY; Fairbanks, AK Captain, Belle of Louisville; Kentucky Colonel

**Professional Skills:**

Certified On-Line Instructor; Software programs: Word, WordPerfect, Excel, PowerPoint, SPSS, BlackBoard, WebCT; Hypnotist (clinical and investigative); WordPerfect; typing; Jiu-Jitsu (holder of a third degree black belt); Judo (holder of a first degree black belt); International Instructor-Trainer in several less-than-lethal and non-lethal impact tools, defensive tactics, and tactics.

**Presentations:**

American Jail Association's 27th Annual Training Conference & Jail Expo—Sacramento, CA (May 5, 2008). Jail Deaths: Excited Delirium—Prevention In-Custody Deaths: Part I.

California Sheriff's Association Seconds in Command Workshop—Mt. Shasta, CA (May 1, 2008). Excited Delirium.

AELE Lethal and Less Lethal Force Workshop—San Francisco, CA (March 25, 2008). Sudden and In-Custody Deaths.

Arizona Homicide Investigator Conference—Tempe, AZ (March 17, 2008).Excited delirium, sudden in-custody death, behavioral cues, and forensic investigation guidelines.

CA P.O.S.T. CIT Seminar/Curriculum Update—San Jose, CA. (February 28, 2008). Excited delirium history and behavioral cues.

American Jail Association—Ft. Walton Beach, FL. (January 21, 2008). Excited Delirium/Sudden In-Custody Deaths in the Correctional Setting.

AELE Jail and Prisoner Legal Issues—Las Vegas, NV. (January 15, 2008). Excited Delirium and Sudden, In-Custody Deaths.

11th Annual Homicide Investigator Conference—Mesquite, NV (December 13, 2007). Excited Delirium, Sudden, In-Custody Death, Use of Force, and Forensic Investigation.

2nd Annual Sudden Death, Excited Delirium & In-Custody Death Conference—Las Vegas, NV (November 28, 2007). Scientific Method, Causation, Fallacies, and the FRCP 702 Gatekeeper Function.

TASER® Use of Force, Risk Management, and Legal Strategies Conference—Honolulu, HI. (November 19, 2007).

Operationalizing Theory Into Practice: Sudden and In-Custody Deaths.

AELE Lethal and Less Lethal Force Workshop—Las Vegas, NV (November 12, 2007). Sudden and In-Custody Deaths.

California Sheriff's Association—San Jose, CA (October 24, 2007. Excited Delirium and Sudden In-custody Deaths.

WCRP Excited Delirium Workshop—Federal Way, WA (October 11, 2007).

WCRP Excited Delirium Workshop—Spokane, WA (October 10, 2007).

CVMIC Excited Delirium Conference—New Berlin, WI. (October 2, 2007). Excited Delirium Overview, Forensic Investigations, and Scientific Causation.

TASER® Use of Force, Risk Management, and Legal Strategies Conference—Vancouver, B.C. (September 2007). Operationalizing Theory Into Practice: Sudden and In-Custody Deaths

TASER®/FBINAA Use of Force, Risk Management, and Legal Strategies Conference—San Diego, CA (July 2007). Operationalizing Theory Into Practice: Sudden and In-Custody Deaths

Montana Chiefs of Police Association Missoula, MT. (July 2007). Excited Delirium, Sudden, In-Custody Deaths, Suicide-by- Cop.

Cincinnati (OH) Police Department (May 2007): Keynote speaker: Sudden/In-Custody Deaths.

Contra Costa County Sheriff's Department Correctional Services (April 2007): Sudden Death, Excited Delirium Deaths.

Illinois State Police Internal Investigator Symposium Springfield, IL (April 2007): Investigating Sudden Death, Excited Delirium Deaths

Utah Chiefs' of Police Association St. George, UT (March 2007): Sudden Death, Excited Delirium, Jail Suicide, and Suicide- by-Cop

AELE Lethal and Less Lethal Force—Las Vegas, NV (March 2007): History of Sudden Death: An Overview

Las Vegas Metropolitan Police Department "Use-of-Force Media Day, Las Vegas, NV (February 2007): Sudden Death, Excited Delirium, and TASER ECDs

Boulder City Kiwanis Club, Boulder City, NV (February 2007): Sudden Deaths and TASER ECDs

Southern California Jail Manager's Conference, Santa Paula, CA (January 2007): Excited Delirium

Montana Association of Cities and Counties, Billings, MT (January 2007): Exited Delirium; Jail Suicide; Suicide by Cop

AELE Jail and Prisoner Legal Issues—Las Vegas, NV (January 2007): Psychological Considerations: Excited Delirium and Jail Suicide

P.A.T.C., Western Training Conference, Las Vegas (November 2006): Excited Delirium, In-Custody Death; Investigations

TASER® Use of Force, Risk Management, and Legal Strategies Conference—Oakland, CA (November 2006). Operationalizing Theory Into Practice: Sudden and In-Custody Deaths

TASER® Use of Force, Risk Management, and Legal Strategies Conference—Colorado Springs, CO (August 2006). Operationalizing Theory Into Practice: Sudden and In-Custody Deaths

TASER® Use of Force, Risk Management, and Legal Strategies Conference—Portland, OR (July 2006). Operationalizing Theory Into Practice: Sudden and In- Custody Deaths

PRIMA Conference—Las Vegas (June 2006): Sexual Harassment and Research Findings

FBI National Academy Graduates—Utah (May 2006): Excited Delirium, In-Custody Death; Jail Suicide; Suicide by Cop

TASER® Annual Conference—Las Vegas, NV (May 2006): Excited Delirium, Sudden Death

TASER® Master Instructor Program—Las Vegas, NV (May 2006). Excited Delirium, Sudden Death

Harrah's Entertainment, Inc.—Las Vegas, NV (April 2006): Ethics

AELE Lethal and Less-Lethal Force—Las Vegas, NV (February    2006):
Excited Delirium and In-Custody Deaths

TASER® Use of Force, Risk Management, and Legal Strategies
       Conference—Scottsdale, AZ (January, 2006).
       Operationalizing Theory Into Practice: Sudden and In-
       Custody Deaths

TASER® Use of Force, Risk Management, and Legal Strategies
       Conference—Scottsdale, AZ (December, 2005).
       Operationalizing Theory Into Practice: Sudden and In-
       Custody Deaths

Michigan Sheriff's Conference (October, 2005): Excited Delirium

Intercourse (PA) Merchants Association (February, 2004): Village History

PRIMA Conference—Reno (May 2003): Sexual Harassment and
       Employment Issues

Academy of Criminal Justice Sciences, Boston, MA (Feb., 2003)

Civil Air Patrol, Leola (PA) Elementary School (November, 2002)

PRIMA Conference—San Antonio (May 2002): Sexual
Harassment

Wisconsin Sheriff's Conference (January 2001): Sudden Death

Walden University (December 1998): Use of Force

Pennsylvania Sheriff's Conference (July 1998)

Walden University (March 1997)

Walden University (July 1997)

Milwaukee (WI) County Chief's Association (1995): Pepper Spray

Texas Narcotics Officers Association Conference (1988, 1989):
Safe Prisoner Searching Methods

Waltham (MA) Police Academy (March 1982)

Boston University (October 1979)

<u>Waltham Police Department</u> (October 1979)

<u>PR-24 International Instructor Conferences</u> (1979, 1980, 1981)

<u>Boston University</u> (February 1979)

<u>Westwood (MA) Police Department</u> (February 1979): Defensive Tactics

**Panelist:** "Excited Delirium." CVMIC Excited Delirium Conference, New Berlin, WI, October 2, 2007.

"Sexual Harassment Research Findings in Local Government." PRIMA's 26th Annual Conference, Las Vegas, NV, June 12, 2006.

"Legal, Psychological and Biomechanical Aspects of Officer-Involved Lethal and Less Lethal Force." Americans for Effective Law Enforcement, Las Vegas, NV, February 2006.

"Interactive Mock Trial" (municipal government employment practices). PRIMA's 24th Annual Conference, Reno, NV, May 22, 2003.

"Officer-Assisted Suicide: Liability, Training, and Municipal Concerns." Milwaukee, WI: Lorman Educational Services, December 5, 2002.

"Interactive Mock Trial" (employment practices). PRIMA's 23rd Annual Conference, San Antonio, TX, May 16, 2002.

"Sexual Harassment: Research Findings In The Law Enforcement Workplace", Milwaukee, WI. Lorman Educational Services, December 4, 2001.

"Police Liability in Wisconsin", Milwaukee, WI. Lorman Educational Services, December 14, 2000.

"To Protect and Serve." KNME Channel 5, Albuquerque, NM: July 10, 1991. Invited panelist: police "use-of-force"program.

## PUBLICATIONS:

Texts:

1. **Official Kubotan® Techniques** (with Takayuki Kubota). (1981). Ventura, CA: Reliapon Police Products, Inc.

2. **Realistic Defensive Tactics**. (1981). Ventura, CA: Reliapon Police Products, Inc.

3. **Official Kubotan Techniques--Civilian** (with Takayuki Kubota). (1982). Braintree, MA: Defensive Tactics Institute, Inc.

4. **Defensive Tactics With Flashlights**. (1983). Ventura, CA: Reliapon Police Products, Inc.

5. **Afraid of the Dark? Lite Your Way To Safety** (with Laurie A. Peters). (1984). Ventura, CA: Reliapon Police Products, Inc.

6. Tactical Handcuffing for Chain- and Hinged-Style Handcuffs. (1989). Ventura, CA: Reliapon Police Products, Inc.

7. **Prevention and Management of In-Custody Deaths** (with A. David Berman). (1997).Millersville, PA: Defensive Tactics Institute, Inc.

8. **Tactical OC®**. Ventura, CA: Reliapon Police Products, Inc. (forthcoming 2008).

9. **Identification, Prevention, Management, and Investigation of Sudden and In -Custody Deaths**. Las Vegas, NV: 702 Visual Communications, Inc. (forthcoming 2008).

## ARTICLES, NEWSLETTER, and HANDBOOKS

1. *BLURB*. Lancaster: Lancaster (PA) Judo Club, January 1976.

2. "Search: the Elevated Lying Position." *The Sentinel*, Spring 1976, pp. 44-45.

3. "Massachusetts Prison Furlough System. A Failure?" (with George Sacco) *The Advocate*, Spring 1976, pp. 2-9.

4. *BLURB*. Lancaster: Lancaster (PA) Judo Club, February-March, 1976.

5. "Massachusetts Prison Furlough System. A Failure?" (with George Sacco) *The Sentinel*, Summer 1976, pp. 61-64.

6. Warren Hall Handbook. Boston: Boston University Press, 1976.

7. *BLURB*. Lancaster: Lancaster (PA) Judo Club, April-May, 1976.

8. "Massachusetts Police Association's Position On Firearms." (with George Sacco) *The Sentinel*, Fall 1976, pp. 41-44.

9.      "Management vs Media." *The Sentinel*, Fall 1976, pp. 63-64.

10.      "Escape From A Full Nelson." *The Sentinel*, Fall 1976, pp. 63-64.

11.      *BLURB.* Lancaster: Lancaster (PA) Judo Club, September-October, 1976.

12.      *Massachusetts Police Association's 1976 Convention Report* (with Bill Brooks, et al.) Peabody: Massachusetts Police Association, 1976.

13.      "Dealing With Recidivism." *The Sentinel*, Winter 1976, pp. 57-62.

14.      "This Way Please." *The Sentinel*, Winter 1976, pp. 49-50.

15.      "Breaking A Front Choke Hold." *The Sentinel*, Winter 1976, pp. 48-49.

16.      *BLURB.* Lancaster: Lancaster (PA) Judo Club, November-December, 1976.

17.      "Pinned On Your Back: Now What?" *The Sentinel*, Spring 1977, pp. 55-56.

18.      "Bartley-Fox: Is It Working?" (Part I with W. Brooks) *The Sentinel*, Spring 1977, pp. 51-54.

19.      *A Descriptive Study To Determine The Salutation Preference of Massachusetts' Drivers.* Wellesley: Babson College Press, 1977.

20.      "Self-Defense Tips For Women." *The Sentinel*, Summer 1977, pp. 51-53.

21.      "Bartley-Fox: Is It Working?" (Part II with W. Brooks) *The Sentinel*, Summer, 1977, pp. 47-50.

22.      "First Names: Should They Be Used During Traffic Stops?" (with R. Goulet) *The Sentinel*, Summer 1977, pp. 15-20.

23.      "You Want Me Out, Take Me Out." *The Sentinel*, Fall 1977, pp. 33-34.

24.      *Northern Essex Hospital.* Haverhill: Northern Essex Community College, 1977.

25.      "Escape From A Crushing Bearhug." *The Sentinel*, Winter 1977, p. 27.
26.      "Shoplifting: Its Impact On You." (with D. Slifka). *The Sentinel*, Winter 1977, pp. 31-32.

27.      "The PR-24: An Answer To The Grey Area." *The Sentinel*, Spring 1978, pp. 19-21.
28.      *Hypnosis: An Evaluation of its Impact on Learning In A Police Recruit Class.* Boston: Massachusetts Criminal Justice Training Council, 1978.

29. *The Connection.* Braintree: PR-24 International Institute, Inc., August-September 1979.

30. "Defensive and Offensive Blocking: How A New Type of Baton Can Work For You." Law Enforcement Communications, August 1979, pp. 47-51.

31. "Police Field Studies: A Review of Evaluation Research." ( with Michael Cahn, and Edward Kaplan). *How Well Does It Work? Review of Criminal Justice Evaluation, 1978.* Washington National Institute of Law Enforcement and Criminal Justice, 1979, pp. 205-236.

32. *The Connection.* Braintree: PR-24 International Institute, Inc., October-November, 1979.

33. *The Connection.* Braintree: PR-24 International Institute, Inc., December-January, 1980.

34. *The Connection.* Braintree: PR-24 International Institute, Inc., February-March, 1980.

35. *The Connection.* Braintree: PR-24 International Institute, Inc., April-May, 1980.

36. *The Connection.* Braintree: PR-24 International Institute, Inc., June-July, 1980.

37. *The Connection.* Braintree: PR-24 International Institute, Inc., August-September, 1980.

38. *The Connection.* Braintree: PR-24 International Institute, Inc., October-November, 1980.

39. *The Connection.* Braintree: PR-24 International Institute, Inc., December-January, 1981.

40. "Kubotan: New Police Impact Tool." *The Sentinel,* Winter 1981, pp. 23-26.

41. *DTI Training Review.* Albuquerque: Tri-Sector Professional Development Institute, Volume 84 No 1, 1984.

42. *DTI Training Review.* Albuquerque: Tri-Sector Professional Development Institute, Volume 84 No 2, 1984.

43. *DTI Training Review.* Albuquerque: Tri-Sector Professional Development Institute, Volume 84 No 3, 1984.

44. *DTI Training Review.* Albuquerque: Tri-Sector Professional Development Institute, Volume 84 No 4, 1984.

45. *DTI Training Review.* Albuquerque: Tri-Sector Professional Development Institute, Volume 85 No 1, 1985.

46. **Instructor Handbook: Use of Force.** Albuquerque: Reliapon Police Products, Inc., 1985.

47. "Tactical Handcuffing Part I." *Police and Security News*, January-February 1988, pp. 6-23.

48. "Tactical Handcuffing Part II." *Police and Security News*, March-April 1988, pp. 2-19.

49. "Mini-Flashlights: More Than An Illumination Device." *Police and Security News*, July-August 1988, pp. 3-14.

50. **Tactical Handcuffing: Instructor Handbook.** Albuquerque: Reliapon Police Products, Inc., 1988.

51. **Tactical Handcuffing: Test Administrator Manual.** Albuquerque: Reliapon Police Products, Inc., 1988.

52. "Officer Survival Tip When Using the Beretta 92-F and the H & K 9mm Auto Pistols." *Police and Security News*, September-October 1988, pp. 3-14.

53. "The Truth About Electronic Restraints." *Police and Security News*, November-December 1988, pp. 3-14.

54. "The Expandable Baton: Your Less-Than-Lethal Sidekick." *Police and Security News*, January-February, 1989, pp. 5-16.

55. "Use of Force: Making the Intangible, Tangible." *Police and Security News*, March-April 1989, pp. 5-23.

56. **Electronic Restraint Lesson Guide.** Albuquerque: Reliapon Police Products, Inc., 1989.

57. **Electronic Restraint Test Administrator Manual.** Albuquerque: Reliapon Police Products, Inc., 1989.

58. "Reduce Your Training Liability With Performance- and Situational-Based Testing. "*Police and Security News*, May-June 1989, pp. 5 - 25.

59. "Eight Areas Of Potential Negligence For Criminal Justice Trainers,

Supervisors, and Administrators." *Police and Security News,* July-August 1989, pp. 7 - 30.

60. "Restraining Prisoners: An Historical View." *Police and Security News,* September-October 1989, pp. 6-9.

61. **Firearm Disarming Instructor Guide.** Albuquerque: Reliapon Police Products, Inc., 1989.

62. **Firearm Disarming Test Administrator Manual.** Albuquerque: Reliapon Police Products, Inc., 1989.

63. **Tactical Flashlight Instructor Guide.** Albuquerque: Reliapon Police Products, Inc., 1989.

64. **Tactical Flashlight Test Administrator Manual.** Albuquerque: Reliapon Police Products, Inc., 1989.

65. "Corrective Discipline for the 1990s." *Police and Security News,* March-April 1990, pp. 14-31.

66. "Mini-Flashlights Revisited." *Police and Security News,* July-August 1990, pp. 5-27.

67. "Kubotai: New Restraint Tool." *Police and Security News,* July-August 1990, p. 40.

68. "New Restraints For The 1990s." *Police and Security News,* September-October 1990, pp. 12-35.

69. "Your Whistle: An Important, But Often Overlooked Officer Survival Tool." *Police and Security News,* November-December 1990, pp. 3-27.

70. *DTI Training Review.* Albuquerque: Defensive Tactics Institute, Inc., Volume 91 No. 1, 1991.

71. "The Expandable Baton: More Than A Defensive Striking Tool." *Police and Security News,* January-February 1991, pp. 5-39.

72. Tactical Handcuffing Review: Standing Face To Face No. 1 Poster. Albuquerque: Reliapon Police Products, Inc., January 1991.

73. Tactical Glove Review. Poster. Vermont: Dakota Corp., March 1991.

74. "Flashlights: The Ersatz Baton: Part I." *Police and Security News,* March-April 1991, pp. 10 - 25.

75. "Rechargeable Flashlights: The Most Cost-Effective Tools You Can Use On

The Job." *Police and Security News*, May-June 1991, pp. 10-33.

76.  *DTI Training Review.* Albuquerque: Defensive Tactics Institute, Inc., Volume 91 No. 2, 1991.

77.  "Tactical Gloves: A Must For The Street-Wise Officer." *Police and Security News*, September-October 1991, pp. 18-31.

78.  **Chemical Aerosol Spray Instructor Guide.** Albuquerque: Reliapon Police Products, Inc., 1991.

79.  "Heroes Behind The Badge: National Law Enforcement Officers Memorial." *Police and Security News*, November-December 1991, pp. 43-45.

80.  **Chemical Aerosol Spray Workbook**. Albuquerque: Defensive Tactics Institute, Inc., 1991.

81.  **Defensive Tactics Instructor Workbook.** Albuquerque: Defensive Tactics Institute, Inc., 1991.

82.  "Selected Medical Implications of Handcuffing." *Police and Security News*, January-February 1992, pp. 24-27.

83.  **Tactical Flashlight Instructor Workbook.** Albuquerque: Defensive Tactics Institute, Inc., 1992.

84.  **Kubotan Instructor Workbook.** Albuquerque: Defensive Tactics Institute, Inc., 1992.

85.  **Side-Handle Baton Instructor Workbook** (with Steven Shockley). Albuquerque: Defensive Tactics Institute, Inc., 1992.

86.  "Americans With Disabilities Act: Its Affect On Criminal Justice and Security Agencies." (with Michael Brave, J.D.) *Police and Security News*, May-June 1992, pp. 3-63.

87.  *DTI Training Review.* Albuquerque: Defensive Tactics Institute, Inc., Volume 92 No. 1, 1992.

88.  "OSHA's Occupational Exposure to Bloodborne Pathogens Standard: How it Can Cave Your Life! Part I of 2." (with Michael Brave, J.D.) *Police and Security News*, July-August 1992, pp. 28-41.

89.  "Americans With disabilities Act: An End to Disability discrimination by Law Enforcement." (with Michael Brave, J.D.) *CVMC Risk Management Case Study VII*, July 1992.

90. "Why OC? (Oleoresin Capsicum)." (with Michael Brave, J.D.) *CVMC Risk Management Study V*, July, 1992.

91. "Managing The Use of force Through Policies and Procedures." (with Michael Brave, J.D.) *Legal Defense Manual*, Brief 92-3, pp. 12-19.

92. "New Technology--Oleoresin Capsicum Spray; Policy and Procedure." (with Michael Brave, J.D.). *Legal Defense Manual*, Brief 9203, pp. 12-19.

93. "Electronic Restraint Devices--Policy and Procedures." (with Michael Brave, J.D.). *Legal Defense Manual*, Brief 9203, pp. 19-23.

94. "OSHA's Occupational Exposure to Bloodborne Pathogens Standard: How It Can Save Your Life--Part II." (with Michael Brave, J.D.). *Police and Security News*, September-October 1992, 20-56.

95. **Edged Weapons Instructor Workbook** (with Steven Shockley). Albuquerque: Defensive Tactics Institute, Inc., 1992.

96. **Crowd Control Instructor Workbook** (with Steven Shockley). Albuquerque: Defensive Tactics Institute, inc., 1992.

97. *DTI Training Review*. Albuquerque: Defensive Tactics Institute, Inc., Volume 92 No 2, 1992.

98. "Stop Exposing Yourself." *Hatch Gloves Newsletter*. Ventura: Hatch Gloves, Volume 92 No 4, 1992.

99. *Electronic Restraints*. Sample Policy (with Michael Brave). Albuquerque: Reliapon Police Products, Inc., 1992.

100. *Aerosol Sprays*. Sample Policy (with Michael Brave). Albuquerque: Reliapon Police Products, Inc., 1992.

101. "OSHA's Occupational Exposure to Bloodborne pathogens Standard: How it Can Save Your Life! (with Michael a. Brave), *CVMC Risk Management Case Study IX*, December, 1992.

102. "New Information On Aids That Can Save Your Life!" (with Michael A. Brave) *Police and Security News*, January-February 1993, pp. 13-39.

103. "Legal Constraints On Human Restraints." *The Police Chief*, March 1993, pp. 28-35.

104. "What's Your Use Of Deadly Force Standard?" (with Michael A. Brave) *Police and Security News*, May-June 1993, pp. 9-51.

105. "The Problem With Off-Duty Employment." (with Michael A. Brave) *Legal Defense Manual*, Brief 93-2, pp. 3-8.

106. "Secondary Employment: Sample Policy and Procedure." (with Michael A. Brave) *Legal Defense Manual*, Brief 93-2, pp. 8-12.

107. "General Use-of-Force Considerations: Sample Policy and Procedure." (with Michael A. Brave) *Legal Defense Manual*, Brief 93-2, pp. 25-29.

108. "Deadly Force: More Than Just Firearms." (with Michael A. Brave) *Police and Security News*, September-October 1993, pp. 16-28.

109. "OC Aerosol Spray Update." (with Michael A. Brave) *Police and Security News*, January-February 1994, pp. 13-28.

110. "Flashlights and Police Liability." (with Michael A. Brave) *The Police Chief*, May 1994, pp. 46-49.

111. "New Study Says OC Sprays Safe." (with Michael A. Brave) *Police and Security News*, May-June 1994, pp. 55-58.

112. "Written Policy: Foundation for Officer Accountability." (with Michael A. Brave) *Legal Defense Manual*, Brief 94-2, pp. 3-8.

113. "Street-Proven, Life-Saving Equipment." *The European Government Journal*, Volume 2 No. 4 [1994], pp. 107-111.

114. "OC Training: Are Facial Sprays Necessary?" *Police and Security News*, September-October 1996, pp. 57-61.

115. **Prevention and Remediation of Sexual Harassment in the Workplace.** Millersville, PA: Defensive Tactics Institute, Inc., 1996.

116. "Prevention and Remediation of Sexual Harassment In The Criminal Justice Workplace—Part I." *Police and Security News*, January - February, 1997, pp. 15 - 50.

117. "Prevention and Remediation of Sexual Harassment In The Criminal Justice Workplace—Part II." *Police and Security News*, March - April, 1997, pp. 3 - 7.

118. "Hogtying: Take It Off Your Restraint Menu." *Police and Security News*, May - June 1998, pp. 52 - 57.

119. "Hogtying: Take It Off Your Restraint Menu." *CVMC Risk Management Case*

Study #83, July 1998.

120. "Sexual Harassment: What Can Your Agency Do To Minimize Liability?" (with G. Gunta). (1998, November) *The Police Chief*, p. 10.

121. The Patterns, Practices, and Managerial Impact of Sexual Harassment in a Southern Sheriff's Department with a Comparative Analysis to the United States Merit Systems Protection Board Findings. (1999). Ann Arbor, MI: UMI, Inc.

122. "Sexual Misconduct: The No Win Lawsuit." (with G. Gunta). (2001, July). *CVMIC Update*, Vol. 11 No.3, pp. 2-3.

123. "National Law Enforcement Officers Memorial: 10[th] Anniversary." *Police and Security News*, November-December 2001, p. 78.

124. "Sexual Harassment: Research Findings in the Law Enforcement Workplace." (2001). *Police Liability in Wisconsin*. Eau Claire: Lorman Education Services, pp. 129-148.

125. "Great Cause, Great Night." *American Police Beat*, December 2000, p. 38.

126. "Officer-Assisted Suicide: Liability, Training, and Municipal Liability." (2002). *Police Liability in Wisconsin*. Eau Claire: Lorman Education Services, pp. 143-169.

127. "Suicide-by-Cop: Liability, Training, and Municipal Concerns. *Police and Security News*, January-February, 2003.

128. "1754-2004 Hall of Fame: Village of Intercourse, PA." (2004). *Amish Country News*, Volume 15, Issue 2, 17-19.

129. **Identification, Prevention, Management, and Investigation of Sudden and In-Custody Deaths**, Instructor Workbook v.1.0. (2005, July). Henderson, NV: Institute for the Prevention of In-Custody Deaths, Inc..

130. **Identification, Prevention, Management, and Investigation of Sudden and In-Custody Deaths**, Instructor Workbook v.2.0. (2005, October). Henderson, NV: Institute for the Prevention of In-Custody Deaths.

131. "Operationalizing Theory Into Practice: Sudden and In-Custody Deaths." (2005, December). *TASER® Use of Force, Risk Management and Legal Strategies for Chiefs, Sheriff's Risk Managers, and Legal Advisors.* Scottsdale, AZ: TASER® International, Inc.

132. "Force Continuums: Three Questions." (2006, January). *The Police Chief*, 8-9.

133. "Force Continuums: Are They Still Needed?" (2006, January). *Police and Security News.*

134. "Operationalizing Theory Into Practice: Sudden and In-Custody Deaths." (2006, January). *TASER® Use of Force, Risk Management and Legal Strategies for Chiefs, Sheriff's Risk Managers, and Legal Advisors.* Scottsdale, AZ: TASER® International, Inc.

135. "Sudden and In-Custody Deaths." (2006, Feburary). *AELE legal, psychological and biomechanical aspects of officer-involved lethal and less lethal force workshop workbook.* Park Ridge, IL. Americans for Effective Law Enforcement.

136. "Sudden death, 'excited' delirium, and issues of force: Part I." (2006, March-April). *Police & Security News,* 104-107.

137. "Sudden death, 'excited delirium, and issues of force: Part II--TASER® and EMDs." (2006, May-June). *Police & Security News.*

138. "Sudden death, 'excited delirium,' and issues of force: Part III: Behavioral Cues and Response Plan for Sudden and In-Custody Deaths." (2006, July-August). *Police & Security News,* 44-49.

139. "Highlights From the 2006 TASER Conference." (2006, July-August). *Police & Security News,* 56-59.

140. "Sudden Death, 'Excited Delirium,' and Issues of Force: Part IV: A Blueprint for Forensic Investigators." (2006, September-October). *Police & Security News.*

141. "Management Issues in law Enforcement Litigation." (2006, October). *AELE Police Civil Liability.* Park Ridge, IL: Americans for Effective Law Enforcement.

142. "In-Custody Death and Injuries." (2006, October). *AELE Police Civil Liability.* Park Ridge, IL: Americans for Effective Law Enforcement.

143. "The Aftermath of an Event." (2006, October). *AELE Police Civil Liability.* Park Ridge, IL: Americans for Effective Law Enforcement.

144. "Sudden Death, 'Excited Delirium,' and Issues of Force: Part V: Preventing Jail Suicide." (2006, November-December). *Police & Security News.*

145. "Psychological Considerations." (January, 2007). *AELE Jail and Prisoner Legal Issues.* Park Ridge, IL: Americans for Effective Law Enforcement.

146. "Sudden and In-Custody Deaths." (February, 2007). *AELE Lethal and Less Lethal Force Workshop.* Park Ridge, IL: Americans for Effective Law Enforcement.

147. "Sudden and In-Custody Deaths." (March, 2007).*AELE Less Lethal and Less Lethal Force CD.* Park Ridge, IL: Americans for Effective Law Enforcement.

148. "Sudden Death, 'Excited' Delirium, and Issues of Force: Jail Suicide."(April/May 2007). *Correction Managers' Report.*

149. "Prescription Drugs, Sudden Death, and Risk Management" (June/July 2007). *Correction Managers' Report.*

150. "Excited Delirium: What Every Chief Needs To Know." (2007, September-October). *Police & Security News.*

151. "*Chattanooga Police Department: Investigative Audit of Use of Force, Agency Oversight, and Training in 'In-Custody Deaths: Final Report.' "* (with Lou Reiter & Steve Rothlein). (November 2007). Indianapolis, IN: Legal & Liability Risk Management Institute.

152. **Recognition, Prevention, Management of Excited Delirium and Sudden and In-Custody Deaths**, Instructor Workbook v.3.0. (2008, February). Henderson, NV: Institute for the Prevention of In-Custody Deaths.

153. Science, Logic, and the Law. Book chapter in forthcoming book.

154. "Excited Delirium, Sudden and In-Custody Deaths." (March, 2008). *AELE Less Lethal and Less Lethal Force CD.* Park Ridge, IL: Americans for Effective Law Enforcement.

**SCRIPTS:**

1. Defensive Tactics With Flashlights. Produced by Alan Popkin. Directed by Drew Michaels. 45 min. Wild Wing Productions, 1986. Videocassette.

2. Tactical Handcuffing: Part I. Produced by Marc Knutson. Directed by Rick Eisleben. 60 min. M & C Productions, 1986. Videocassette.

3. Tactical Handcuffing: Part II. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1986. Videocassette.

4. Basic Defense With Flashlights. Produced by Alan Popkin. Directed by Drew Michaels. 20 min. Wild Wing Productions, 1987. Videocassette.

5. Basic Tactical Handcuffing: Part I Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

6. Basic Tactical Handcuffing: Part II. Produced by Marc Knutson. Directed by

Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

7. LaChoy: Menu of Fortune. Produced by Marc Knutson. Directed by Rick Eisleben. 45 min. M & C Productions, 1987. Videocassette.

8. Realistic Firearm Disarming: Part I. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

9. Realistic Firearm Retention: Part II. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

10. Defensive Tactics With Mini-Flashlights. Produced by Marc Knutson. Directed by Rick Eisleben. 90 min. M & C Productions, 1987. Videocassette.

11. Realistic Side-Handle Baton Techniques: Part I. Produced by Marc Knutson. Directed by Rick Eisleben. 60 min. M & C Productions, 1987. Videocassette.

12. Realistic Side-Handle Baton Techniques: Part II. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987.

13. Mission Possible. Produced by Marc Knutson. Directed by Rick Eisleben. M & C Productions, 1987.

14. Basic Firearm Disarming. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

15. Basic Firearm Retention. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

16. Basic Mini-Flashlight (Kubotan) Techniques: Part I. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

17. Basic Mini-flashlight (Kubotan) Techniques: Part II. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

18. Basic Side-Handle Baton: Part I. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

19. Basic Side-Handle Baton: Part II. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

20. Basic Side-Handle Baton: Part III. Produced by Marc Knutson. Directed by Rick Eisleben. 30 min. M & C Productions, 1987. Videocassette.

21. REFAST Dynamic Tactical Firearms Training System: Promotional Video
    Tape. Produced by John G. Peters, Jr. Directed by Rick Eisleben. 30
    min. Impact Productions, Inc., 1989. Videocassette.

22. REFAST Dynamic Tactical Firearms Training System: Operational Video
    Training Manual. Produced by John G. Peters, Jr. Directed by Rick Eisleben. 45
    min. Impact Productions, Inc., 1989. Videocassette.

23. ASP Tactical Baton. Produced by John G. Peters, Jr. Directed by Susan
    Sherman. 60 min. Impact Productions, Inc., 1989. Videocassette.

24. Defensive Tactics With Electronic Restraints. Produced by John G. Peters,
    Jr. Directed by Susan Sherman. 45 min. Impact Productions, Inc., 1989.
    Videocassette.

25. Kubotai. Produced by Takayuki Kubota. Directed by Val Malochevic. 30
    min. International Karate Association, 1990. Videocassette.

26. Tactical Flashlight: An Introduction. Produced by John G. Peters, Jr.
    Directed by Susan Sherman. 90 min. Impact Productions, division of
    Reliapon Police Products, Inc. 1991. Videocassette.

27. Defensive Tactics With Chemical Aerosol Sprays. Produced by John G.
    Peters, Jr. Directed by Susan Sherman. 50 min. Reliapon Police Products, Inc.,
    1992. Videocassette.

28. BodyGuard: Personal Protection with Chemical Aerosol Sprays. Produced by
    John G. Peters, Jr. Directed by Susan Sherman. 30 min. Reliapon Police
    Products, Inc., 1992. Videocassette.

29. Stop Exposing Yourself: Reducing Personal Risk Through Leather Gloves.
    Produced by John G. Peters, Jr. Directed by Susan Sherman. 30 min. Reliapon
    Police Products, Inc., 1992. Videocassette.

30. Pneu-Gun, Ballistic Baton: An Introduction. Produced by John G. Peters, Jr.
    Directed by Susan Sherman. 10 min. Reliapon Police Products, Inc.,
    1992. Videocassette.

31. Prevention and Management of In-Custody Death. Produced by John G.
    Peters, Jr. Directed by John G. Peters, Jr. and Mark Myers. 45 min. American
    Handcuff Co, Inc., 1998. Videocassette.

32. Response to Sexual Harassment: Organizational Victory or Checkmate? Produced
    by John G. Peters, Jr. Directed by David A. Donovan and John G. Peters, Jr. 42
    min. Millersville University, 2002. Videocassette.

33. The Old Woodshed. Produced by John G. Peters, Jr. Directed by David A. Donovan and John G. Peters, Jr. Commemorative Intercourse, 2004. Videocassette & DVD.

34. Commemorative Intercourse (PA):1754-2004. Produced and written by John G. Peters, Jr. Directed by David A. Donovan and John G. Peters, Jr. Commemorative Intercourse, 2004. Videocassette & DVD.

35. Intercourse (PA) 250th Celebration & Heritage Parade. Produced by John G. Peters, Jr. Directed by John G. Peters, Jr. Commemorative Intercourse, 2004. Videocassette & DVD.

36. Intercourse (PA) 200th Celebration: 1954. Produced by John G. Peters, Jr. Directed by Alvin Smoker and John G. Peters, Jr. (forthcoming, Winter 2005). Videocassette & DVD.

37. Tactical OC®. Produced by John G. Peters, Jr. Directed by David A. Donovan and John G. Peters, Jr. (forthcoming, 2007). DVD.

38. Identification, Prevention, Management, and Investigation of Sudden and In-Custody Deaths. Produced by John G. Peters, Jr. Directed by John G. Peters, Jr. (forthcoming, 2007). DVD.

**Cassette Recordings:**

1. Berman, A. David, & Peters, Jr., John G. (Speakers). (1995). Officer safety update. Millersville, PA: Defensive Tactics Institute, Inc.

2. Berman, A. David, & Peters, Jr., John G. (Speakers). (1995). Lesson guides and performance-based testing. Millersville, PA: Defensive Tactics Institute, Inc.

3. Adams, J. T., & Peters, Jr., John G. (Speakers). (1998). Prevention and Management of Sudden In-Custody Death. Millersville, PA: Defensive Tactics Institute, Inc.


**On-line Course Development:**

1. "Certified Online Facilitator ." *Neumann College*, 2006.

2. "Developing Online Courses." *Neumann College*, 2006.

3. "Master Syllabus: Emergency Management." *Walden University*, 2004.

4. "Critical Thinking." (Course Developer.) Regent University, 2003.

5.      "Police Organizational Culture." (Course Developer with Dr. Julian Timothy
        Adams). *Capella University*, 2002.

6.      "Vocational Psychology." (Course Developer with Dr. Wayland Secrest).
        *Capella University*, 2002.

7.      "Organizational Psychology." (Course Collaborator with Dr. Karen Yasgoor).
        *Capella University*, 2001.

**PowerPoint® Presentations:**

"Sudden, In-Custody Deaths." Americans for Effective Law Enforcement, Lethal & Less Lethal
        Force Workshop: San Francisco, CA. (March 2008).

"Excited Delirium and Crisis Intervention Training." California P.O.S.T. workshop: San Jose,
        CA (February 2008).

"Recognition, Prevention, Management of Excited Delirium and Sudden and
        In-Custody Deaths: Version 3.0." (2008, February).      Henderson, NV: Institute
for      the Prevention of In-Custody Deaths.

"Sudden, In-Custody Deaths." Americans for Effective Law Enforcement, Lethal & Less Lethal
        Force  Workshop: Las Vegas, NV. (March 2007).

"Excited Delirium." Southern California Jail Manager's Association: Santa Paula, CA. (January
        2007).

"Excited Delirium, Sudden Death, Jail Suicide, and Suicide by Cop." Montana Association of
        Cities and Counties Conference: Billings, MT. (January 2007).

"Psychological Considerations." AELE Jail and Prisoner Legal Issues Workshop: Las Vegas,
        NV. (January 2007).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force,
        Risk Management and Legal Strategies Seminar: Toronto, Canada (December 2006).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force,
        Risk Management and Legal Strategies Seminar: Montgomery, AL. (December 2006).

"Investigating Excited Delirium, Sudden Death, and Jail Suicide." P.A.T.C. Western Training
        Conference: Las Vegas, NV. (November 2006).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force,
        Risk Management and Legal Strategies Seminar: Oakland, CA (November 2006).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force, Risk Management and Legal Strategies Seminar: Chicago, IL (October 2006).

"In-Custody Death and Injuries." AELE Police Liability Workshop: Las Vegas, NV. (October 2006).

"Management Issues in Law Enforcement Litigation." AELE Police Liability Workshop: Las Vegas, NV. (October 2006).

"The Aftermath of an Incident." AELE Police Liability Workshop: Las Vegas, NV. (October 2006).

"IPICD Specialist Program." Institute for the Prevention of In-Custody Deaths, Inc. Specialist Program: Henderson, NV. (September 2006).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force, Risk Management and Legal Strategies Seminar: Colorado Spring, CO. (August 2006).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force, Risk Management and Legal Strategies Seminar: Cleveland, OH (June 2006).

"Sexual Harassment: Findings in the Local Government Workplace." AGRIP Pooling Session 1132, PRIMA Conference: Las Vegas, NV. (June 2006).

"Excited Delirium, Sudden Death, and Jail Suicide." FBI National Academy GraduateS—Utah Conference: St. George, UT. (May 2006).

"Suicide by Cop." FBI National Academy Graduates—Utah Conference: St. George, UT. (May 2006).

"Cause and Effect." TASER® International Conference: Las Vegas, NV. (May 2006).

"Excited Delirium and Sudden Death." TASER® Master Instructor Conference: Las Vegas, NV. (May 2006).

"Identification, Prevention, and Management of In-Custody Deaths." ILEETA Conference: Chicago, IL. (April 2006).

"Ethics." Harrah's Entertainment, Inc.: Las Vegas, NV. (April 2006).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force, Risk Management and Legal Strategies Seminar: Santa Ana, CA. (March 2006).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force, Risk Management and Legal Strategies Seminar: Scottsdale, AZ (January 2006).

"Operationalizing Theory Into Practice: Sudden & In-Custody Deaths." TASER® Use of Force, Risk Management and Legal Strategies Seminar: Scottsdale, AZ (December 2005).

"Identification, Prevention, Management, and Investigation of Sudden In-Custody Deaths, V.2." Institute for the Prevention of In-Custody Deaths, Inc. (October 2005).

"Identification, Prevention, Management, and Investigation of Sudden In-Custody Deaths, V.1." Institute for the Prevention of In-Custody Deaths, Inc. (July 2005).

John G. Peters, Jr., M.B.A., Ph.D., CLS has testified in the following cases during the last four years (2005, 2006, 2007, 2008 to date):

**2005**

Stiebling v. Sheriff Harry Lee, et al.      X            X
New Orleans, LA
Plaintiff: use-of-force

Shah v. District of Columbia            X
Washington, DC
Plaintiff: driving
**2006**

Workman v. Tangue Verde Unified
School District, et al.                                      X
U.S. District Court
Tuscon, AZ
Plaintiff: handcuffing; use-of-force
Nunez v. San Joaquin County, et al.      X            X
Contra Costa County, California
Plaintiff: excited delirium

Adams v. West Coast Protection
and Patrol, et al                          X            X
Oakland, California
Plaintiff: use-of-force

Quinette v. Henry Lee, et al             X
New Orleans, LA
Plaintiff: driving

Calhoun v. City of Chicago, et al.       X
Circuit Court of
Cook County, Illinois
No: 02-L-11289
Plaintiff: shooting; use-of-force

Zivonivich v. Collier County Sheriff's Dept. X

530

U.S. District Court
Middle District of Florida
Fort Myers Division
No: 2:05-CV-263-FtM-29SPC
Defense: TASER; use-of-force

| **2006** | **Deposition** | **Trial** |
|---|---|---|
| Elcholtz v. TASER International, Inc. U.S. District Court Northern District of Texas Fort Worth Division No: 4-05-CV-487-Y Defense: TASER; use-of-force; product warnings | X | |

**2007**

| | | |
|---|---|---|
| Antonio Burg v. City of Philadelphia Court of Common Pleas Philadelphia County, Pennsylania No: 0802 Plaintiff: handcuffing; use-of-force | X | |
| Heston, et al. v. TASER International, Inc. U.S. District Court Northern District of California San Jose Division No: C05-03658JW Defense: TASER; use-of-force; product warnings | X | |
| Pamela Denczak-Henderhan v. Jackson Township Police Department, et al. Court of Common Pleas Stark County, Ohio No: 2006-CV-01606 Defense: sexual harassment | | X |

**2008**

| | | |
|---|---|---|
| Ketcham v. Swak Trucking, et al. Ada County District Court | X | |

531

Boise, Idaho
No: CV-PI-0611736
Defense: use-of-force

Metcalf, et al. v. Leon County
Sheriff's Department, et al.                                    X
U.S. District Court
Northern District of Florida
No: 4:07-CV-73-RH/WCS
Defense: use-of-force; TASER

Whittier v. City of Sunrise, et al.          X
U.S. District Court
Southern District of Florida
No.: 07-60476-CIV
Plaintiff: use-of-force

Lisa Peterson v. TASER International, Inc.
U.S. District Court
District of Nevada
No.: CV-001450JCM-RJJ
Defense; warnings; training

532