United States District Court
For the Northern District of California

1

2

3

4

5

6

7          IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                    SAN JOSE DIVISION

10   Elvira Teran, et al.,                    NO. C 06-06947 JW

11              Plaintiffs,                    **ORDER DENYING DEFENDANT TASER
                                               INTERNATIONAL, INC.'S MOTION FOR
12        v.                                   SUMMARY JUDGMENT; GRANTING
                                               THE MONTEREY DEFENDANTS'
13   County of Monterey, et al.,               MOTION FOR SUMMARY JUDGMENT**

14              Defendants.
                                        /

15                    **I.  INTRODUCTION**

16        Elvira Teran ("Teran") and Stephanie Lizaola ("Lizaola"), as *guardian ad litem* for Angela

17   Alyssa Teran, Jennifer Lisette Teran and Briana Isabel Teran (collectively, "Plaintiffs") bring this

18   action against the County of Monterey and various other Monterey officials,[1] and TASER

19   International, Inc. ("TASER"), alleging civil rights violations and products liability as a result of the

20   death of Jaime Teran Coronel ("Coronel").  Coronel died six days after being drive-stunned by

21   Monterey deputy sheriffs with a taser gun on the roof of a home in Castroville, California.

22

23

24

25  ────────────────

26        [1] Other Monterey County Defendants are the Monterey County Sheriff's Department,
     Monterey County Sheriff Michael Kanalakis, various individual Monterey County deputy sheriffs
     and one sheriff's sergeant (collectively, "Monterey Defendants").  The individual deputy sheriffs are
27   Brandon Smith ("Smith"), Warren Sano ("Sano"), Michael Darlington ("Darlington"), Benjamin
     Payton ("Payton"), Brian Hoskins ("Hoskins") and Emily Howlett ("Howlett").  The individual
28   sheriff's sergeant is Denis Greathead ("Greathead").

1    Presently before the Court is Defendant TASER's Motion for Summary Judgment[2] and the

2    Monterey Defendants' Motion for Summary Judgment.[3]  The Court conducted a hearing on

3    February 9, 2009.  Based on the submitted papers to date and oral argument, the Court DENIES

4    Defendant TASER's Motion for Summary Judgment and GRANTS the Monterey Defendants'

5    Motion for Summary Judgment.

6                              **II.  BACKGROUND**

7    **A.    Undisputed Facts**

8         On the evening of January 24, 2006, Monterey County Sheriff's deputies Smith and Sano

9    were dispatched to 11367 Del Monte Avenue #A in Castroville, California, to respond to a report of

10   a prowler.[4]  Before the deputies arrived, they were informed that the prowler had climbed on top of a

11   roof across the street.  (Sano Depo. at 13.)  After checking with the person who originally called

12   about a suspicious person and performing an area check, Smith and Sano saw Coronel lying across

13   the crest of an A-frame roof.  (Sano Depo. at 17; Liberty Decl., Ex. E, Deposition of Deputy

14   Brandon Smith at 34, hereafter, "Smith Depo.")

15        Deputy Howlett, the third deputy to arrive, was ordered to remain on the ground and keep an

16   eye on Coronel's position on the roof.  (Sano Depo. at 14-15.)  Sano and Smith then climbed a

17   ladder to the roof to approach Coronel.  (Id. at 16-17.)  Sano reached down to jostle and shake

18   Coronel because he was motionless, and said something to the effect of "Hey, buddy."  (Id. at 17.)

19   _____

20        [2] (Notice of Motion and Motion of TASER International, Inc. for Summary Judgment and/or
     Adjudication of Issues on First Amended Complaint, hereafter, "TASER Motion," Docket Item No.
21   66.)  In connection with this motion, TASER also filed a Motion to Exclude Expert Opinions, or in
     the Alternative for a Daubert Hearing of Dr. Byron Lee.  (Notice of Motion and Motion of
22   Defendant TASER International, Inc. to Exclude Expert Opinions and Testimony of Dr. Byron Lee,
     or, in the Alternative, for Daubert Hearing, hereafter, "TASER Motion to Exclude," Docket Item
23   No. 71.)

24        [3] (Monterey County Defendants' Notice of Motion and Motion for Summary Judgment or in
     the Alternative, for Summary Adjudication, hereafter, "Monterey Motion," Docket Item No. 62.)
25
          [4] (Declaration of Michael D. Liberty in Opposition to Monterey County Defendants' Motion
26   for Summary Judgment or in the Alternative for Summary Adjudication of Issues, hereafter,
     "Liberty Decl.," Ex. F, Deposition of Deputy Warren Sano at 13-14, hereafter, "Sano Depo.,"
27   Docket Item No. 81.)

28                                       2

Coronel reacted violently by swinging his arms and legs, and pounding his fists on the rooftop. (Sano Depo. at 17, 20; Smith Depo. at 26.)  Sano and Smith then backed away while Sano drew his Taser M26 ECD weapon and held it pointed toward Coronel.  (Sano Depo. at 21.)

Deputy Hoskins then arrived around the same time as fire and ambulance personnel.  (Sano Depo. at 21.)  Hoskins initially remained on the ground, while Coronel began to "flop around"–repeatedly standing up, taking a few steps, laying down, getting back up on his knees and yelling at the deputies.  (Id. at 23.)  Hoskins, joined by deputies Darlington and Payton, climbed onto the roof with Sano and Smith.  (Id.)  After all five deputies were on the roof, Coronel continued to "flop around."  (Id.)

The fire and medical personnel began staging the ground below, while the deputies told Coronel to calm down and come toward the ladder.  (Sano Depo. at 23-24.)  Coronel did not comply. (Id.)  Sano and Darlington formulated a plan to wait until Coronel laid down on his stomach, and then the deputies would surround him, drop to their knees to avoid being pushed off the roof, and place Coronel in handcuffs.  (Id. at 24.)  Once Coronel was handcuffed, he could be placed in a litter and brought down from the roof.  (Id.)  The plan called for Payton to grab Coronel's left arm, Sano to grab the right arm, Smith to grab his legs and Darlington to grab his head and torso.  (Liberty Decl., Ex. C, Deposition of Deputy Michael Darlington at 40, hereafter, "Darlington Depo.") Deputy Hoskins' job was to cover the other deputies by having his taser ready for use.  (Darlington Depo. at 40; Liberty Decl. Ex. D, Deposition of Deputy Bryan Hoskins at 46, hereafter, "Hoskins Depo.")

The deputies surrounded Coronel, and when he laid down on his stomach, each of the deputies dropped down on their knees and put their plan into effect.  (Sano Depo. at 24.)  Payton was able to pull Coronel's left arm from underneath his body within a few seconds, but Sano was unable to pull Coronel's right arm out from underneath Coronel's body.  (Id. 24-25.)  During the deputies' struggle with Coronel, Hoskins deployed his taser in drive-stun mode on Coronel's upper shoulder area.  (Hoskins Depo. at 49-50; Smith Depo. at 34.)  The drive-stun taser applied electricity

3

United States District Court
For the Northern District of California

1   to Coronel for five seconds.  (Smith Depo. at 35.)  After approximately ten seconds, Hoskins used

2   his taser on Coronel a second time in drive-stun mode.  (Id. at 36.)

3        After Coronel had been tased twice, the deputies were able to handcuff him.  (Smith Depo. at

4   36.)  Sergeant Greathead, joined the deputies on the roof and held Coronel's legs while leg restraints

5   were brought onto the roof from Greathead's car.  (Darlington Depo. at 59-60; Liberty Decl., Ex. G,

6   Deposition of Sheriff's Sergeant Denis Greathead at 36, hereafter, "Greathead Depo.")  Darlington

7   placed Coronel's legs in the leg restraints.  (Darlington Depo. at 60.)  Coronel was placed in a litter

8   while on the roof and then lowered down with the help of fire personnel.  (Greathead Depo. at 38.)

9        Coronel's vital signs were checked by the fire and emergency medical personnel on the

10  ground, and it was determined that he did not have a pulse.[5]  Coronel's handcuffs were removed

11  while CPR was performed.  (Greathead Depo. at 43.)  Coronel received medical treatment for

12  approximately 15 to 20 minutes before he was transported to the hospital.  (Greathead Depo. at 43.)

13  While in the hospital, a drug screen was conducted, and it was determined that Coronel had non-

14  quantified amounts of methamphetamine and cocaine in his urine.[6]  Coronel died six days later on

15  January 31, 2006.  (First Amended Complaint ¶ 6, hereafter, "FAC," Docket Item No. 31.)

16  **B.    Procedural Background**

17        Plaintiffs originally filed this action in California Superior Court on September 16, 2006.

18  (See Docket Item No. 1.)  On November 7, 2006, Defendants removed this action to federal court

19  pursuant to 28 U.S.C. § 1331.  (Id.)  On October 22, 2007, Plaintiffs filed their First Amended

20  Complaint, alleging eleven causes of action:

21

22  _____

23      [5]  (Declaration of Traci A. Kirkbride in Support of Monterey County Defendants' Motion for
    Summary Judgment, hereafter, "Kirkbride Decl.," Ex. E, Deposition of Deputy Emily Howlett at 17,
24  hereafter, "Howlett Depo.," Docket Item No. 63.)

25      [6]  (Declaration of Michael D. Liberty in Opposition to 1) TASER International, Inc.'s Motion
    for Summary Judgment and/or Adjudication of Issues on the First Amended Complaint; and 2)
26  TASER International, Inc.'s Motion to Exclude Expert Opinions and Testimony of Dr. Byron Lee,
    or, in the Alternative, for Daubert Hearing Ex. H at 2, hereafter, "Liberty TASER Decl.," Docket
27  Item No. 76.)

28                                          4

**United States District Court**
For the Northern District of California

| | Cause of Action | Defendants |
|---|---|---|
| 1 | Negligence | Deputies Smith, Sano, Darlington, Payton, Hoskins and Howlett; Sergeant Greathead |
| 2 | Assault and Battery | Deputies Smith, Sano, Darlington, Payton, Hoskins and Howlett; Sergeant Greathead |
| 3 | Violations of Civil Rights pursuant to 42 U.S.C. § 1983 | Deputies Smith, Sano, Darlington, Payton, Hoskins and Howlett; Sergeant Greathead |
| 4 | Violations of Civil Rights pursuant to 42 U.S.C. § 1983 | County of Monterey, Monterey Sheriff's Department and Michael Kanalakis in his official capacity |
| 5 | Violations of Civil Rights pursuant to 42 U.S.C. § 1983 | Michael Kanalakis in his individual capacity |
| 6 | Wrongful Death | All Defendants |
| 7 | Strict Products Liability | TASER |
| 8 | Negligence | TASER |
| 9 | Wrongful Death | TASER |
| 10 | Survival Action | County of Monterey, Monterey Sheriff's Department, Michael Kanalakis; Deputies Smith, Sano, Darlington, Payton, Hoskins and Howlett; Sergeant Greathead |
| 11 | Negligent Training and/or Supervision | County of Monterey, Monterey Sheriff's Department and Michael Kanalakis |

Presently before the Court are Defendants' Motions for Summary Judgment.

### III.  STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses."  Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

5

United States District Court

For the Northern District of California

1       The moving party "always bears the initial responsibility of informing the district court of

2   the basis for its motion . . . ." Id. at 323.  "The judgment sought should be rendered if the pleadings,

3   the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

4   as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

5   P. 56(c).  The non-moving party "may not reply merely on allegations or denials in its own pleading;

6   rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts

7   showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

8       When evaluating a motion for summary judgment, the court views the evidence through the

9   prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby

10  Inc., 477 U.S. 242, 255 (1986).  The court draws all reasonable inferences in favor of the non-

11  moving party, including questions of credibility and of the weight that particular evidence is

12  accorded. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992).  The court

13  determines whether the non-moving party's "specific facts," coupled with disputed background or

14  contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.

15  T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987).   In such a case,

16  summary judgment is inappropriate. Anderson, 477 U.S. at 248.  However, where a rational trier of

17  fact could not find for the non-moving party based on the record as a whole, there is no "genuine

18  issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

19                              **IV.  DISCUSSION**

20  **A.      TASER's Motions**

21      Defendant TASER moves for summary judgment on the sole ground that the opinion of

22  Plaintiffs' expert, Dr. Byron Lee ("Dr. Lee"), must be disregarded, eliminating Plaintiffs' ability to

23  produce any evidence creating a triable issue of fact that Coronel's death was caused by his being

24  tased. (TASER Motion at 10-11.)  Thus, TASER's Motion for Summary Judgment operates in

25  tandem with TASER's Motion to Exclude.

26

27

28                                      6

United States District Court

For the Northern District of California

1       On February 25, 2009, TASER notified the Court that Dr. Lee had withdrawn as an expert in

2   this case.  (See Docket Item No. 129.)  Plaintiffs respond that they are actively seeking and

3   interviewing other potential experts for their case.[7]  (See Docket Item No. 130.)  Since Dr. Lee's

4   report is no longer an issue, the Court considers whether summary judgment is appropriate in the

5   absence of Dr. Lee's testimony.

6       To establish products liability under either a strict liability or negligence theory, a plaintiff

7   must establish that a defendant's product caused the plaintiff's injury.  Thomas v. Lusk, 27 Cal.

8   App. 4th 1709, 1716 n.3 (1994).  With respect to medical causation, a plaintiff must establish to a

9   "reasonable medical probability based upon competent expert testimony" that the defendant's

10  conduct contributed to the plaintiff's injury.  Bockrath v. Aldrich Chemical Co., 21 Cal. 4th 71, 79

11  (1999); Rutherford v. Owens-Illinois, 16 Cal. 4th 953, 968-69 (1997).  In addition, a coroner's report

12  may be admissible for identifying a cause of death.  See LeBlanc v. City of Los Angeles, No. C 04-

13  8250 SVW, 2006 WL 4752614, at *6, n.4 (C.D. Cal. Aug. 16, 2006).

14      In this case, TASER has provided expert opinions that conflict with both Dr. Lee's and the

15  coroner's reports.  However, since Dr. Lee's report is no longer at issue, the Court examines the

16  coroner's report to determine whether it creates trial issues for the jury.  The coroner's report lists

17  "taser application and struggle with police" as "contributing conditions" to Coronel's death.

18  (Liberty TASER Decl., Ex. H at 3.)  Contrary testimony has been given by Dr. Jeffrey D. Ho, one of

19  TASER's experts:[8]

20          Based on my review of the totality of the documentation listed above, as well as my
            professional education, experience and background, it is my opinion, to a reasonable degree

21

22

23  _____

24      [7] The Court declines to comment on the propriety of Plaintiffs' ability to introduce new
    experts at this stage of litigation.  The Court encourages the parties to meet and confer on this issue
25  and if the parties are unable to resolve the dispute, Plaintiffs may file a motion for leave to submit
    alternative expert reports.

26
        [8] Although TASER has submitted the opinions of multiple experts to challenge Plaintiffs'
27  evidence, the Court relies on Dr. Ho's declaration to illustrate that there are triable issues.

28                                              7

United States District Court
For the Northern District of California

1  of medical probability, that the use of the Taser ECD did not cause or contribute to Mr.
Cornel's death.[9]

2

3  It is also my opinion that, to a reasonable degree of medical probability, that the factors of
chronic illicit drug abuse, illicit drug intoxication, continued delirious behavior and
underlying metabolic acidosis directly contributed to Mr. Coronel's death and his inability to
survive the cascade of events following his initial resuscitation.  (Ho Decl. ¶ 23.)

4

5  Based on this evidence, a reasonable jury could believe the opinion stated in the coroner's report

6  over the opinions presented by TASER's experts.  Ultimately, a credibility determination will need

7  to be made regarding the causes of Coronel's death.  Thus, the Court finds there is a genuine issue of

8  material fact as to whether Coronel's death was caused by the use of a taser in drive-stun mode.

9  Accordingly, the Court DENIES Defendant TASER's Motion for Summary Judgment and

10  DENIES its Motion to Exclude Dr. Lee's report as moot.

11  **B.**     **The Monterey Defendants' Motion**

12     **1.**     **Title 42 U.S.C. § 1983 Claims**

13  The Monterey Defendants move for summary judgment on Plaintiffs' Third, Fourth and Fifth

14  Causes of Action under § 1983 on various grounds.  The Court considers each basis in turn.

15         **a.**     **Standing**

16  The Monterey Defendants move for summary judgment on the ground that Teran, Coronel's

17  mother, and Coronel's three children lack standing to bring this suit.  (Motion at 11-12.)  The

18  Monterey Defendants contend that Teran, Coronel's mother, lacks standing because she cannot

19  bring a claim on behalf of Coronel and she has not alleged a wrongful death action to vindicate her

20  own rights.  (Motion at 11.)  The Monterey Defendants contend that Coronel's children lack

21  standing because the First Amended Complaint makes no allegation that Lizaola and Coronel's three

22  children have suffered loss of consortium, loss of companionship, loss of familial relations or loss of

23  support.  (Motion at 12.)

24

25  _____

26  [9]  (Declaration of Jeffrey D. Ho, in Support of 1) TASER International, Inc.'s Motion for
Summary Judgment; and 2) TASER International, Inc.'s Motion to Exclude Expert Opinions and
Testimony of Dr. Byron Lee, or, in the Alternative for Daubert Hearing ¶ 22, hereafter, "Ho Decl."
27  Docket Item No. 67.)

28                                              8

**United States District Court**
For the Northern District of California

In § 1983 actions, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. 42 U.S.C. § 1988(a); <u>Moreland v. Las Vegas Metro. Police Dept.</u>, 159 F.3d 365, 369 (9th Cir. 1998). Under Cal. Code Civ. Proc. § 377.30, a survival action may be commenced by a decedent's personal representative or, if none, by the decedent's successor-in-interest. The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law allows for such an action and that she meets the state's requirements. <u>Moreland</u>, 159 F.3d at 369.

Under the Due Process Clause of the Fourteenth Amendment, both the parents and children of a person killed by a government officer have standing to assert claims for their own deprivations of liberty arising out of their loss of consortium. <u>Moreland</u>, 159 F.3d at 371; <u>Smith v. City of Fontana</u>, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled in part on other grounds by* <u>Hodgers-Durgin v. De La Vina</u>, 199 F.3d 1037, 1041 (9th Cir. 1999).

With respect to their rights to bring an individual claim under the Fourteenth Amendment, Plaintiffs allege that Teran "is the mother, lawful heir and/or the lawful successor-in- interest to [Coronel]." (FAC ¶ 7.) Plaintiffs also allege that "Angela Alyssa Teran, Jennifer Lisette Teran, and Briana Isabel Teran are the legal heirs of [Coronel] and have the legal right through their guardian *ad litem* to maintain this lawsuit for, *inter alia*, wrongful death," and that Lizaola is the guardian *ad litem* of Coronel's three children. (FAC ¶ 8-11.) Further, Plaintiffs allege under each § 1983 cause of action that both Coronel and Plaintiffs suffered damages. The Monterey Defendants fail to direct the Court to any case law requiring a plaintiff to specifically allege that their injury is in the form of loss of consortium. Thus, the Court finds that Plaintiffs have adequately alleged their own loss and have standing to assert their own § 1983 claim under the Fourteenth Amendment.

With respect to Plaintiffs' standing to bring a claim on behalf of Coronel, Teran has the burden of showing that she qualifies as a successor-in-interest under California law. To do so, she must provide evidence showing that she was financially dependent on Coronel. <u>See</u> Cal. Code Civ.

9

1   Proc. § 377.60; Chavez v. Carpenter, 91 Cal. App. 4th 1433, 1445 (2001).  Plaintiffs, however,

2   provide no such evidence.  Coronel's children, on the other hand, do have standing to bring a claim

3   on Coronel's behalf without having to provide evidence of dependency.  See Cal. Code Civ. Proc. §

4   377.60.  Thus, the Court finds Coronel's children have standing to assert his § 1983 claim, through

5   their guardian Lizaola.

6        Accordingly, the Court finds that it should not rely on the ground that Plaintiffs lack standing

7   as a basis for granting summary judgment to the Monterey Defendants.

8                    **b.        Fourth Amendment Violation**

9        The Monterey Defendants move for summary judgment on Plaintiffs' Third, Fourth and Fifth

10  Causes of Action for violations of § 1983 on the ground that the individual deputies did not violate

11  Coronel's Fourth Amendment rights.  (Motion at 16, 21.)

12       A claim that law enforcement officers used excessive force, either deadly or non deadly, in

13  the course of an arrest, investigatory stop, or other seizure of a citizen is to be analyzed under the

14  Fourth Amendment and its standard of objective reasonableness.  See Blanford v. Sacramento

15  County, 406 F.3d 1110, 1115 (9th Cir. 2005); Quintanilla v. City of Downey, 84 F.3d 353 (9th Cir.

16  1996); see also Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003); Robinson v.

17  Solano County, 278 F.3d 1007, 1009 (9th Cir. 2002) (en banc).  The Fourth Amendment

18  reasonableness standard requires a court to balance the amount of force applied against the need for

19  the use of that force.  Billington v. Smith, 292 F.3d 1177, 1185 (9th Cir. 2002).

20       The determination of reasonableness must "be judged from the perspective of a reasonable

21  officer on the scene, rather than with the 20/20 vision of hindsight," and must "embody allowance

22  for the fact that police officers are often forced to make split-second judgments–in circumstances

23  that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a

24  particular situation."  Graham v. Connor, 490 U.S. 386, 396-97 (1989); Drummond, 343 F.3d at

25  1058; Billington, 292 F.3d at 1182; Robinson, 278 F.3d at 1009.  In the Ninth Circuit, the

26

27

28                                    10

1    availability of alternative methods of capturing or subduing a suspect is also taken into

2    consideration.  <u>Smith v. City of Hemet</u>, 394 F.3d 689, 703 (9th Cir. 2005) (*en banc*).

3         In <u>Heston v. City of Salinas</u>, this Court noted that the use of tasers or stun guns to effectuate

4    an arrest has not been determined as *per se* excessive or unconstitutional.  <u>See</u> No. C 05-03658 JW,

5    slip op. at 8 (N.D. Cal. Dec. 20, 2007).  Courts have found the use of these devices to be reasonable

6    in certain circumstances and excessive in others.[10]  The relevant cases highlight the fact-intensive

7    and case-specific nature of the inquiry.  However, with respect to whether excessive force was used,

8    courts generally consider  (1) the "type and amount of force inflicted," <u>Drummond</u>, 343 F.3d at

9    1056; (2) the threat posed by the suspect and the severity of the crime at issue, <u>City of Hemet</u>, 394

10   F.3d at 702-703; and (3) balancing the severity of the force against the minimal need to use the

11   force, and in doing so considers, (a) whether the suspect resisted arrest or attempted to flee and (b)

12   the availability of less intrusive means.  <u>Id.</u> at 703-704; <u>Santos v. Gates</u>, 287 F.3d 846, 854 (9th Cir.

13   2002).

14        In this case, the Monterey Defendants contend that the physical force used to subdue Coronel

15   and the tasing of Coronel were reasonable because Coronel violently resisted arrest from a rooftop at

16   night time, which presented a risk of someone falling off the roof.  (Monterey Motion at 17.)

17   Plaintiffs contend that, under the circumstances, the multiple tasings and use of positional

18   asphyxiation on Coronel were excessive.[11]  The Court considers the deputies' actions under the

19   three prong analyses articulated above.

20

21

22        [10]  <u>See</u> <u>Michenfelder v. Sumner</u>, 860 F.2d 328 (9th Cir. 1988); <u>Compare</u> <u>Draper v Reynolds</u>,

23   369 F.3d 1270 (11th Cir. 2004) <u>and</u> <u>Schumacher v. Halverson</u>, 467 F. Supp. 2d 939 (D. Minn. 2006)

     <u>with</u> <u>Williams v Franklin County, Ohio Sheriff's Department</u>, 619 N.E.2d 23 (Ohio Ct. App. 1992);

24   <u>see also</u> <u>Sanders v. City of Fresno</u>, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008) (collecting cases

     indicating that tasers are generally considered less than lethal force, and finding that use of a taser

25   was "intermediate force").

26        [11]  (Plaintiff's Memorandum of Points and Authorities in Opposition to Monterey County

     Defendants' Motion for Summary Judgment at 13, 16, hereafter, "Monterey Opposition," Docket

27   Item No. 79.)

28                                                     11

**United States District Court**
For the Northern District of California

1

### i.      The Type and Amount of Force Inflicted

2

The first issue to consider is the "type and amount of force inflicted." <u>Drummond</u>, 343 F.3d

3

at 1056.  The Ninth Circuit has held that a use of force is considered deadly if it "creates a

4

substantial risk of causing death or serious bodily injury." <u>City of Hemet</u>, 394 F.3d at 706.  Here, it

5

is undisputed that Hoskins was the only deputy who used his taser on Coronel.[12]  At the time that

6

Hoskins used his taser on Coronel, deputies Sano, Smith, Darlington and Payton had initiated the

7

use of force by grabbing Coronel when he rolled onto his stomach, attempting to restrain his limbs,

8

head and torso in an effort to place him in handcuffs.  (Darlington Depo. at 52.)  Payton pulled

9

Coronel's left arm behind his back, but Sano struggled to pull his right arm out from underneath

10

him.  (Sano Depo. at 24.)  After about fifteen seconds of watching the other deputies struggle with

11

Coronel, Hoskins deployed his taser in drive-stun mode, issuing five seconds of electricity to

12

Coronel's body.  (Darlington Depo. at 50-51; Hoskins Depo. at 51.)  Ten seconds later, Hoskins

13

deployed his taser in drive-stun mode a second time because Coronel did not react to the first tasing.

14

(Smith Depo. at 35-36, 51-53.)

15

In the Ninth Circuit, it has not been clearly established that the <u>City of Hemet</u> standard

16

applies to taser weapons.  There is no evidence that deputy Hoskins knew his two drive-stun mode

17

taser stuns would reasonably likely cause injury or death to Coronel.  The undisputed evidence is

18

that deputy Hoskins twice used his taser against Coronel in the drive-stun mode.  At the time of the

19

first stun, Coronel was continuing to struggle and he was doing so with four deputies attempting to

20

subdue him to remove him safely from the rooftop.  There is no evidence that a similarly situated

21

reasonable police officer would not have administered a drive-stun under those circumstances.  The

22

second stun was administered when the first stun did not induce compliance and when it appeared to

23

the officers that Coronel was still resisting.  Again, there is no evidence that a similarly situated

24

reasonable police officer would not have administered the second stun.

25

26

27

[12]  (Kirkbride Decl., Ex. I, Declaration of Deputy Bryan Hoskins ¶ 7, hereafter, "Hoskins Decl.")

28

United States District Court

For the Northern District of California

ii.     **The Threat Posed by Coronel**

The second issue to consider is the threat posed by Coronel to the deputies and others.  <u>City</u> <u>of Hemet</u>, 394 F.3d at 702.  With respect to whether the deputies felt that Coronel posed a serious threat to himself and to them, deputy Hoskins submits a declaration explaining as follows:

> I deployed my taser in drive-stun mode on Mr. Coronel when I noticed that one of my fellow deputies that was surrounding Mr. Coronel, Deputy Brandon Smith, was getting very close to the edge of the roof and I was concerned that Deputy Smith might be kicked off the roof by Mr. Coronel's kicking.  In addition, Mr. Coronel kept telling us that the had been shot.  I could not confirm this, but I knew that if Mr. Coronel had been shot, we needed to get him subdued as soon as possible in order to get him medical treatment.

(Hoskins Decl. ¶ 8.)  Hoskins also testified in his deposition that "factors that led me to conclude the use of the taser as being appropriate was that my training, that told me that when you have a noncompliant suspect that the [t]aser is a viable tool to gain compliance, and overcome resistance." (Hoskins Depo. at 48.)  Coronel "was showing abnormal strength . . . which caused me great concern because we were on an elevated platform. . . .  We still didn't know whether he was shot. And so we needed to get him medical treatment as soon as we could."  (Hoskins Depo. at 48-49.)

Moreover, Deputy Smith testified in his deposition as follows:

> I remember hearing the guys saying he's not complying, he's not giving–he's not giving up his arms, and we were trying to communicate with each other what was going on at the time. And I was still trying to keep his legs under control while he–he tried to kick underneath me and I was–I was basically trying to control him but I could hear the other guys, they were in the middle of a pretty hard struggle in order to get his arms. . . .

> I believe after the second drive-stun he gave up his arms or his–he finally gave up his arms. . . . I know at the end of the final drive-stun that Coronel finally gave up his arms and we were able to safely handcuff him.

(Smith Depo. at 35-36.)

In this regard, Plaintiffs point out that pursuant to Monterey County Sheriff's Office General Order No: 74 ("General Order 74"), which details the Sheriff's Department's policies on using a taser, that "[p]rior to firing the Taser the deputy should, when feasible, issue a warning that the Taser is going to be discharged (i.e. shouting TASER! TASER!)," and "[i]t is not advisable to deploy the Taser in the following circumstances unless all other means short of lethal force have been used . . . Extreme height."  (<u>See</u> Liberty Decl., Ex. A at 4.)  Plaintiffs contend Hoskins' failed

13

to follow these directives.  Although Hoskins used his taser on Coronel without warning Coronel, there was nothing about his training which would have brought to the mind of a reasonable police officer that a warning was necessary under the circumstances.  General Order 74 provides for a warning if "feasible."  (Liberty Decl., Ex. A at 3-5.)  This gives discretion to police officers to judge whether compliance might be gained if a suspect is advised that a taser is going to be deployed.  There is no evidence to support a finding that under the circumstances, a reasonable police officer would have believed that a warning might have caused Coronel to comply with the officers who were attempting to bring him under control.

Plaintiffs emphasize that it is undisputed that the deputies were investigating only a suspected prowler, Coronel was not armed and that, at the time he was stunned, he was laying on his stomach.  (Opposition at 16.)  However, equally undisputed is that the events were taking place during the night-time on a rooftop.  The suspected prowler did not comply with the deputies' instructions.  The deputies observed him reacting violently by swinging his arms and legs, and pounding his fists on the rooftop; and with four officers attempting to subdue him, the suspect continued to resist and was "flopping" around.   The undisputed circumstances posed a danger for the police officers and the suspect.  After he was down and continued to resist, no reasonable jury could find that it was unreasonable to drive-stun him to overcome his continuing resistance.

        **iii.**       **Balance Between the Severity of the Force Applied and the Need to Use Force**

The third factor to consider is the balance between the severity of the force applied and the need to use force.  Under this factor, the Court considers whether there were attempts to resist arrest and the availability of less intrusive means for taking the suspect into custody.  It is undisputed that Coronel resisted arrest.  It is also undisputed that the deputies did not have less intrusive means for subduing Coronel.

The Court finds that there is no genuine factual issue with respect to the drive-stun use of the taser and finds on the basis of the undisputed facts that the use did not constitute excessive force.

1    Accordingly, the Monterey Defendants' are entitled to summary adjudication on that issue in their

2    favor as a matter of law.  The Court proceeds to consider other bases of the motion.

3                    **iv.      Deputies Sano, Smith, Darlington and Payton**

4            In the alternative, Plaintiffs contend that deputies Sano, Smith, Darlington and Payton are

5    liable because they contributed to Coronel's death by inducing positional asphyxiation and

6    excessively beating him.[13]  (Monterey Opposition at 13, 16.)

7            Plaintiffs only evidence in this regard is a declaration of Lizaola describing Coronel's

8    appearance when she arrived at the hospital the night of the incident at issue.  Lizaola states, "I

9    visually saw that [Coronel] had been beaten severely; he had a cut above the right eyebrow, had

10   blood on his hands, bruises on the right side, cuts on his legs and rocks in between his teeth."[14]

11   Attached to Lizaola's declaration are photographs of Coronel taken the night of his altercation with

12   the deputies.  (Lizaola Decl., Ex. A.)  The only evidence concerning Coronel's possible asphyxiation

13   during his struggle with the deputies is Hoskins' admission that had his knee placed on top of

14   Coronel while the other deputies wrestled with him, and the coroner's report indicated that

15   Coronel's struggle with the police was a condition contributing to his death.  (See Hoskins Depo. at

16   5; Liberty TASER Decl., Ex. H at 3.)

17          The Court finds that Lizaolo's declaration describing post-incident observation insufficient

18   to counter evidence by the deputies that Coronel was violently swinging his arms and legs, and

19   pounding his first on the rooftop even before they approached him to try and subdue him.  Further,

20   although the coroner's report indicated that Coronel's struggle with the police was one of the factors

21   contributing to his death, absent from the report is any evidence that Coronel was severely beaten.

22

23   _____

24          [13]  The Court notes that the Monterey Defendants object to Plaintiffs' positional asphyxiation
     theory because it never came up until Plaintiffs opposed the present motion and that it was not a

25   subject of discovery.

26          [14]  (Declaration of Stephanie Lizaola in Opposition to Monterey County Defendants' Motion
     for Summary Judgment or in the Alternative for Summary Adjudication ¶ 9, hereafter, "Lizaola

27   Decl.," Docket Item No. 83.)

28                                               15

United States District Court
For the Northern District of California

1    The Court finds that there is no genuine factual issue with respect to the conduct of deputies

2    Sano, Smith, Darlington and Payton and finds that they did not use excessive force.  Accordingly,

3    these Defendants are entitled to summary judgment in their favor with respect to all claims which

4    are based on a claim that they used excessive force.

5                           **v.        Deputies Howlett and Greathead**

6        The Monterey Defendants contend that summary judgment is appropriate with respect to

7    deputies Howlett and Greathead on the ground that Plaintiffs have no evidence showing that they

8    used any force on Coronel.  (Monterey Motion at 16-17.)

9        In a § 1983 action, a plaintiff must demonstrate that the defendant personally participated in

10   the alleged denial of rights because there generally is no liability based on *respondeat superior* or

11   other theories of vicarious liability.  Monell v. Dep't of Soc. Serv. of the City of New York, 436

12   U.S. 658 (1978); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  However, "a supervisor is

13   liable for the constitutional violations of subordinates 'if the supervisor participated in or directed

14   the violations, or knew of the violations and failed to act to prevent them.'"  Hydrick v. Hunter, 466

15   F.3d 676, 689 (9th Cir. 2006).  In addition, a plaintiff must allege and prove a causal connection.

16   Rizzo v. Goode, 423 U.S. 362, 370-71 (1976); Hydrick, 466 F.3d at 689.  If there is no affirmative

17   link between the defendant's conduct and the alleged injury, the defendant is not liable for any

18   deprivation of the plaintiff's constitutional rights.  Rizzo, 423 U.S. at 370-71.

19       It is undisputed that Howlett, although the third deputy to arrive on the scene, never climbed

20   onto the roof or participated in any use of force against Coronel.  With respect to Sergeant

21   Greathead, he did not arrive on the scene and climb onto the roof until after Plaintiff had been tased,

22   restrained and handcuffed.  (Opposition at 7.)  Greathead's participation was limited to holding

23   Coronel's legs and assisting the other deputies and fire personnel in placing Coronel's legs in leg

24   restraints and lowering him off the roof in a litter.  (Greathead Depo. at 36-37.)  Moreover, Plaintiffs

25   do not present any evidence, for instance, that Greathead participated in any sort of cover-up after

26

27

28                                              16

1  the incident with Coronel.[15]  Thus, Plaintiffs fail to provide any evidence that would allow a

2  reasonable jury to conclude that deputies Howlett or Greathead personally participated in any

3  excessive use of force against Coronel.

4       Accordingly, Defendants Howlett and Greathead are entitled to summary judgment in their

5  favor.[16]  Having disposed of Plaintiffs' excessive force claims, the Court proceeds to consider the

6  Monterey Defendants' other bases for summary judgment.

7            **c.    Due Process Violation**

8       The Monterey Defendants move for summary judgment as to Teran and the children's due

9  process claims under § 1983.  The Monterey Defendants contend that none of the deputies engaged

10  in an arbitrary abuse of power that "shocks the conscience."  (Monterey Motion at 18.)

11      Both parents and children of a decedent may assert claims on behalf of themselves under §

12  1983 for a state's conduct that interferes with their liberty interest in those relationships.  Smith, 818

13  F.2d at 1418.  Such claims arise out of the Fourteenth Amendment's guarantee of substantive due

14  process.  See Moreland, 159 F.3d at 371.  The Ninth Circuit has characterized the substantive due

15  process claim as raising a "cognizable liberty interest," with which "the state has no legitimate

16  interest in interfering . . . through the use of excessive force," adding that "[s]uch an action [on the

17  part of the state] constitutes the very sort of affirmative abuse of government power which the

18  substantive protections of the due process clause are designed to prevent."  City of Fontana, 818

19  F.2d at 1419-20.  In other words, it was the decedent's excessive force claim that gave rise to the

20  children's substantive due process claim.  However, the Ninth Circuit has not clearly indicated that a

---

[15]  Police can be liable under § 1983 if their attempts to cover up the conduct of other officers is causally connected to the plaintiff's failure to prevail against those other officers under § 1983. See Karim-Panahi v. Los Angeles Police Department, 839 F.2d 621, 625 (9th Cir. 1988).

[16]  Although the Monterey Defendants' Motion only addresses deputies Howlett and Greathead individually under Plaintiffs' § 1983 action, the Court finds that, for the reasons addressed here, summary judgment is appropriate as to Defendants Howlett and Greathead with respect to all claims asserted against them.

United States District Court
For the Northern District of California

1   finding that a decedent's Fourth Amendment rights were not violated precludes the parents or

2   children of the decedent from asserting a Fourteenth Amendment substantive due process claim.

3        Thus, the Court must consider whether the evidence shows that the deputies' conduct

4   violated a constitutional right, and, if so, whether the right was clearly established.  The deputies'

5   conduct would be 'conscience-shocking,' and would constitute a substantive due process violation,

6   only if they acted with the purpose of causing harm.  See Moreland, 159 F.3d at 372.  Following the

7   Ninth Circuit's reasoning in Moreland, the Court finds that the "purpose to harm" standard is

8   applicable in the present case, and finds further that there is no constitutional violation under that

9   standard.  As discussed in the Fourth Amendment context, the deputies were confronted with a

10  rapidly changing environment whereby a possible suspect refused to come down from a rooftop and

11  was observed to be hurting himself by pounding his own fists into the rooftop.  While Coronel was

12  unarmed, he was on top of an A-frame roof and any sudden or exaggerated movement might have

13  caused him to fall off the rooftop.  Once the deputies were on the rooftop themselves, they not only

14  had to worry about Coronel's safety but also their own safety.  Thus, the Court finds that no

15  reasonable jury could find that the deputies acted with the "purpose of causing harm."

16       Accordingly, the Court finds that the Monterey Defendants are entitled to summary judgment

17  as to Plaintiffs' Fourteenth Amendment theory under § 1983.

18       **2.    Liability of the County of Monterey, the County Sheriff's Department and Michael Kanalakis**

19

20       The Monterey Defendants move for summary as to the County of Monterey, the County

21  Sheriff's Department and Sheriff Kanalakis on the ground that Plaintiffs have no evidence that they

22  caused any constitutional deprivations through customs, policies or practices.  (Monterey Motion at 22.)

23

24       A public entity defendant cannot be held liable for a § 1983 violation caused by an individual

25  employee's actions under a theory of respondeat superior.  Monell, 436 U.S. at 694.  To be liable,

26  the defendant must act as a "lawmaker[ ] or . . . [one] whose edicts may fairly be said to represent

27  official policy."  Id. at 691.  Under Monell, municipal liability must be based upon enforcement of a

28                                                        18

municipal policy or custom that causes the deprivation of a plaintiff's constitutional right, and not upon the municipality's mere employment of a constitutional tortfeasor.  Id.  To maintain a § 1983 claim against a public entity defendant or a supervisor not personally involved in the alleged violation, a plaintiff must allege that his or her constitutional injury resulted from a policy, practice or custom of the local entity.  Id.  "While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights."  Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994).  Thus, municipal defendants cannot be held liable when no constitutional violation has occurred.  Id.  Similarly, liability as a supervisor depends upon whether the supervisor "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury."  Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998).

In this case, the Court has found that the deputies did not violate Coronel or Plaintiffs' constitutional rights.  Thus, there is no predicate violation upon which the County of Monterey and Sheriff Kanalakis' liability can attach.[17]  Accordingly, the Court finds that the County of Monterey and Sheriff Kanalakis are entitled to summary judgment as to Plaintiffs' Monell claims.

_____

[17] With respect to Plaintiffs' suit against the County Sheriff's Department, the Court finds that the department is not the proper Defendant in this case.  Under § 1983, a "person" acting under color of law may be sued for violations of the U.S. Constitution or federal laws.  The term "persons" under § 1983 encompasses state and local officials sued in their individual capacities, private individuals and entities which acted under color of state law, and local governmental entities.  Vance v. County of Santa Clara, 928 F. Supp. 993, 995-96 (N.D. Cal. 1996).  But "persons" do not include municipal departments.  Id.  Thus, "[n]aming a municipal department as a defendant is not an appropriate means of pleading a § 1983 action against a municipality."  Stump v. Gates, 777 F. Supp. 808, 816 (D.Colo. 1991).  Accordingly, the Court DISMISSES the County Sheriff's Department from this action as an improper Defendant.

With respect to Plaintiffs' suit against Sheriff Kanalakis, he is being sued in both is individual and official capacities.  Under § 1983, an official-capacity suit represents "only another way of pleading an action against an entity of which an officer is an agent."  Monell, 436 U.S. 658 at 690 n.55.  Thus, any official capacity claims against Sheriff Kanalakis are really claims against the government entity—the County of Monterey.  See Hafer v. Melo, 502 U.S. 21, 25 (1991).  Accordingly, claims against Sheriff Kanalakis in his official capacity are DISMISSED with prejudice.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  |  **3.     Plaintiffs' State Law Claims**

2  The Monterey Defendants move for summary judgment on Plaintiffs' state law causes of

3  action[18] on the ground that they are immune from liability pursuant to California's Government

4  Code §§ 820.2 and 820.4.  (Monterey Motion at 19-20.)

5  California Government Code § 820.2 provides:

6     Except as otherwise provided by statute, a public employee is not liable for an injury
   resulting from his act or omission whether the act or omission was the result of the exercise
7     of discretion vested in him, whether or not such discretion be abused.

8  California Government Code § 820.4 provides:

9     A public employee is not liable for his act or omission exercising due care, in the execution
   or enforcement of any law.

10 Under these statutes, police officers are immune from liability under state law for all state law

11 claims for acts in their discretion except for claims for false arrest, false imprisonment, or excessive

12 force.  See Robinson, 278 F.3d at 1016; Scruggs v. Haynes, 252 Cal. App. 2d 256, 264 (Cal. Ct.

13 App. 1967).

14
   In this case, Plaintiffs' negligence, assault and battery claims are asserted against all
15 deputies.  Plaintiffs' negligent training or supervision claim is asserted against the County, the

16 Sheriff Department and Sheriff Kanalakis.  However, the Monterey Defendants are alleged to have

17 committed acts within their discretion.  Thus, the only claim that Plaintiffs allege for which the

18 Monterey Defendants would not receive immunity under California law is the excessive force.  The

19 Court finds that Plaintiffs' excessive force claims are subsumed in their assault and battery claims.

20
   In California, a battery claim against a police officer performing official duties is analyzed
21 under the reasonableness standard of the Fourth Amendment.  "[A] prima facie battery by a police

22 officer is not established unless and until the plaintiff proves unreasonable force was used."  Edson

23 v. City of Anaheim, 63 Cal. App. 4th 1269, 1273 (Cal. Ct. App. 1998); see also Saman v. Robbins,

24 173 F.3d 1150, 1157 fn.6 (9th Cir. 1999).  As discussed above in the Fourth Amendment context,

25

26
   [18]  Plaintiffs First, Second, Sixth, Tenth and Eleventh Causes of Action are brought pursuant
27 to California law.

28                                                20

the Court finds that the actions of the deputies which led to Coronel's death were not unreasonable. Thus, the deputies did not commit assault and battery and there is no predicate claim for which the County, the Sheriff Department and the Sheriff may be vicariously liable.

Accordingly, the Court finds that the Monterey Defendants are entitled to summary judgment as to all of Plaintiffs' state law claims.

## V.  CONCLUSION

The Court DENIES TASER's Motion to Exclude Expert Opinions as moot.

The Court DENIES TASER's Motion for Summary Judgment.

The Court GRANTS the Monterey Defendants' Motion for Summary Judgment as to Plaintiffs' First, Second, Third, Fourth, Fifth, Sixth, Tenth and Eleventh Claims.  Pursuant to Federal Rule of Civil Procedure 54(b), the Court finds good cause for severing the claims against the Monterey Defendants from those of Defendant TASER.  Thus, an interlocutory judgment in favor of the Monterey Defendants shall be entered accordingly without further delay.

Dated:  May 20, 2009

_____
JAMES WARE
United States District Judge

United States District Court
For the Northern District of California

21

**United States District Court**
For the Northern District of California

1

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2  Michael A Brave brave@laaw.com
   Michael David Liberty mdlaw@pacbell.net
3  Mildred Katherine O'Linn mko@mmker.com
   Traci A. Kirkbride kirkbrideta@co.monterey.ca.us
4

5  **Dated:  May 20, 2009**                          **Richard W. Wieking, Clerk**

6
                                                   **By:   /s/ JW Chambers**
7                                                        **Elizabeth Garcia**
                                                        **Courtroom Deputy**
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28